## WESTERN DISTRICT,

### 1857.

————o————

## COUNTY OF ANDROSCOGGIN.

————o————

### The State vs. George Knight.

In all challenges to the jury for cause, the ground of challenge must be distinctly stated and entered upon the record.

By the provision of the Constitution of the Commonwealth of Massachusetts, it was indispensable that a doctrine of the common law of England should have been adopted and approved, and actually practiced upon in courts in the colony, province or state, in order to render them obligatory; and this provision declaring what laws shall remain in force excludes all others.

The common law practice in England in relation to triors in a challenge to the jury for favor, has been superseded by satisfactory provisions of statutes under the different forms of government in Massachusetts.

Challenges of jurors are allowed in criminal as in civil causes, and for similar reasons, and the court is the only tribunal which the statute has provided for their trial, whether they be principal challenges or challenges to the favor.

A question which may be answered in a manner to disclose evidence given before the grand jury cannot be proper.

A witness cannot be called upon to state his testimony given on a former occasion in a trial where the same evidence is relevant.

It is proper for a surgical expert who examined a wound to give his opinion of the character of the instrument that produced it.

State v. Knight.

A witness possessing scientific skill may properly be inquired of whether there be a distinction—chemical, physical or microscopic—between the qualities of human blood and that of any animal.

A diagram approximating to perfect representation, when exhibited by a witness qualified to give explanation, may be used to illustrate his meaning.

The result of scientific knowledge and experience is proper for the consideration of the jury.

The court will not determine the truth or absurdity of such facts. If untrue their fallacy is to be shown by evidence of other experts who have made application of their scientific knowledge and experience.

The jury are not bound to disregard the testimony of a witness which they fully believe, because it is inconsistent with the evidence of another called by the same party; and the evidence tending to show the mistake of the witness, being properly before the jury, is the subject of legitimate argument.

Where the unlawful killing is proved, and there is nothing to explain, qualify or palliate the act, the law presumes it to have been done maliciously, and the burden is upon the accused to rebut the presumption.

Instructions in law applicable to the evidence in the case, should always be given, on request, but a judge is not bound to give them in the language used by the counsel making the request, nor to repeat them when requested, if once given.

The judge may properly refuse to give a requested instruction involving no question of law.

The defendant was tried and convicted of murder in the first degree, before Rice, Justice, upon the following indictment:

The jurors for said State upon their oath present that George Knight, of Poland, in the county of Androscoggin, laborer, on the sixth day of October, in the year of our Lord one thousand eight hundred and fifty-six, with force and arms, at said Poland, in said county of Androscoggin, in and upon one Mary Knight, of said Poland, she, the said Mary Knight, then and there being a human being, and she then and there being in the peace of said State, feloniously, wilfully, and of his express malice aforethought, did make an assault; and that he, the said George Knight, with a certain knife, which he then and there in his right hand had and

held, her, the said Mary Knight, in and upon the throat of her, the said Mary Knight, then and there, feloniously, wilfully, and of his express malice aforethought, did strike, cut, stab and thrust, giving to the said Mary Knight, then and there, with the knife aforesaid, in and upon the throat of her, the said Mary Knight, one mortal wound, of the length of five inches, and of the depth of three inches;—of which said mortal wound, the said Mary Knight, then and there instantly died.

And so the jurors aforesaid, upon their oath aforesaid, do say, that the said George Knight, her, the said Mary Knight, in manner and form aforesaid, then and there, feloniously, wilfully, and of his express malice aforethought, did kill and murder:—against the peace and dignity of the State aforesaid, and contrary to the form of the statute in such cases made and provided.

And the jurors aforesaid, upon their oath aforesaid, do further present:—that the said George Knight, at Poland aforesaid, in the county aforesaid, in a certain bed-room within a certain dwelling-house then and there occupied by the said George Knight and Mary Knight, there situate, on the sixth day of October last past, in and upon the said Mary Knight, feloniously, wilfully, and of his malice aforethought, did make an assult; and her, the said Mary Knight, in and upon the throat of her, the said Mary Knight, with some cutting instrument and weapon, to the jurors unknown, then and there, feloniously, wilfully, and of his malice aforethought, did strike, cut, stab and thrust, and deprive of life; giving to the said Mary Knight, then and there, with the instrument and weapon aforesaid, in and upon the throat of her, the said Mary Knight, one mortal wound, of the length of five inches, and of the depth of three inches;—of which said mortal wound, said Mary Knight, then and there, instantly died.

And so the jurors aforesaid, upon their oath aforesaid, do say, that the said George Knight, her, the said Mary Knight, in manner and form aforesaid, then and there, feloniously,

wilfully, and of his malice aforethought, did kill and murder; against the peace of the State aforesaid, and contrary to the form of the statue in such case made and provided.

When the name of the first juror was called, the counsel for the defendant challenged him for favor, and demanded triors to be appointed, according to the course of the common law, to hear and determine the question as to his indifference and impartiality. But the presiding justice denied the demand for triors, and ruled that in all cases of challenge for cause, whether for favor or otherwise, the question of indifference or impartiality must be heard and determined by the court, and the juror was sworn to make true answers, and was examined by the counsel on both sides, whether he had given or formed any opinion, or was sensible of any bias, prejudice or particular interest in the cause, and also whether he stood indifferent between the State and the defendant; and after the hearing, the court ordered the juror to be set aside, and another to be called in his stead, for the trial of the defendant.

Subsequently, when another juror was called, the counsel for the defendant challenged him for cause, and again demanded triors as aforesaid, which were refused by the presiding justice, and the juror was sworn and examined as before; and the court determined that the juror was indifferent, and refused to set him aside, whereupon the defendant challenged the juror peremptorily.

The forty-seven jurors first named in the list were called before the panel was made complete, and the right of peremptory challenge of the prisoner was exhausted when the forty-sixth juror was called. The judge stated to the counsel for the defendant, after the second demand for triors was made, that it would not be necessary to repeat the demand, as the point would be saved for the full court, whether the defendant, in such cases, had a right to demand triors, or whether it was the province of the court to hear and determine the matter. Other challenges for cause were made by

the defendant, before the panel was completed; some of which were allowed and others were disallowed, on hearing before the presiding judge, under the ruling aforesaid. The government relied entirely upon circumstantial evidence to prove the guilt of the defendant.

The defendant's counsel requested the presiding judge to give the following instructions to the jury:

1. That the burden of proof is upon the government, to prove the whole charge as laid in the indictment.

2. That it is incumbent upon the government to prove the death of Mary Knight on or about the sixth of October, 1856, and in the manner and by the means alleged in the indictment, and also to identify the body found of the said Mary Knight.

3. That after the death of the said Mary Knight is proved, and the identity of her body is established by the evidence in the case, that then it is necessary for the government to prove that the said Mary Knight came to her death by the unlawful act of another person.

4. That " the possibility of reasonably accounting for the fact (her death) by suicide, by accident, or by any natural cause must be excluded by the circumstances proved."

5. That " it is only when no other hypothesis will explain all the conditions of the case and account for all the facts, that it can be safely and justly concluded that it (the death) has been caused by intentional injury."

6. That if the jury do not find from the evidence in the case that the said Mary Knight came to her death " by the unlawful act of another," that then the defendant must be acquitted.

7. That if the jury find from the evidence that the said Mary Knight came to her death by the unlawful act of another, that the question whether or not the act was perpetrated by the defendant, is a question entirely for the consideration of the jury, under all the circumstances proved in the case.

8. That to entitle the government to a verdict in its favor,

the guilt of the prisoner must be proved by the evidence in the case, "beyond all reasonable doubt."

9. That the jury are required by law to consider the defendant innocent until he is proved by the evidence of the case to be guilty, "beyond all reasonable doubt."

10. That the defendant is presumed to be innocent until he is proved to be guilty by the evidence in the case, "beyond all reasonable doubt."

11. That in order to warrant a verdict of guilty, the evidence must be sufficient to overcome the presumption of innocence, and to establish the guilt of the defendant "beyond reasonable doubt."

12. That the jury are required by law to enter upon the examination and consideration of the evidence in the case, on the basis that the defendant is presumed to be innocent until he is proved to be guilty, "beyond all reasonable doubt."

13. That the jury are required by law to examine and consider the evidence on the basis that the defendant is presumed to be innocent until he is proved guilty, "beyond any reasonable doubt."

14. That in examining and considering the evidence, the jury are bound to give the defendant the benefit of the legal presumption that he is innocent until he is proved guilty, and that before a verdict of guilty can be rendered against him, the jury must be satisfied of his guilt by the evidence in the case, "beyond any reasonable doubt."

15. That in cases depending entirely upon circumstantial evidence, "each fact necessary to the conclusion (that the defendant is guilty) must be proved by competent evidence, "beyond any reasonable doubt."

16. That the government is bound (in such cases) to prove every single circumstance which is essential to the conclusion, in the same manner and to the same extent, as if the whole issue rested upon the proof of each individual and essential circumstance.

17. That "it is essential, in circumstantial evidence, that

the circumstances from which the conclusion is drawn should be fully proved."

18. That "it is essential, in circumstantial evidence, that all the facts should be consistent with the hypothesis."

19. That it is essential, in circumstantial evidence, that the circumstances should be of a conclusive nature and tendency.

20. That "such evidence is always insufficient, where, assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true."

21. That "it is essential (in circumstantial evidence) that the circumstances should, to a moral certainty, exclude every hypothesis but the one proposed to be proved."

22. That "in order to justify the inference of legal guilt from circumstantial evidence, the existence of the inculpatory facts must be *absolutely incompatible* with the innocence of the accused, and *incapable* of explanation upon any other reasonable hypothesis than that of his guilt."

23. That the law makes it the duty of the jury to consider whether the connection betwixt the circumstances proved, and the crime charged, is a *necessary one* or only *casual* and *contingent;* and whether the circumstances proved *necessarily* involve the guilt of the prisoner or only *probably* so."

24. That when circumstantial evidence "merely establishes some finite probability in favor of one hypothesis, rather than another, such evidence cannot amount to proof, (of guilt,) however great that probability may be."

25. That "in criminal cases the mere union of a limited number of independent circumstances, each of which is of an imperfect and inconclusive nature, *cannot* afford a just ground for conviction."

26. That whenever mere inconclusive probabilities concur, the result, however the degree of probability may be increased by the union, will *still* be of a definite and inconclusive nature."

27. That the government, by calling and examining Lydia Knight, has accredited her as a competent and credible wit-

State *v.* Knight.

ness, and is thereby *estopped* to deny or call in question either her competency or credibility.

28. That the government, by calling and examining Lydia Knight as a witness, has accredited her as a witness of sufficient intelligence to testify in this case, and is thereby *estopped* to deny or call in question that fact.

29. That "the legal presumption of innocence is to be regarded by the jury, in every case, as a matter of evidence, to the benefit of which the party is entitled."

30. That "in order to convict the defendant upon the evidence of circumstances, it is necessary, not only that the circumstances all concur to show that he committed the crime, but that they *all* be inconsistent with any other rational conclusion."

31. That no conviction in a criminal case ought ever to take place on circumstantial evidence, where the government has introduced direct evidence tending to show that the defendant could not have committed the crime charged.

32. That direct evidence introduced by the government, tending to prove the innocence of the defendant, "shall not be held refuted, from being opposed to circumstances incongruous with that evidence."

33. That the theory that the blood of animals, such as the ox or the sheep, can be discriminated from that of man, when in a dried state, by chemical means, is too uncertain to be used as evidence, or to be relied on as evidence, in this case.

34. That the theory that the blood of the ox, or of the sheep, can be distinguished from that of a human being, when in a dried state, by microscopic observation, is too uncertain to be used as evidence, and the difference in size of the globules is too slight to be relied on as evidence in this case.

35. That the distinction between positive and negative testimony is applicable to direct testimony, and cannot be applied to circumstantial evidence, when placed in direct conflict with positive testimony.

The first twenty-nine requested instructions were given to the jury, and the remaining six were not given as requested.

*Dr. Augustus A. Hayes*, Assayer to the Commonwealth of Massachusetts, and a scientific expert, being called for the government, testified: " I have made chemical and microscopic examinations of the articles before me, (knife, shirts, &c.) My attention was especially called to spots said to be blood. Most persons present are acquainted with the first appearance of blood, as it issues from the wound or opening of the living body, as a deep red fluid.   At the instant of leaving the body, it may be considered as a part of the organization, becoming rapidly changed by exposure to the air.   In the lapse of from three to ten minutes of time, the fluid becomes changed ; the process of coagulation commences ; and in some twenty or thirty hours after organic life ceases in it, and it follows the laws of ordinary fluids containing solid matter—i. e., its fluid and volatile portions escape, and the solid parts are left. Blood is not a uniform fluid, but consists of a fluid holding in suspension two or three distinct bodies.   One of these bodies (which distinguishes it from all other fluids) has received the name of blood globules ; and these are always present in the blood of man and the higher orders of the animal creation. When we examine recent blood, these globules, then colored red, appear suspended in a fluid of a light yellowish color."

The witness here exhibited a diagram to the jury, and desired to use it to illustrate his testimony.   To which the counsel for the prisoner objected.   But the court overruled the objection, and ruled that the witness might use it as a matter of illustration ; and the following diagrams were shown to the jury ; to which the counsel of the prisoner excepted ; and the witness proceeded :

" The first diagram exhibits recent blood, as seen through a microscope ; second, coagulating of blood ; third, recent blood, to which water has been added ; fourth, blood to which a saline solution has been added.

" Although these parts are called globules, they are not spherical bodies : but, in the higher animals, have the form

of discs, compressed at their centres, so as to become con-cave; not unlike the form of two watch crystals, with their rounded surfaces applied to each other, and the space formed by their edges being filled and rounded—compressed at the centre, so as to be thin at that point. And these appearances, nearly, are preserved after full and complete drying. After the drying of blood has taken place, and some time has elapsed, the red color of the mass remaining is nearly lost; being suc-ceeded by a dark brown color; especially when it has been received upon iron or steel. After a thorough drying of a covering of blood, the form of the covering remains the same, although the color is changed. The form of the disc is pre-served in the dry blood.

" Blood which has been dried on iron or steel, when exposed in thin portions, under the microscope, presents the appear-ance of a large number of these discs or globules, cemented together by a light yellow body, not unlike glue or gum. The form of the discs can be distinctly seen, as separate from everything else. When to the dry blood, we apply a little of the solution of corrosive sublimate, or bi-chloride of mercury, the blood discs then come fully into view, and may be even measured. The simple addition of water often sus-pends the discs, and renders transparent the other parts of the blood, so that the form of the discs can be recognized. Certain physical changes are produced by the addition to the blood, under the microscope, of small portions of chemical re-agents. The changes which follow, serve to identify, under different points of view, small portions of blood which have been dried. The mere observation of the blood discs or globules in a fluid, sufficiently distinguishes it from all other fluids of the body, for ordinary cases. In the more careful examinations, we apply the tests which have been named, and observe the changes produced. In the chemical examinations of blood which has been dried on iron or steel, we carefully separate it from the surface on which it was dried, and dis-solve it in water, or in water with the addition of a little alkali. To remove foreign bodies not dissolved, we pass the

fluid so obtained through one or more thicknesses of paper. The fluid thus separated from matter accidentally present, and especially from any rust of iron, is then, after the addition of a drop of weak acid, brought nearly to the boiling point, when a coagulation of the fluid takes place. The colored portions of the blood, with most of the animal matter present, separate after repose, and fall to the bottom of the vessel. The blood thus divided into its solid and fluid parts, is examined through the action of other bodies upon it. Taking the fluid portion that is above that which has fallen, we examine it for a compound of iron.

"We also examine it for certain saline bodies, and, finally, for a small portion of animal matter. Returning to that portion which has fallen from the fluid by the action of heat, we dissolve the whole in a small portion of alkaline water; and a certain change is then produced. We obtain a fluid, which, viewed by reflected light, is pale red, or light reddish brown. On reversing the mode of viewing it, so as to permit the light to pass through it, and looking through the solution, a greenish hue is observed. This effect of light indicates the true coloring matter of blood, which is thus characterized. The subsequent steps show the presence of albumen and other organic compounds. Albumen is best represented by the white of an egg—a transparent fluid at ordinary temperatures; but when heated to near the boiling point of water, it becomes an opaque, white, solid body. The other organic bodies can, in most cases, be pointed out by the action of metallic salts upon the solution. In regard to the blood upon steel or iron, these observations and experiments have all been made upon it; and I am therefore prepared to state to you, that both physically and chemically, there is nothing wanting to prove the presence of blood upon them, (viz., the knife, &c.)

"I made all these experiments on the substance taken from this knife, and on portions taken from every part of the blade; that in contact with the steel, and that representing the surface of the blood. I concluded from these experiments that the substance upon the blade and handle of the knife was

blood, and that blood of a uniform character; so far as composition is concerned. On different portions of the blade, the blood had dried there, preserving, to a large extent, its red color. That portion of the substance mixed with rust, or the oxide of iron, has the same appearance. There is much less blood adhering to the knife now, than appeared when in my possession. Blood separates very readily from iron and steel. As an explanation, I will add the observation that when a knife is kept so long in the warm blood that the steel blade takes the temperature, the adhesion of the blood afterwards is much more perfect than where it simply flows upon it. In this case the close adhesion of the blood distinctly indicates that the blade was of the temperature of the blood in which it was placed.

" The blood on the clevis was subjected to the same examination which I have described, and the same results, in general, were obtained, as in the case of the knife. I found blood spots on various parts of the clevis; in some cases mixed with rust, and in others quite free from it. It did not present the appearance of blood having flowed upon it, but of having been wiped upon it.

"I subjected this pin to the same tests; and I concluded that blood had been smeared on it. Some small portions still remain. The blood upon this chain and ring was subjected to the same tests and brought out the same results. Each detached portion of blood was carried through all the minute examinations which were described this morning. I arrived at the same general conclusions as in the case of the clevis. Passing the lens over the surface, you will catch a smooth red varnish. I removed from the ring and chain the more distinctly seen portions of blood, for the purposes of my examination. The spots now are very thin. These varnished appearances I know to have been produced by blood. The hook of the chain contained the larger part of the blood upon the chain. Think I cannot point out the spots now. There was less blood upon the chain than upon any other piece examined.

" I noticed no peculiarities in the blood on any one of the articles which would distinguish it from that on the other.   I can distinctly and decidedly distinguish blood spots on iron and steel from rust spots, by the physical examination as given, and the conclusion may be support by the chemical examination given.   An iron compound exists in the blood of all the higher order of animals; and in its organic association it is a characteristic of blood; and we have no other fluid of the animal body which contains a soluble compound of iron as a constituent of the fluid.   The course pointed out in the analysis removes iron from any other source than that of the blood itself.   This compound of blood is called *hœmatine.* It is the coloring part of the blood, and in connection with that the iron is found in its soluble state.   Neither iron rust nor iron which has been exposed to the air, is soluble in water nor in alkali.   Hæmatine is soluble to some extent in water, dissolves freely in alkaline fluids, and the appearance which the alkaline solution of blood presents, when viewed by reflected or transmitted light, is due to its presence.   I can distinguish blood spots from red paint with great ease. A little alkaline water dissolves the oil used in forming the paint, and leaves the red powder or pigment in a dry state, ready to be subjected to the action of tests for the red oxide of iron or red lead, the two pigments usually employed. There is no such substance as the red oxide of iron in the blood.   I distinguished these spots distinctly from red paint. There is no other known substance which gives those reactions which dried blood gives.   I separated dried blood from the knife, the clevis, the pin, the hook of the chain and the large ring.

" I made examinations of two shingles marked No. 1, and one shingle marked No. 3.   These three shingles were subjected to the same tests of observations under the microscope, and separations by chemical means, which I have stated, on the knife and iron articles, with the exception that the blood on the shingles was taken off by water alone—a character which I found to belong to blood which had dried on the

fibrous surface of wood. Blood was found upon the three shingles, and still remains upon them. I arrived at this with certainty. You will observe by the marks that they are outside shingles. I designate the shingles by a little clip which I took from them. The spots have the character of a smear rather than that of a drop of blood. Another shingle, numbered one, has a small portion of blood spread upon its surface. It is also an outside shingle, as I infer from the color. Shingle No. 3 has also blood spread upon it.

"Two other shingles, one marked No. 4, and one No. 2, contained no blood on the surface, but some brown, accidental matter, not blood, a portion of which still remains; had no difficulty at all in distinguishing these spots from the spots on the other shingles. The smear on one of the shingles had a rounded outline; arrived at no conclusion relative to its form, except that it was not produced by a drop, but painted on, so to speak, by some other object.

"The under-shirt which I hold in my hand, is of cotton-flannel, and was the first article of clothing examined. A portion of the fabric of the blood spot on the left arm of the shirt was removed, diminishing the size of the spot one half. The blood obtained from that portion of the fabric removed, was freely dissolved in warm water, leaving the cloth almost colorless. On the solution thus obtained, the microscopic observations before described were made, and the whole course of chemical analysis above described was pursued. I first allude to a peculiarity which the stain itself presents." The counsel of the prisoner objected to the witness describing what he called the peculiarities of the stain; as they, if any such, were open to the observation of the jury. But the court overruled the objection, and the witness stated: "I call the attention of the jury to this spot, as exhibiting, on one side of the fabric, a much larger proportion of the coloring matter of the blood than exists upon the other part, or the surface which was worn next to the skin. I cut a piece from the blood spot, on which the experiment was made.

"I call attention to this point, as it is sustained both by

chemical experiments and microscopic observations. These show that more of the coloring matter exists upon the outer surface of the fabric than can be found on the inner surface, worn next to the skin." To all which the counsel of the prisoner excepted.

The witness further testified: "There is now hardly remaining, but distinctly visible while the shirt was in my possession, a small quantity of blood on the wristband. From the portion of the shirt near the part which has since been removed, I took threads covered with blood, having the character of that on the arm of the shirt. The small portion now remaining has been recognized by me as blood."

The counsel of the government here asked the witness, whether blood flowing directly from the skin upon the shirt, could not have produced such a spot. To which the counsel of the prisoner objected. But the court overruled the objection, and the witness answered: "Blood flowing directly from the skin upon the shirt, could not have produced such a spot." The witness further testified: "The coloring matter of the blood, which is suspended in the blood, remains upon the outer surface of the fabric, the effect being the reverse of that which would have taken place had blood flowed from the arm of the person wearing it."

The counsel of the government then asked the witness the question: "In your opinion, could or not blood flowing directly upon the outer surface of the shirt, have occasioned such a spot?" To which the counsel of the prisoner objected. But the court overruled the objection, and the witness answered: "I think not."

"Blood received directly from a vein would penetrate the fabric more uniformly than in this case. I mean by uniformity, that the coloring matter would be diffused nearly equally throughout the fabric, speaking now of live blood, as it flows from the vein or artery. The spot does not exhibit the appearance presented when a jet of live blood has flowed upon the fabric. Live blood holds, for the instant, a uniformity of

3

composition in its parts, enabling it to permeate and equally saturate a fabric of this description. This remark does not apply to blood which has been for a few minutes exposed to the air. The appearance presented by this spot agrees more closely with that presented when blood is received through a fabric placed over it. Comparative trials were made by covering a surface of this fabric with a thin worn cotton covering. The blood received on the double thicknesses was in part retained by the upper covering, and the spot produced closely resembled this upon the shirt." To all the grounds of opinion as given above, the counsel of the prisoner excepted.

The witness further testified: "My conclusion is, that these spots were produced by blood. The portion of the shirt removed, leaving this opening, (a hole cut where the blood spot was on the arm,) was covered with blood, which had saturated its substance, but to a less extent than that of the flannel shirt. The coloring matter of the blood, and its other constituents, were present, although in very small amount, compared with the quantity obtained from an equal surface of the flannel shirt. I observed that the outer cotton shirt corresponded, when worn, at the spot where it was discolored, nearly, with the spot upon the left arm of the flannel shirt; and the appearances indicated that it had received its portion of blood "—[the counsel of the prisoner *objects;* the court rules that the witness cannot state the particular object from which it received its blood]—" not directly from a flowing vein. There was more blood upon the inner than upon the outer surface of the shirt. I think that blood received upon the outer surface of this shirt could not occasion such a spot as this one before me."

The counsel of the government then asked the witness the question: "Is there a distinction, chemical, physical, or microscopic, between the qualities of human blood and that of any beast?" To which the counsel of the prisoner objected. But the court overruled the objection, and the

witness answered: "There is a distinction, a physical distinction, existing between the blood of man and that of some beasts. I know of no precise chemical distinction."

The witness further testified, that "the physical distinction of the blood of man, as compared with that of some beasts, lies in the fact that the globules which characterize blood, are larger in the blood of man than in the blood of some animals. This admits of demonstration. It is no theory."

The counsel of the government then asked the witness the question: "Have you subjected any of the articles before you to any observations or tests, touching this distinction?" To which the counsel of the prisoner objected. The court overruled the objection, and the witness answered: "I have."

The counsel of the government then asked the witness the question: "Will you please state what those observations and tests were, and their results?" To which the counsel of the prisoner objected. The court overruled the objection, and the witness answered: "I made microscopic observations of the blood on the knife, in comparison with the dried blood of a sheep, also on a steel knife. The observations turned mainly on the relative sizes of the discs or globules in the dried blood from the different sources. I found those in the dried blood on the knife to differ in size so much from those of the dried blood on another knife, as to constitute a clear distinction between the two. If I may be allowed to add, very accurate measurements have been made of the globules of blood of most animals, reptiles, and species of the other orders of animated nature; and those measurements have the same claim to be received as a settled truth, as the measurements of an arc of the meridian.

"My observations did not extend so far as to determine the size of the globules or discs in either case. But they did extend so far as to demonstrate that great differences existed; and to separate, in point of fact, the blood dried upon the knife first presented to the court, from that purposely dried upon another knife, and which had been taken from a sheep. I made a number of examinations at different times,

and upon different portions of the blood from both sources, for determining that the discs or globules varied in size in the blood from the different sources; but I did not include the whole character of blood from the different sources. The result that I arrived at, was, that they differed, and that the globules and discs from the knife first presented, are larger in their dimensions than those of either of the samples from the other source. All the examinations that I made showed this. I concluded that the blood from the two sources was different microscopically." To all of which the counsel of the prisoner excepted.

The counsel of the government then asked the witness the question: "In your opinion, could the blood upon that knife first shown, have flowed from a sheep?" To which the counsel of the prisoner objected. The court overruled the objection, and the witness answered: "My opinion, on a careful microscopic examination, is, that no part of the blood upon that knife flowed from the blood vessels of a sheep. I do not hesitate in expressing that opinion. Upon this knife I first made an examination before any blood was removed. The first examination of the knife showed that a portion near the front had been dulled by coming in contact with some hard body. This portion was about an inch in length; the edge of the knife was turned. I examined it carefully with the microscope." To all which the counsel of the prisoner excepted.

The counsel of the government, in his closing address to the jury, argued:

"But the counsel further objects that it was impossible for the prisoner to do this murder while his mother was in the bed. I answer that it was equally impossible for Mary Knight to commit suicide by cutting her own throat, while Lydia Knight remained in the bed, without staining some of the old lady's garments with blood. You will remember the pools of blood that saturated the sheets of the bed; and you will also remember that the blood in one place approached within six or eight inches of the front side.

" You will observe, too, that the dead body, when first discovered by Mr. Prout and others, lay so near the front side that no grown person could lie down in that bed on the front side without moving it.

" It is therefore evident that the death of Mary Knight, whether occasioned by her own hand or her husband's, could not have taken place until after Lydia Knight had left the bed.

" So I say that the facts prove that Lydia Knight is mistaken in her supposition that Mary Knight died in that bed while Lydia Knight was in it; and I say that this is equally true, whether you call her death a murder or a suicide. I repeat, that the government does not impeach the competency nor credibility of any of its witnesses; but we do say that it is perfectly obvious that there is a mistake here. And when you remember the appearance of that old lady upon the stand, bent with age, deaf, decrepit, enfeebled in mind and body, you will not be surprised that amid the darkness, confusion and terror of that night, many circumstances were unobserved, or left no trace upon her memory. Permit me, also, to recall your attention to her appearance in this court. You have had an opportunity to observe her condition; and I appeal to your own observation. Her deafness is conceded; but the doctrine is advanced that deafness only sharpens the sight. Is it so, gentlemen, in old age? Is not old age, on the contrary, a general decay of all the faculties, sight, smell, taste, hearing and perception? Torpor, insensibility, dullness, creep over the whole body, and the mind shares the general decline.

" It is a gradual separation of the soul from the body; and the mind, finding its communication with the outward world obstructed, gradually withdraws within itself, and is roused to action with difficulty. In this old lady, the perceptive powers of the intellect seem almost effaced; only by powerful effort can her mind be aroused. Unmindful of the present, unobservant of the living, moving world about her, she lives only in the memory of the buried past."

To which the counsel of the prisoner objected; and insisted that the government had no right thus to argue against the intelligence and capacity of its own witness. But the court overruled the objection, and ruled that the course of argument was allowable, and that the counsel of the government might proceed; and the counsel proceeded as follows:

" Gentlemen, we believe that we have been fair and liberal to the prisoner in this case; and we also intend to be just to ourselves and to the government. We did not say to him, " the witness nearest this tragedy is your own mother, and consequently we shall not incur the risk of her testimony. We leave her for you to summon, and for us to cross-examine · and impeach." No, gentlemen. We were straight-forward enough to summon her ourselves, and, having done so, we believe it our duty to correct her mistakes.

" You saw her in this crowded hall, indifferent to the strange scene, unmindful of you, of the court, of the audience; her mind abstracted, and her attention, when given for a moment to the prisoner's counsel or myself, as quickly withdrawn. And when, at the adjournment, the prisoner endeavored to gain her attention, and called her " mother," did she, as she stood by that box, recognize her own son? And if she did not know him here, in the broad light of noon, when he sought in vain to attract her attention, is it surprising that she failed to recognize him in the darkness of midnight ?"

To each and every, the rulings aforesaid, in overruling the demand for triors, in the empaneling of the jury, and the ruling that in all cases of challenge by the defendant of a juror for cause, whether for favor or otherwise, it was the province of the presiding justice to hear and determine the matter; and to each and every, the rulings in overruling objections made by the counsel of the defendant to questions to witnesses propounded by the counsel of the government, and in sustaining objections made by the counsel of the government to questions propounded to witnesses by the counsel of the defendant; and to each and every ruling admitting the use of diagrams and plates; and to each and every rul-

ing admitting testimony offered by the government, or rejecting testimony offered by the defendant, and to the ruling allowing the counsel of the government to argue against the intelligence and capacity of Lydia Knight, a government witness; and to each and every instruction to the jury, and to the refusals to instruct the jury as requested by the counsel of the defendant, the defendant excepts.

The judge charged and instructed the jury as follows:

*Gentlemen of the Jury:*

The occurrences of the last three weeks cannot have failed to admonish you that we have been engaged in the discharge of duties of no ordinary character. The careful manner in which you were empaneled, the protracted and searching examination of the numerous witnesses who have been before you, and the extended and learned arguments of counsel, afford evidence of the importance attached to our proceedings by those principally engaged in them. The vast concourse of citizens who have attended the sittings of the court through this protracted trial, also bears testimony to the deep interest which pervades the community in reference to the subject of our deliberations.

The administration of justice is at all times deemed a matter of high importance. To determine conflicting rights of property between man and man, is one of the most important functions of human government. But when the liberty and life of the citizen are involved, it assumes an importance inferior to no other question which can be submitted to the decision of man.

In no country does the administration of justice assume so imposing a form, in a moral point of view, as in these United States. To be able to govern one's self successfully, is, by moralists, accounted the highest degree of human excellence. For a people, self-moved, to frame their own laws, and then, in a judicial capacity, intelligently, firmly, and impartially to enforce them, presents a spectacle of moral grandeur unsurpassed by anything in the affairs of men.

There is a conservative power in law, when well administered, which is truly surprising. It not only overshadows and protects communities, but it infuses its salutary principles into the whole mass of the people. It not only regulates and determines our rights of property, but it restrains the arm of the assassin, dashes the poisoned chalice, extinguishes the incendiary's torch, and enables us to lie down with our families in conscious security. These are the legitimate effects of wholsome laws when well administered.

In our government, the trial by jury is justly deemed an element of the highest importance. It has been denominated, in no language of fiction, the palladium of our liberties, the noblest institution ever invented by man. It is the corner-stone of our judicial system.

The importance of your duties, gentlemen, in the administration of justice, cannot be over-estimated. The protection of the weak and defenceless in their humble homes, the security of the whole community, as well as the safety of the individual citizen when unjustly accused of crime, depend upon an intelligent and honest discharge of those duties. Without it, courts would be powerless, and law useless. Each one would, from necessity, become his own protector, and the vindicator of his own wrongs, real or imaginary. In view of such momentous considerations, how important it is, that jurors discharge their duties faithfully and well. How utterly insignificant and paltry become all considerations of private interests, of party attachment, of sectarian or social ties! They sink into absolute nothingness in the estimation of any man in whom is the first element of that true manhood which constitutes the good citizen.

On you, therefore, as a most important elemental part of the highest judicial tribunal of the State, is now devolved the most responsible duty ever imposed upon men. You are to sit in judgment upon a fellow-citizen, charged with the commission of the highest crime known to our laws.

For his deliverance he has put himself upon his country,

which country, by representation, you are. And permit me to say, that upon earth there can be no exhibition of higher moral sublimity than that of men thus situated, holding with even, unwavering hands, the scales of justice, in which are to be determined, intelligently, without bias, prejudice or partiality, an issue involving not only the integrity of the law, and the safety of the community, but the life of a citizen.

That you will act honestly and manfully under this high responsibility, your past deportment affords the fullest assurance.

The prisoner is charged with murder—the murder of his wife, for which alleged crime he is now upon his trial.

The R. S., chap. 154, sec. 1, defines the crime of murder as follows: "Whoever shall unlawfully kill any human being, with malice aforethought, either express or implied, shall be deemed guilty of murder."

*The killing of a human being* may be lawful or unlawful. It is lawful when necessarily done in execution or in furtherance of justice; or when done upon an enemy in lawful war, or when necessary for the prevention of atrocious crimes, such as murder, robbery, housebreaking in the night-time, and the like.

It is *unlawful* when done without justifiable cause, or reasonable excuse. The unlawful killing of a human being is either *murder or manslaughter*. These offences, although both unlawful, import different degrees of criminality, and are punished with different degrees of severity. *Manslaughter*, by our statute, is defined to be the unlawful killing of a human being, in the heat of passion, upon sudden provocation, without malice aforethought, expressed or implied. There are many circumstances, in which, at common law, the destruction of human life is deemed manslaughter. The circumstances of this case do not, however, require their examination at this time.

Our statute (R. S., 154, sec. 2,) distinguishes between different degrees of murder. It provides that whoever shall

commit murder with express malice aforethought, or in perpetrating or attempting to perpetrate any crime punishable with death, or imprisonment in the state prison for life, or for an unlimited term of years, shall be deemed guilty of murder of the first degree, and shall be punished with death.

Whoever shall commit murder otherwise than as is set forth in the preceding section, shall be deemed guilty of murder of the second degree, and shall be punished by imprisonment for life in the state prison.

The term *malice* is intended to denote an action flowing from a wicked and corrupt motive. A thing done, *malo animo,* where the fact has been attended with such circumstances as carry in them plain indications of a heart, regardless of social duty, and fatally bent on mischief.

*Malice,* in its legal sense, differs from the sense in which the word is used in common conversation. Though in law, as in common speech, the term includes acts done from ill-will, hatred, malevolence, and a desire for revenge; it also includes all wrongful and wicked acts intentionally and deliberately done without just cause or excuse.

Thus, in a trial for murder, which is always charged as having been committed with "malice aforethought," it is not necessary to prove that the accused was influenced by feelings of particular or special ill-will to the deceased. If it be proved that the act of killing was intentional, the result of deliberation, of a design to kill, without justifiable cause, it will involve legal malice.

Men, when in possession of their reasoning faculties, are supposed to intend the results which ordinarily and naturally flow from their acts. When, therefore, a person deliberately performs an unlawful act, the ordinary and natural result of which is the destruction of human life, or the doing of great bodily harm, the law presumes such an act to be done maliciously, if life is thereby destroyed.

*Express malice* exists where one with a sedate, deliberate mind, and a formed design, doth kill another; which formed design is evidenced by external circumstances discovering

the inward intention, as by lying in wait, antecedent menaces, former grudges, and concerted schemes to take life.

*Implied malice* is an inference of law upon the facts found by a jury. It exists where one attempts to kill or maim one person, and in the attempt kills another against whom no injury was intended, or in general, in any deliberate attempt to commit a felonious act, and death is occasioned in the execution of such attempt, although the original intention may not have been to take life.

When the killing is unlawful, and neither express nor implied malice exists, the crime is reduced from murder to manslaughter. But in all cases where the unlawful killing is proved, and there is nothing in the circumstances of the case as proved, to explain, justify or excuse the act, the law presumes it to have been done maliciously; and if the accused would reduce the crime below the degree of murder, the burden is upon him to rebut the inference of malice which the law raises from the act of killing, by evidence in defence.

The indictment in this case contains two counts. In the first count, the prisoner is charged with having murdered Mary Knight with a " certain knife." In the second count, the prisoner is charged with having committed the act of murder with " some cutting instrument and weapon to the jurors unknown."

It is competent for you to find the prisoner guilty, under either count, of murder of the first degree, of murder of the second degree, of manslaughter, or not guilty generally, as you shall find the facts to be.

If you find the prisoner guilty of murder, you will inquire, and by your verdict ascertain, whether he be guilty of murder of the first degree, or of the second degree.

The prisoner is by law presumed to be innocent until he is proved to be guilty, beyond all reasonable doubt. Reasonable doubts are such substantial doubts as intelligent men, with enlightened consciences, acting upon principles of sound common sense, upon matters of highest moment, would regard. In the language of Professor Greenleaf, " The cir-

cumstances must be sufficient to satisfy the mind and conscience of a common man; and so convince him that he would venture to act upon that conviction in matters of the highest concern and importance to his own interests."

The venerable and learned Chief Justice Shaw, in the case of Commonwealth *vs.* Webster, 5 Cush., 320, thus defines a reasonable doubt: " It is not mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition, that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge. The burden of proof is upon the prosecutor. All the presumptions of law, independent of evidence are in favor of innocence; and every person is presumed to be innocent until he is proved guilty. If upon such proof there is a reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal. For it is not sufficient to establish a probability, though a strong one, arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary; but the evidence must establish the truth of the fact to a reasonable and moral certainty; a certainty that convinces and directs the understanding, and satisfies the reason and judgment, of those who are bound to act conscientiously upon it. This we take to be proof beyond a reasonable doubt; because, if the law, which mostly depends upon considerations of a moral nature, should go further than this, and require absolute certainty, it would exclude circumstantial evidence altogether."

With this general view of the rules of law upon which this prosecution is based, and by which it is to be controlled, I proceed to call your attention to the propositions which it is necessary for the government to establish, in order to entitle it to a verdict.

In the first place, it is necessary that it should satisfy you of the death of Mary Knight, the person charged to have

been murdered; that she did not die a natural death; that she did not die by accident; that her death was occasioned by violence, and that that violence was not inflicted by her own hand, but by the hands of another; and finally, in order to charge the prisoner, it must satisfy you that she came to her death by violence inflicted by his hand, or under his immediate direction.

1st: are you satisfied that Mary Knight is dead? You have evidence on this point that she was in full life on the 6th of October last, and that she was found dead early on the morning of October 7th. These facts are not contradicted. I do not understand that there is any question as to the identity of the body found in the house of the prisoner on the morning of October 7th, that it was the body of Mary Knight.

Did she die a natural death or by accident? Neither are suggested. Did she come to her death by violence inflicted by her own hand? That is suggested. It is contended that the evidence in this case, when taken altogether, and carefully considered, does not exclude the conclusion that she might have come to her death by violence inflicted by her own hand. If this is so, if you have remaining in your minds a reasonable doubt, such as I have described to you, whether she might not have come to her death by violence inflicted by herself, it is your duty to acquit the prisoner: for if there is a reasonable doubt whether a murder has been committed, no one can be charged with the commission of the crime of murder.

To determine that question, you must recur to the evidence which tends to show her previous character, habits, situation, and condition, anterior to, and at the time of her death. It is proper for you to consider whether there was anything connected with her previous life and habits, indicative of a tendency to self-destruction.

Then you are to consider the situation in which the body was found after her decease, and to gather from the surrounding circumstances, in connection with the positive tes-

timony, such facts as will tend to throw light upon the manner in which she came to her death.

What, then, was her condition immediately anterior to her death, and what was the condition in which her body was found? I propose to call your attention to the prominent facts bearing upon this question. It seems to be admitted, that on the night of October 6th, Mary Knight retired early to her bed in the sitting-room of the prisoner. The next evidence we have which shows her situation, comes from Lydia Knight, the mother of the prisoner, who tells you that on that night she occupied the corner or parlor bed-room; that she retired to bed at an early hour, before the setting of the sun, and that after she had been asleep, she does not know how long, the deceased came to her room, having in her hands a lighted candle and a pillow; that she desired to occupy the bed with the witness; that, having received permission to do so, she disrobed herself to some extent, extinguished her candle, and got into bed upon the back side; that witness afterwards distinctly heard an outcry from the deceased, and that she felt arms thrown upon her; that she neither saw nor heard any other person present. The witness further states, that from the time the deceased came to her room till the hearing of the outcry, she had not been asleep. This, I believe, is substantially, the positive testimony you have from Lydia Knight, on this point.

You have also the testimony of the two children, that they had been asleep; that they were awakened by the outcries of the deceased; that they immediately arose and partially dressed themselves. They both testify that they heard two shrieks, after which all, so far as the deceased was concerned, was silent. After much search in different parts of the house, a light was obtained by them, and they returned, through the room occupied by the girl, into the room occupied by the boy; and, as they approached the corner bed-room, the old lady, Lydia Knight, came out, and at that time, the little girl saw passing into the parlor what she called a

"glimpse" or "shadow." She immediately after heard a noise in the parlor which she designated a "racket." The little boy was dispatched for the nearest neighbor, Mrs. Rice. She, with the two little children, with a light, approached the bed-room, the little boy being in advance. As they approached the door, he observed the deceased upon the bed, and perceiving blood, exclaimed, "Aunt Mary has cut her throat." They retreat in alarm. Other neighbors were called. Mr. Prout, Mr. McCann, and others came. They, being led by Mr. Prout, visited the room. Mr. Prout has described the condition of the deceased more fully than any other witness upon the stand. He found her lying upon the bed, diagonally, her head and shoulders within a foot of the front side of the bed, her feet and limbs further back upon the bed. Over her head and neck was a pillow, pressed down, or to use his words and those of another witness, "jammed down." Blood was observed upon the front side of the bed, within six or eight inches of the side of the bed. On the other side of the deceased was a pool of blood. He had an imperfect view of the wound. No change was made in the situation of the body at this time.

The deceased was visited afterwards by others, among whom was Dr. Carr; and his general description substantially conforms with that of Mr. Prout. He however states other circumstances tending to show the character of the wound, and perhaps to throw additional light upon the manner in which it was made. Inserted into this wound was the night-cap of the deceased, and a handkerchief of the prisoner, as identified by Mrs. Jordan. There was a deep cut upon one of the fingers of the left hand of the deceased. Her hair was in a disordered `condition, being brought forward, and the ends glued to her face with blood. You will have occasion further to examine the testimony of Dr. Carr, when you consider whether this wound was inflicted upon the deceased by some person other than herself, and whether these facts and circumstances do or do not show deliberation and concerted action, not only before but after the fatal blow was

struck. One other fact bearing upon that point. I have already called your attention to the fact testified to by several witness, that when the deceased was found, her head was covered by a pillow, pressed down upon her face. In connection with that testimony it may not be an impertinent inquiry, how came that pillow there?

The testimony of the little girl is, that she made up the bed on which the deceased died; that when she made it up she took a pillow from the parlor bed and put it upon this bed, for the use of grandmother. The testimony of Lydia Knight is, that when she retired that night there was but one pillow upon her bed; that when the deceased came to her bed, she brought with her a candle and a pillow. The little girl testified that there were four pillows that belonged to the bed in the sitting-room. Mr. Rice testified that in the morning he observed that the bed in the parlor had but one pillow upon it.

Two pillows were found upon the bed in the corner bedroom, on the morning of the 7th, in addition to the one pressed upon the head of the deceased.

In view of these facts, the question becomes one of considerable importance, whence came the third pillow? Was it brought there by the deceased, or by the hands of some other person after she had retired? The testimony of the old lady is, that after the deceased came to her bed, she (witness) did not go to sleep again till she heard the outcry, and that the deceased did not rise after she came to bed.

Was the wound of such a character as that it could have been inflicted by the hands of the deceased? On this point you will consider the description of the wound itself—its character and extent—and the testimony of the physicians as to the effect which such a wound would produce upon the deceased, and how speedily it would terminate life.

You will also take into consideration the testimony of the physicians who, as experts, are permitted to give opinions, in addition to stating facts; you have heard their opinions whether the wounds could have been inflicted by the deceas-

ed upon herself, and the reasons upon which those opinions are based.

There is still another consideration. This woman was found lying in bed, with all the great arteries and blood-vessels of the neck severed, apparently at a single blow. You have a description from the surgeons, of the effect upon the flow of blood, that would be produced by the sudden severance of all the great blood vessels of the neck. You will consider whether the blood would not, under such circumstances, be thrown out in jets, and spattered over the whole room; whether, after the infliction of such a wound, by which all the blood vessels of the neck were severed, the deceased would have had power remaining sufficient to arrange matters in the manner described by the witness.

There is still another consideration. If this testimony leaves you in any doubt, any uncertainty, how the wound was inflicted, you will still make another inquiry; if inflicted by the deceased, with what weapon was it done? Is it or not obvious that it must have been done with some cutting instrument of considerable magnitude? No such instrument appears to have been found in the room or upon the premises. There are still other considerations:—the appearance of blood upon the window-stool, and drops of blood upon the floor, may bear upon this question. It is in evidence that there was found upon the bed, the next day, a razor; but it bears no marks of blood—there is nothing upon it to indicate that it was the instrument used for the infliction of the wound. It has not been suggested by any party that this instrument caused the death of the deceased. The question may arise, why it was found in that condition; who placed it there? That question may or may not be of importance. Experience has shown that it not unfrequently occurs, when death has been occasioned by unlawful violence inflicted by persons other than the deceased, that the murderer seeks to divert attention from himself and to produce the conviction that the deceased committed suicide, by surrounding the body, as far as he may, with circumstances tending to pro-

duce such belief. Many cases of this description are found in the books.

One case is that of a man found dead with a pistol by his side. The first supposition was that he had committed suicide; but upon extracting the bullet, and comparing it with the bore of the pistol, it was found so large that it could not have been fired from that pistol. This fact repelled the idea of suicide. [The judge cited several other similar cases, and continued.]

I call your attention to these cases, not that they have any particular bearing, as authority on this case, but to induce you to examine carefully the circumstances surrounding this case, when you determine whether there is reason to believe that it is within the range of possibility that the deceased could have come to her death by her own hand; whether all the circumstances can be explained on the hypothesis that she committed suicide, or whether they are of such a character as absolutely to exclude such a conclusion.

You are to determine that question, and, as I said before, if a careful examination of the evidence leaves on your mind any reasonable doubt, whether she did not come to her death by violence inflicted by her own hand, then you will have no occasion to proceed any further; whatever your own feelings or impressions may be, it will be your duty to acquit the prisoner. If, on the other hand, the evidence brings your minds to the conclusion that she came to her death by violence inflicted by the hands of another, you will proceed a step further in your investigations, to a question more directly bearing upon the prisoner.

I may remark, gentlemen, that you are to determine these facts upon what is termed circumstantial evidence. There has been much discussion as to the weight and influence which circumstantial evidence is entitled to receive at your hands. Legal writers divide evidence into two great divisions, called positive evidence and circumstantial evidence.

Positive evidence is that in which the witness testifies from his own personal knowledge of the specific fact to be

State *v.* Knight.

proved. It is the most simple in its character, and generally deemed most satisfactory. It, however, has its dangers. It ordinarily presents fewer points for observation and comparison than circumstantial evidence, and therefore gives greater facilities for swearing falsely with impunity.

Circumstantial evidence is compound in its character. It consists in the proof of facts not directly in issue, and of presumptions or inferences deduced from those facts.

Rules have been adopted for the application of this kind of evidence, to which I desire to call your attention. Different legal writers have stated these rules in different forms of language, though in substance they generally concur. For simplicity, conciseness and completeness, I have found no author whose statement of these rules I think preferable to that of Mr. Starkie. It is as follows:

1st. "That the circumstance from which the conclusion is to be drawn, should be fully established." That is, the facts should be proved beyond a reasonable doubt. What is a reasonable doubt I have already explained. You will perceive at once that unless your fundamental facts are proved, you have no solid basis from which inferences can be safely deduced.

2d. "All the facts should be consistent with the hypothesis to be established.

3d. "It is essential that the circumstances should be of a conclusive nature and tendency." That is, those circumstances on which reliance is placed, should have a direct necessary tendency to establish the proposition sought to be proved.

4th. "It is essential that the circumstances should, to a moral certainty, actually exclude every hypothesis but the one proposed to be proved."

If the facts proved are consistent with any hypothesis other than the one sought to be established, the proof fails. Therefore, if the material circumstances in this case may be explained on any reasonable hypothesis other than the guilt

of the prisoner, he must be acquitted, though they may all be explained on the hypothesis that he is guilty.

The moral and physical world is governed by fixed laws. Those laws, when their operation becomes known, form the basis of circumstantial evidence. When we have learned by experience, or otherwise, that a given cause produces a particular effect in many instances, we infer that the same cause, under like circumstances, will produce the like effect. And upon such experience we act with undoubting confidence, and without hesitancy. On such evidence are based most of the acts of our lives. It is, however, acting upon circumstantial evidence. This kind of evidence is composed of physical circumstances and moral coincidences. When these unite and harmonize, this species of evidence is presented in its most convincing form.

To explain: you, gentlemen, are, as I understand, most of you, farmers. If you observe a field that yesterday was covered with growing grass, which to-day lies in the swarth, you at once infer that the mower has been present with his scythe. If you see the sheaves of wheat standing in the field, you infer that the reaper has done his work. You pass a forest upturned by its roots, and you infer that it has been swept by the tornado. The earth is covered with newly fallen snow, and you observe that upon the highway it has been disturbed. You examine the impressions upon it, and determine with unerring certainty, whether they were made by the ox team and sled of the woodman, the horse and lighter vehicle of the ordinary traveler, or by the road breaker with his shovel and triangle. Those are physical circumstances, which, being seen, or their existence proved, authorizes certain conclusions on which you act in common life.

So, too, in the administration of justice, long experience has shown that it is safe to draw certain inferences from the existence of certain facts. Thus, when property, recently stolen, is found in the possession of one not its owner, an inference arises, in the absence of any explanation, that the

one having the possession committed the larceny. After a recent murder, the possession of the weapons by which the murder was committed, or marks of violence, or stains of blood upon the person of one proved to have been in a situation to participate in the crime, unexplained, authorizes the inference that a party, thus situated, is in some way connected with the transaction. These physical circumstances may, however, be of conclusive or inconclusive character, depending, to some extent, upon moral coincidences.

Where men are found to keep silence, when they are surrounded with circumstances of suspicion which require explanation, or give a false explanation, or attempt to induce others to relieve them by falsehood and perjury, inferences necessarily arise prejudicial to them; and when such moral coincidences are connected with physical circumstances, it frequently gives a conclusive and inculpatory character to circumstances which otherwise might be inconclusive or slightly inculpatory.

Thus, Mr. Foreman, to illustrate: suppose your horse to have been stolen from your stable. Immediately after, you find him in the possession of a man who has appropriated him to his own use. The fact of possession, under such circumstances, is a fact tending to implicate the possessor as the thief. It is not, however, absolutely conclusive. He may have purchased him of the real thief. But suppose, further, on being asked for an explanation of the manner in which he obtained possession, he refuses to explain, the circumstance of possession thereby assumes a stronger inculpatory character. Suppose, still further, that instead of making no explanation, he makes a false one, and attempts to sustain his false explanation by subornation of perjury. Under such a state of things, the physical circumstance of possession becomes much more highly inculpatory or conclusive in its tendency.

Almost every conceivable physical circumstance is capable of being qualified in this way, by the existence of moral

coincidences. Take one of the strongest cases in the books, where a man is found dead. On his person is a mortal wound, inflicted by a cutting instrument. On examination, in that wound is found a part of the instrument which had been broken and left in the body of the murdered man. Another is searched, and on his person, immediately afterwards, is found a broken dirk-knife. By comparison, it is found that the two parts of the steel so exactly coincide and fit together, as to render it morally certain that they are parts of the same knife. This, you perceive, is a circumstance strongly, almost conclusively inculpating the man upon whose person the knife was found.

Yet he may not be guilty; it is possible that he obtained the knife from some other person, and knew nothing of the purposes for which it had been used. The evidence, though strong, is not absolutely conclusive; but if, on being interrogated, he refuses to explain how and where he obtained possession of the fatal knife; or if he state falsely, or attempt to procure others to do so, the character of the original circumstance of possession becomes much more strongly conclusive in its character.

[The judge here gave several other cases in illustration of this principle, which are omitted.]

These principles apply with equal force in cases of murder, to recent marks of violence; to the possession of weapons recently used for the destruction of life; to the blood upon the person; to articles of clothing, belonging to the accused, found near the body of the deceased person; and, in general, to all the circumstances which connect the accused with the crime, and may be of importance in applying the evidence in the case.

Again, the force and strength of circumstantial evidence depends very much upon the character and number of the circumstances proved. The more numerous the facts which are material, and of conclusive tendency, provided they are independent of each other, and the more diverse the sources

from which they come, the more conclusive will be their general character, provided they all point in the same direction, and all harmonize with each other.

It can hardly be supposed that many circumstances, especially if they be those over which the accused could have no control, forming altogether the links of a transaction, should all unfortunately concur to fix the presumption of guilt upon an individual, and yet such conclusion be erroneous.

Truth is alwas consistent with itself. Facts are like perfect cubes; it matters not from whence they come; they will always harmonize with each other, and with surrounding objects. Falsehood, on the other hand, is inharmonious and irregular, with sharp angles and jagged corners. It is with much difficulty that two falsehoods can be made to coincide and fit together. But if their number be largely increased, they become an incongruous mass of mis-shapen materials, harmonizing neither with surrounding objects nor with themselves.

You have been told, gentlemen, that the law does not contemplate the possibility of the conviction of an innocent man. That is true. Neither does the law contemplate that it is possible that a guilty man shall go unpunished. But, gentlemen, human law, though said to be the perfection of human reason, is not absolutely perfect. Infirmity, imperfection, is stamped upon everything pertaining to humanity. There is no eye, save the eye of Omniscience, that sees with absolute certainty.

But though human law does fail at times, and the guilty escape unpunished, and possibly at times punishment falls upon the innocent, yet there is much more certainty in its operation, when well administered, than is generally supposed. One who has never considered the subject, would be surprised, on observing the almost unerring certainty with which the avenging ministers of the law detect and bring to punishment those who violate its mandates. There is something in the very nature of crime which tends to its

own exposure. Security is not the natural condition of the wicked. That Being who has written the records of this. world's progress in the solid rocks, and on the cliffs of the mountains, writes also the history of secret crime in characters which will be found so legible that they may be read with almost unerring certainty, if you will only give them your attention.

Such, gentlemen, is the character of circumstantial evidence, which is often inconsiderately spoken against; but, if properly understood, and its principles correctly applied, it will seldom lead to erroneous results.

With these rules for ascertaining truth, thus imperfectly illustrated, before you, and with an earnest desire to arrive at just conclusions in this case, let us proceed to an examination of the facts proved, that you may determine what legitimate inferences should be drawn therefrom, as to the guilt or innocence of the prisoner.

We now proceed upon the hypothesis that you may find that the deceased did not commit suicide.

In view of all these considerations, looking at the character of the evidence, direct and circumstantial, and applying it to the great fact to which I have called your attention—the manner in which the deceased came to her death—determine, as men, on your consciences, on your responsibility, how that fact was. If you find that the deceased committed suicide, it is an end of the case; the prisoner must be acquitted.

If death was occasioned by violence inflicted by the hand of another, whose hand was it that inflicted the violence? Was it the hand of the prisoner at the bar? That solemn question you must decide. The presumption of the law is, that he is innocent. He is entitled to that presumption, step by step, throughout the investigation. He is to be deprived of it only when it is overcome by the testimony.

Have the government overcome that presumption? They answer in the affirmative. The respondent, by his counsel, in the negative. You are to decide. To satisfy you that he

has committed the offence, the government affirm, in the first place, that he had the opportunity. They affirm, also, that he had the motive. They tell you that the circumstances in this case, all tend to show that he did the deed. The prisoner responds that it is not so.

First, then, had he the opportunity? This raises one of the controverted points in this case, and as it is of a character which particularly addresses itself to you as practical men, I feel the less responsibility upon that point. I refer you to the appearances in the neighborhood of the "heater piece." The fact is proved by positive testimony, not controverted, that the prisoner, on the evening of the 6th of October, about seven o'clock, with his oxen and cart, and one thousand of shingles, started for Israel Herrick's, where he procured some seven and a quarter thousands additional, and loaded them upon his cart; that he left Herrick's at about twenty minutes before ten o'clock in the evening, declaring that he was going to Gray. The next morning, it appears from the testimony, that he was found at the tavern of Brown, in New Gloucester, at ten minutes before four o'clock.

The government affirm that he did not pass directly down to Brown's; that he drove his team down to the mouth of the *Hayes road*, across the north branch of that road, to the rear of the *heater piece;* that he there left his team; thence proceeded to his own house, committed the fatal deed upon the body of his wife, returned to his team, and then proceeded on his way to Brown's.

The prisoner himself has given an account of the transaction, testified to by the witness Brown. Brown tells you that the prisoner arrived at his house at ten minutes before four o'clock in the morning; that when there he desired some refreshment, and proceeded to give an account of the manner in which he had passed the night, in which he said that he left Herrick's at about ten o'clock; that he arrived at Brown's between twelve and one o'clock; that he drove under the shed, fed his oxen, sat down and fell asleep, and remained there until the time he called Brown up.

Now the government say that this account of his was false; that in the first place he had not been waiting at Brown's; that he did not arrive there at the hour he stated; that he had not been under the shed of Brown; but that he had, after a forced drive, just arrived at the place; and they have introduced many witnesses to establish this hypothesis.

First, they call your attention to the physical appearance of the earth, the marks of the cart and the tracks of the oxen. They tell you that these left the main road, going into a by-path, where, many years ago, there had been a road; that there he stopped his team; that he took off his oxen and chained them to the wheel; and that from the appearance of the ground you must be satisfied that they remained there a very considerable period of time. You will be able to judge with a good deal of accuracy, how this was. You are farmers, and may have had occasion to observe circumstances of this character. The government point you to the indication of a stone having been removed from the earth and placed before the wheel as a trig, to the appearance of the cart-tongue having been swung off, to tracks of oxen having been driven round to the wheel, to the appearance of a recent manure dropped from an animal at rest, to the appearance of an animal having lain down at a place where numerous tracks pointed towards the wheel marks.

The government tell you that all these indications could not have occurred, unless the team had remained there some considerable time. Then it is contended, that concurring with these circumstances, are other facts proved in the case; that the evidence shows that the prisoner could not have been upon the road during any period of time from ten o'clock until half past twelve or thereabouts. The evidence relied upon to establish these propositions, is in substance this:

Mr. Wallace, living north of Herrick's, having a sick child, and desiring the services of a physician, testifies that he called his neighbor, Mr. Lunt, and desired him to procure the services of Dr. Eveleth, who lived some three miles below Poland Corner.

Mr. Lunt testifies that he left his house near eight o'clock; that he passed by Herrick's, and that when he passed down he saw a team of oxen and a cart in Herrick's barn; that he went to Dr. Eveleth's, and that he started on his return, with Dr. Eveleth, at twenty minutes before ten; that Eveleth got a little in advance. They both testify that going up the road by Herrick's they met no team. The testimony is that the prisoner left Herrick's at precisely the same time that Lunt, in company with Dr. Eveleth, left the doctor's house on his return, and the government contend that if they had both kept upon the road, allowing for the difference between the travel of an ox-team and that of horses, they would have met somewhere in the neighborhood of Poland Corner. The government ask you to infer that the prisoner had turned off and stopped behind a little hillock in the rear of the heater piece, and could not have been in the little divergence of the road between the heater piece and Herrick's, because the prisoner must have gone very much further. It is also said that the divergence is very small, and that a team passing upon either branch could be seen with the same facility by one traveling on the other branch, as if they both traveled on the same road.

This hypothesis, it is contended, is still further strengthened from the evidence that Dr. Eveleth left Wallace's at twelve o'clock, and returned home over the same road, where he arrived at about one, and that he saw no team on the way.

It is said, by making a mathematical calculation, that if the prisoner had proceeded directly on, Eveleth must have passed him before he arrived home. The hypothesis that he had not passed, receives, it is said, still additional confirmation from other testimony; that is, that a team was heard and seen upon the road passing Hanscom's, who lives just below Dr. Eveleth's, at two o'clock. Sawyer and Gilman testify that they saw and heard a team passing the Shakers' at three and one quarter o'clock. Tobie testifies that a team passed his house at three and a half o'clock, and that he recognized the voice of the prisoner speaking to his oxen, as he

went by. Benjamin Brackett testifies that he heard a team pass between three and four o'clock, and Daniel Brown testifies that the prisoner made his appearance at his tavern about ten minutes before four.

Now it is said, that, taking these various points of time, and assuming that the prisoner came out of the heater piece at twenty-five minutes past twelve, the rate traveled thence will show that he must have driven his oxen at about two and a half miles an hour; that it is evident that he traveled at this rate from the heater piece to Hanscom's, at the same rate from Hanscom's to the Shakers', and so on, reckoning between each place where the team was heard to pass; and that the same result will be obtained by reckoning from the heater piece to each of the places mentioned. The government say that these coincidences, taken in connection with the testimony of Brown, that he did not drive his team under his shed, that there were no traces of his stopping any considerable time at his house, and the appearances at the heater piece should satisfy you beyond a reasonable doubt that the prisoner stopped his team at the heater piece, and was himself in the vicinity of it from ten o'clock till about half past twelve.

This proposition is controverted on two grounds; first, that it would be impossible for oxen to travel at the rate they must have traveled to perform the journey in the time indicated; that oxen with such a load and over such a road cannot travel at the rate of two and a half miles an hour. There is much testimony on this point. It would be folly for me to undertake to give a jury of farmers any light upon a subject so peculiarly within their own knowledge. The question for you to determine is, not what is the ordinary rate of travel for an ox-team; but to what rate of speed may those animals be forced by a party desiring to make rapid progress. Is there anything impracticable in the speed claimed by the government? I make the suggestion whether you may not have observed differences in the character of these animals, and whether the character of the load may or

may not affect their speed; whether a team loaded with stone or heavy timber, might or might not travel with the same speed as one loaded with smaller lumber.

There is another consideration which I passed over, to which I will call your attention. The counsel for the prisoner say that the theory of the government, that the prisoner's team stopped at the heater piece, will not support the hypothesis that he went to his house, because it was one mile and ninety-two rods from the heater piece to his house. You are asked, the government are asked, where are the foot-prints of the prisoner which connect him with his house in his passage to and from the heater piece. It is said that there is a space of one mile and ninety-two rods which you are asked to overleap without testimony.

Gentlemen, you are to try this case by the evidence *in* the case, and not by that which is *out* of it. You are to determine whether the evidence adduced produces reasonable satisfaction to your mind. If it is sufficient, you are not to *say* we will not find a verdict because other evidence has not been produced.

It is undoubtedly the rule that the government should produce the best evidence of which the case admits under the circumstances, and it was culpable negligence on the part of the government, if by any reasonable examination they could find foot-prints which would have connected the prisoner with the house, and they omitted to do so, or if an examination would have shown that no such foot-prints existed.

You must, however, look at the circumstances—consider the situation of the parties at the time of this death. This death occurred in a remote and secluded part of the country, among a population where such occurrences are very rare, and where there is no effective detective police. You will recollect whether the evidence tends to show that the inhabitants did or not for many hours suspect that a murder had been committed.

The idea at first seemed to prevail that the deceased came to her death by suicide, and the people who came to pay

their respects to the deceased, or on missions of condolence or mercy, came there with that impression. .While this impression lasted, there is evidence of passing to and fro, both on the one side and on the other; down the road to Waterhouse's and Herrick's and back, and also passing to and from the parlor window. You will consider whether, when it was suspected that a murder had been committed, it was not too late to detect tracks upon the road. If, however, the absence of such proof throws an insurmountable barrier in your way, then the hypothesis of the government fails. But, if the situation of the parties at the time, and subsequent occurrences were such that you may suppose that it would not have been possible for the government to have given you this species of evidence, then it is no imputation on the integrity or intelligence of the prosecuting officers that they have not done so, because they are not called upon to perform impossibilities. With these considerations, then, I ask, are you satisfied that the prisoner had the opportunity to commit the crime?

If he had the opportunity, had he a motive to do it? Men do not commit crime, ordinarily, without a motive, although they sometimes act from those which are apparently inadequate. Was there any motive here? One motive assigned is, that he had allied himself to a woman very much his senior in years, some years ago, when their disparity of age was not comparatively as great as now; that he had conceived the idea of marrying a younger woman; and that on one occasion he had indicated this to one of his neighbor's; and that the sickness of his wife was of such a character as to raise suspicions that he had resorted to unjustifiable means to procure her early decease. Then, again, it is suggested that the title to the property, as indicated by the deeds in the case, shows that he was to be benefitted, pecuniarily, by her death. This evidence you will consider.

Sidney Verrill testifies that some weeks before October 6th, he aided the prisoner to grind a knife which the prisoner produced, and which has been put into the case; that he asked him what he intended to do with it · that the prisoner

made no answer; that he put it away in some place unknown to the boy; and that it was not used about the premises. The boy tells you that subsequently having occasion to search for apples in a hole in the hay mow, he there found this knife, and that it was very sharp. The government affirm that this circumstance, when taken in connection with subsequent events, shows that the knife was prepared in anticipation of this crime. They say that it was not before used for any purpose; that it was secreted until the night of the 6th; that it was afterwards ascertained that it had been removed from the hay mow, and was found covered with blood, near a fence, in the prisoner's field, under circumstances tending to connect the prisoner with its use. The prisoner's counsel contend that the facts do not authorize such a conclusion; that they were grinding knives at the time, and having ground one for use, the prisoner proposed to grind this one also, as a matter of convenience; that it was put in the hay mow, not secreted, but in a place open to the view of everybody.

It is further suggested that the prisoner had knowledge of the situation of the house and of everything in it; that the candles, the matches, and the pillows were known to no other person; that the pillow found upon the head of the deceased must have been taken from the bed in the sitting-room; and that the parlor door must have been locked to secure against intrusion; that the windows must have been prepared in advance; and that the party having thus secured the door, and opened a place for retreat, the crime was perpetrated. These acts, it is contended, could not have been done by any one not having knowledge of the house. There has been no explanation as to the knife referred to. If it was found in a place equally accessible to other parties as to the prisoner, he was not called upon to account for it; but if he secreted it in a place where it was under his entire control, then it furnishes evidence against him of a more conclusive character, provided you should be satisfied that the knife found is the one with which the wound was inflicted.

The finding of the knife, the locking of the door, and the opening of the window, have a tendency, more or less strong, to show that the act of killing was one of design and delib- eration. I call your attention to the handkerchief of the prisoner found in the throat of the deceased. It is claimed by the government that this is a circumstance of a highly inculpatory character, directly affecting the prisoner. Har- riet N. Jordan testifies that it was the handkerchief of the prisoner; that she washed and ironed it, and put it in his possession about a week before the witness left for Portland; that it was a handkerchief which the deceased was never accustomed to use. This testimony is of importance. It is suggested by the counsel of the prisoner that the handker- chief might have been placed where it was found, by the deceased herself. This is on the hypothesis that she com- mitted suicide. But if you are satisfied that a murder has been committed, then the testimony that the handkerchief of the prisoner was found pressed into the wound, diminishes the probability that the deceased would have had possession of it and placed it there.

If you are satisfied that it was not in the possession of the deceased, nor used by her, and that there was a physical im- posibility that it could have been placed in the wound by her, as it was found, you will inquire how it came there. The possession was, so far as the evidence shows, last in the prisoner. Has he shown how or when he parted with that possession? Does or not the testimony so connect him with that handkerchief as to require explanation? You will judge.

Again, a knife has been produced, which was found, it is said, on the premises of the prisoner. Is there anything in the position of the prisoner, and the circumstances under which that knife was found, by which you may infer that the prisoner had possession of it, or that it was used to kill the deceased? His counsel say that there is nothing to show that the prisoner was within six rods of that knife; no reason to believe that it might not have been placed where found by any other hand as well as his. This circumstance (the finding

of the knife) is of an inconclusive character, unless you are satisfied that it was placed there by him or by his procurement. If, on the other hand, the circumstances are such as to satisfy you that it was in the possession of the prisoner, and deposited where it was found, by him or by his procurement, and that it was used to take the life of the deceased, then it becomes a circumstance of conclusive tendency against him, unless satisfactorily explained.

There has been considerable discussion as to the character of the stains found upon the knife and other articles, to which your attention has been called. The government affirm that they have produced evidence sufficient to satisfy you that the various articles described by the witnesses were stained with human blood; that you should infer this from appearances in the wound when compared with the knife,—portions of it appearing, it is said, to have been made by that instrument; that the knife fits to the first incision or thrust in the wound, and that it gives evidence of dullness at the point where it was thrust, as is contended, upon the bones of the neck.

Two experts have been called, who assure you that there is a marked and palpable distinction between human blood and the blood of the lower animals. They both testify with great apparent confidence that the stains found upon the shirt of the prisoner and upon the knife, shingles, ring, chain, clevis and pin, were stains of blood which could not have flowed from the veins of a sheep. You heard their testimony, and you will give it the consideration to which you think it justly entitled. They do not testify that these stains were human blood. The government claim that this testimony excludes the possibility that the stains in the articles referred to could have come from the sheep slaughtered by the prisoner.

Next, as to the stains on the person of the prisoner. Mr. Rice testifies that he saw the prisoner on the 7th of October, on the piazza of his house, in conversation with Mr. Holt; that he then discovered upon the arm of the prisoner, a spot which he thought to be blood, about two inches long and one

inch wide. Mr. Holt testifies that he observed what he believed to be blood upon the shirt sleeve of the prisoner, and upon his overalls. Mrs. Small and Mrs. Herrick testify that they washed the overalls. Mrs. Small testifies, that, before she washed them, she discovered upon the left side what she supposed was blood; that she was desired to wash them by the prisoner. You heard her description of what occurred when they were subjected to washing. The counsel for the prisoner admits that there were indications of color upon the overalls, and upon certain other articles, but contends that the evidence shows that it was red paint, which was used by the prisoner the Friday before, while painting the house which he was building at "Black Cat." It does not occur to me that there was any distinct evidence as to the particular day on which that labor was performed. You may have had some experience in such matters, and may be able to determine whether red paint, placed upon clothing, worn, and exposed for several days in succession to open air, would immediately give off the color of red, on being placed in water; whether oil paint is thus easily removed, upon the application of water. If the discoloration of the water, testified to by the witnesses, was produced by red paint, then it should not prejudice the prisoner; but if it was occasioned by recent blood, you will judge whether it was or not a circumstance which required explanation.

So, too, as to the stains upon the shirts of the prisoner, and upon his person. You will consider whether, in the situation in which the prisoner then was, those were or not physical circumstances which required explanation, and whether the witholding of such explanations, if such were the fact, or the explanations, given, were or not such moral coincidences as tended to qualify the character of those circumstances, and to give them an inculpatory and conclusive tendency.

These suggestions will also apply to the stains upon the shingles, chain, ring, clevis and pin, provided you are satisfied,

beyond a reasonable doubt, that they were stains of blood, and were occasioned by the prisoner.

It is contended that the conduct of the prisoner, his acts and declarations, have had a strong tendency to establish his guilt. His statements, testified to by Brown, as made on his arrival at his house, are relied upon by the government with much confidence. The time of his arrival at that point if he were innocent, could, it is said, be of no importance. But if he should be charged with the murder of his wife, it is said that it would be of the utmost importance to him to be able to establish the fact that he was so situated as to render it impossible that he could have committed the crime, and hence his desire to convince Brown that he arrived at his house as early as twelve or one o'clock. These statements, it is contended, were not only false, but were manifestly made with special reference to a future defence. When these statements are said to have been made, no charge of crime appears to have been made against him; nor, indeed, does he appear then to have been suspected by any one.

Of a similar character is a part of the conversation of the prisoner, testified to by Thurston. This witness testifies that when he informed the prisoner that, as near as he could learn, his wife died between twelve and one o'clock, he replied, that was the time, he, (the prisoner) arrived at Brown's.

It is contended that these statements of the prisoner were alse; and that, being made at a time when he was under no embarrassment, in consequence of being charged or suspected of having committed the murder of his wife, they show guilty knowledge, and a concerted scheme to avert suspicion, and in case he should be charged, to prepare a defence in advance. You will examine this part of the testimony carefully, and, applying the principle which I have explained to you, draw such inferences from the facts proved as you may think legitimate.

Then, again, you will consider his alleged attempts to suborn witnesses. It is said that he applied to Herrick, Downs, the two Edwards, Gilson and Brown, desiring each of them,

to aid him to escape from the dilemma in which he found himself; that he desired them to do it by perjury; these are circumstances of a very grave character, tending, if true, to give an inculpatory and conclusive character to material acts which might otherwise be of an inconclusive character.

It is said that he made remarks at his wife's funeral, in relation to his step-daughter, (the daughter of his wife) which showed a cold and hardened heart, and that he indulged, on that occasion, in gross conversation, in levity, in low and obscene jokes, and that such conduct has a tendency to show his guilt. I do not so understand it. I think that conduct cannot be used for that purpose.

But there is one view in which his deportment on that occasion may be of importance. It is contended that his alleged attempts to suborn witnesses, and his failure to give satisfactory explanations when the circumstances of the case reasonably called for explanation, that his giving unreasonable and false accounts really ought not to weigh heavily against him, because they were made under circumstances where he had not full control over his mental faculties. This man, it is said, left his home in peace and security, to pursue his business at a distant village, when suddenly and unexpectedly he was met with the overwhelming intelligence that the person who was most dear to him had fallen by violence inflicted by her own hand; that in this condition he was crushed and overwhelmed with grief, and could hardly be expected to have the full control of his mental faculties; and then, in addition to this great calamity, that, on his return home, he shortly observed that suspicious eyes were fastened upon him, that fingers were pointed at him as the guilty author of the fearful transaction which had occurred; and that thus he labored under double embarrassments; first, suffering under the greatest of earthly calamities, the sudden loss of his wife, and then under the additional one of being unjustly pointed at as guilty of her murder; and that, under such overwhelming circumstances, he might well be expected to say and do things which in his calmer moments he would not have said

or done. Human experience has shown that men have been left, in times of adversity, to do and say things that are absolutely unaccountable.

There are cases on record where men at such times, under a pressure not ordinarily brought to bear upon human beings, have admitted themselves to be guilty of the crime of murder; and have thereby placed their lives in jeopardy, when, in fact, they were entirely free from guilt. Hence has sprung a rule of law which prohibits the government from giving in evidence the declarations of parties who are so situated that those declarations are not supposed to be voluntarily and freely made. That rule has been invoked in this case, and enforced; but I desire to ask you whether or not the evidence shows that the prisoner was in that disordered condition of mind; whether or not he was so overwhelmed with calamities and oppressed with grief, at the times referred to, that he made these various declarations as to his own conduct, and did these various acts in relation to procuring testimony, whatever they were, not knowing what he was doing, or what he was saying.

As explanatory of that point, and tending to show the real condition of his mind, it is legitimate to show how he deported himself at the funeral of his wife. It is a pertinent question to ask, whether, under that which, to ordinary men, would be the most solemn of all earthly occasions, he was indulging in obscene jests, in frivolity and laughter. That testimony becomes pertinent, in connection with his acts, as tending to show, whether, when he performed these acts, he was deprived of his right mind, and was acting under the pressure of an overwhelming calamity, or whether he was in the full possession of all his faculties.

Was the death of Mary Knight occasioned by her own act? If so, you will acquit the prisoner. If not, by whose hand was it occasioned? Was it occasioned by the hand of the prisoner? To determine this, gentlemen, you will look at all the circumstances in the case, and determine whether they are all consistent with the hypothesis, or whether any

of them are inconsistent with it. I have, in this connection, to remark upon the testimony in relation to the condition of the window. It is said, that although the circumstances may be such as to create suspicion, and nearly all point in one direction, yet that, wholly incompatible with the hypothesis of the guilt of the prisoner, is the fact that the window in the parlor was so situated that it was absolutely impossible for him to have made his escape through it from the parlor. This is a circumstance for you to consider, as bearing strongly upon the point whether the deceased was murdered or not, as well as upon the question of the guilt of the prisoner.

It is contended in behalf of the prisoner, that the government have proved that a murder could not have been committed; that they have introduced Lydia Knight, the only human being who was in the immediate vicinity of the deceased at the time of her death, and that her testimony negatives the hypothesis of murder. From all the testimony the inference seems to be very strong that this witness must have been in that room at the time of the death. She testifies that the deceased got into bed with her; that she occupied the front side; that the deceased occupied the back side of the bed; that, while she was in bed, she thought she felt the arms of the deceased thrown upon her, and heard an outcry; and that she has no knowledge of the manner in which her death was occasioned. She also testifies that she saw no person there; that she was not conscious, in any way, that any third person was present. She tells you that it was not possible, in her opinion, for any person to have gone upon that bed and committed the murder without her knowledge.

The defendant, by his counsel, contends that it is not in the mouth of the government to question the competency of Lydia Knight, or impeach her credibility. He tells you that if the crime had been committed as alleged by the government, Lydia Knight must know it.

It is a rule of law, that a party voluntarily introducing a witness into court, shall not be permitted to deny the compe-

tency of that witness, nor to allege his terpitude nor impeach his general credibility. The government have not controverted the competency of Lydia Knight, nor called in question her general credibility; but, gentlemen, I must be permitted to say that the government have, in my judgment, taken a most charitable view of the conduct of Lydia Knight. They are not permitted, as I have said, to deny her competency, nor her general credibility. They have not assumed to do either; but they are permitted to show facts inconsistent with her testimony, by other evidence. If Lydia Knight was in that room with Mary Knight at the time of her decease, and did not see the blow struck by which her life was taken, you are not compelled to come to the incredible conclusion that Mary Knight is not dead. You are to consider all the evidence. It does not necessarily follow that because Lydia Knight was present, but did not observe the manner or time of death, that it did not occur. There is a distinction between positive testimony and negative testimony. By observing this distinction, testimony comparatively in conflict may frequently be reconciled. Thus two of your panel may have been in condition to observe the counsel of the prisoner perform a certain act during this trial. One may have had his attention particularly called to him at the time; while the other, sitting in plain view of the counsel, did not observe that act. Suppose that matter were to be investigated, and you two gentlemen were to go upon the stand and testify to what you saw. While you, Mr. Foreman, might testify distinctly to the transaction in all its details, your fellow, with equal truth, would testify that he saw nothing of the transaction; yet you both sat in plain view of the counsel. Does this supposed case present a necessary conflict of testimony? Not at all. Your fellow, Mr. Foreman, would testify to all he saw. You would testify only to what you saw. Your attention being called to the transaction, you observed it,—the attention of your fellow then being in another direction, he did not observe it. This is an

illustration of positive and negative testimony. I suggest to you whether it may or not be reasonable to explain the testimony of Lydia Knight upon this principle. Such is the explanation of the government. She tells you that she heard the outcry, and was very much alarmed. You observed her upon the stand. She is apparently far advanced in years, and perhaps it may not be unreasonable to suppose that her faculties have become somewhat impaired. Is it or not unreasonable to believe that in her alarm she was really unconscious how the death of Mary Knight occurred? That she did not, is a charitable conclusion; but, however it may be, you are to find the real facts from all the evidence in the case.

If you can resolve the apparent conflict of testimony on that principle, you will undoubtedly be happy to do so, and thus save the character of the old lady from reproach.

You will also, in this connection, consider the testimony of the children, the condition in which the body was found, the marks of violence testified to upon the face and side of the deceased, alleged appearances of blood upon the floor and the window sill, and upon the spring of the window, and also upon the outside of the house, and the alleged situation of the joist in front of the window. You will also consider the absence of blood marks upon the doors, the end window, and the torn curtain, and upon the sash which had been removed, and the situation in which that sash was found.

You will determine from the testimony whether the stains upon the window sills were or not impressed thereon before the sash was placed in the condition in which it was found in the morning, as these stains are alleged to have been under the sash.

From this fact the government ask you to infer, that after the murderer had made his escape, some hand unsmeared with blood had adjusted that window as it was found, and they suggest that it may have been done by Lydia Knight, who, it will be recollected, the witnesses testify was absent at one time during the night of the decease of Mary Knight,

and on search was found in the corner bed-room. I do not recollect that either party interrogated Lydia Knight upon that point.

It is strongly insisted that the situation of that window is *absolutely* inconsistent and incompatible with the guilt of the prisoner; that he could not, by possibility, have committed the murder and escaped through that window, and that there is no suggestion of escape in any other direction. The consideration is worthy your attention, whether there were greater obstacles to the escape of the prisoner than there would have been to that of any other person. If you come to the conclusion that Mrs. Knight did not commit suicide, but was killed by the hand of another, that other hand must, in some way, have come in contact with her. What person had the most favorable opportunity to perform this act? Who had a motive to do it? Who possessed the means and had the facilities with which to accomplish it? In what direction, and to whom do the circumstances in the case, as proved, point, as being connected with the transaction? Do these circumstances *all* point in one direction? Are they proved beyond a reasonable doubt? Are the circumstances of a conclusive and inculpatory character? Do they point to the prisoner as the guilty party? And are they of such a character as actually to exclude, to a moral certainty, and beyond all reasonable doubt, every other hypothesis except that of the guilt of the prisoner?

The prisoner stands before you charged with the crime of murder. That charge is not to prejudice you against him. He is entitled to the presumption of innocence till it is overcome by legal testimony. That testimony, in all its material facts, must be consistent with his guilt. If there is any substantial circumstance proved which cannot exist consistently with his guilt, it acquits him. If on the other hand, the circumstances are all consistent with his guilt, if they conclusively tend to prove his guilt, and are of a character to exclude all reasonable doubt that the crime could have been committed by any other person, and if you are satisfied be-

State *v.* Knight.

yond all reasonable doubt that the fatal wound was not inflicted by the deceased herself, but was inflicted by the prisoner—if the government have proved all this, they have done all that they are required to do, and are entitled to a verdict at your hands. If they fail to do this, the prisoner is entitled to a verdict of acquittal.

If you find the defendant guilty of murder, you will also inquire, and by your verdict ascertain, whether he is guilty of murder of the first degree or guilty of murder of the second degree, and will answer when you return your verdict.

Gentlemen, during the progress of the trial, many cases of erroneous convictions have been read to you from the books, and, in view of these, you have been admonished of the dangers which surround jurors when called to act upon circumstantial evidence. The case of the Boorns, of Vermont, and of Jennings and Shaw, of England, have been the subjects of particular attention. So far as the presentation of those cases may have a tendency to induce you to act with caution and carefully to scrutinize and weigh the evidence in this case, it is well. But if designed to strike terror into your minds, and to induce you to refuse to act except upon positive testimony, they will serve no good purpose. They do not tend to show any marked superiority of one class of testimony over another. The *Boorns* were convicted on their own confession; *Jennings,* on the testimony of a perjured witness; *Shaw,* on a combination of circumstances amounting to little less than positive testimony, including what was supposed to be the dying affirmation of his own daughter. Those, and cases of a similar character, which are almost invariably pressed upon the attention of jurors in capital trials, where the evidence is circumstantial, stand out as land-marks, far removed from each other in judicial history, and tend to illustrate, not so much the dangers peculiar to any particular kind of evidence, as the infirmity incident to all human institutions.

Gentlemen, I have thus passed hastily over the leading features in this case. It has not been my design to recapit-

ulate in detail the testimony, or to determine the facts, but simply to aid you as far as I am able, in arranging them in their proper order. What the testimony of the witnesses has been, and what facts are established, either directly or inferentially, you, and you alone must determine.

This trial has occupied several weeks. A vast amount of testimony has been introduced, and this whole case has been presented with a degree of ability, seldom, if ever, excelled in any court of justice. You are fully possessed of the opinions of the counsel of the government and the defence, both of whom have presented their views with distinguished ability. Further light can hardly be expected. The court has endeavored to hold the scales of justice even, between the government and the prisoner. The hour in which you are to act, has now come. Other parties connected with this trial have discharged their duties; you are now called upon to discharge yours.

In the progress of this protracted trial you may have speculated upon portions of the testimony as it has been produced. One fact may have had a tendency on your judgments to inculpate and another to exculpate the prisoner. These facts may have been matters of discussion among you, and from these discussions partial opinions may have been formed. You would be something more than human if impressions thus made did not remain.

But when you now retire to consider your verdict, you should at once dismiss all such impressions or partial opinions. You must now look at the whole case, and consider all the facts and circumstances as a whole, and in view of all the light that has been thrown upon them, you should examine the case, not with a view to maintain opinions, nor to gain a triumph over your fellows; but discarding all pride of opinion, all strife for victory, and acting under a sense of your high responsibility, each should seek only for the truth.

To all which charge and instructions, and to each of them, and to each and every part thereof, the counsel of the prisoner excepted.

## POINTS AND AUTHORITIES FOR THE DEFENDANT.

### BY N. CLIFFORD.

I.   The demand for triors was improperly refused, and the judge erred in ruling that in all cases of challenge for cause, whether for favor or otherwise, the question of indifference or impartiality must be heard and determined by the court.

1.  Every person accused of crime is entitled to an impartial trial, and except in trials by martial law or impeachment, by a jury of the vicinity.

Nor can any person be deprived of his life, liberty, property or privileges, but by judgment of his peers or the law of the land.  Const., art. 1, sec. 6.  Const. of Mass., 1780, art. 1, sec. 27.

The legislature is authorized to provide by law, " a suitable and impartial mode of selecting jurors, and it is expressly ordained that their usual number and unanimity in indictments and convictions shall be held indispensable."  Const., art. 1, sec. 7.  Const. Mass., 1780, art. 1, sec. 12.

The mode of selecting jurors is accordingly prescribed by statute, and it is to that proceeding, undoubtedly, that the framers of the constitution refer in the above provision.  It confers the powers as the words import, to make provision for the choice of jurors from the mass of the citizens.

It contemplates a proceeding anterior to the service of the venire, and has no reference whatever, to the formation of the panel at the trial.  R. S., chap. 135.

Jurors are first selected and then summoned, and the list is made up by the clerk from the returns upon the venires.

After the list is thus made up, the prisoner is entitled to be furnished with a copy of it, to assist him in exercising his right of challenge.  R. S., chap. 172, sec. 22.

It is obvious therefore that the power conferred upon the legislature to provide for the selection of jurors has nothing to do with the right of challenge in court.

That matter is left entirely to the long established and well known principles of the common law.

2. An impartial jury is one selected or drawn and returned pursuant to the statute and impanneled according to the usages and principles of the common law, as it existed when the constitution was formed.

It must be considered, therefore, that the right of challenge *for cause,* though derived from the common law, is a constitutional right in this state, and one which cannot be impaired even by legislative enactment. Otherwise a person accused of crime might be deprived of an impartial jury.

3. Peremptory challenge stands upon a different basis. It was allowed originally as a matter of favor, and has always been considered subject to legislative control. It was so in England, and is so here. Whar. Crim. Law, (4th ed.) sec. 2958. R. S., chap. 172, sec. 17.

It is doubtless competent for the legislature to enlarge or diminish their number, and perhaps to disallow such challenges altogether. Laws of Maine, 1821, chap. 59, sec. 42. Same, 1849, chap. 105, sec. 1.

Not so with respect to the right of challenge for cause. It is part and parcel of the right of trial by jury, and can no more be abrogated than the constitution itself, by which it is secured.

The guaranty of an impartial jury is of no value if the accused may be deprived of the means of making that guaranty available.

Challenge for cause is the only means allowed of right to the accused at the trial for that purpose. People v. Bodine, 1 Den. on p. 309, near the bottom of the page.

4. It follows therefore that the right of challenge to the polls for cause is an indispensable incident to the right of trial by jury, and though it was derived from the common law, it is by necessary implication, secured by the constitution of this State to every person accused of an indictable offence. Const. Ar. 1, Sec. 6; People v. Bodine, 1 Den. pp. 304 and 305; Low's Case 4 Me. 449; 3 Co. Litt. 157, b. p. 523; 2 Hale's P. C. (1st Am. ed.) p. 275; 2 Hawk P. C. chap. 43 2 Kent's Comm. (6th ed.) p. 13, 1 K. 612; 2 Inst. p. 50;

Hoke v. Henderson, 4 Dev. (N. C.) p. 15; 3 Story's Com. on Const. pp. 652, 661; Taylor v. Porter, 4 Hill on pp. 144, 146; Whar. Crim. Law, (4th ed.) sec. 2944 and 3022; Lewis' Crim. L. p. 611; 5 Bac. Abr. by Bouvier, 436; 1 Bouv. L. Dic. (6th ed.) p. 217. Title, challenge to the polls for favor.

5. Challenges to the polls for cause are twofold. Principal cause, and challenge for favor. Principal cause is where a cause is shown which, if found true, stands sufficient of itself without leaving anything to be tried by triors. Whar. Crim. Law Sec. 2975; 2 Hale's P. C. (1 Am. ed.) 275, note 2; 2 Gabb. Crim. Law p. 391; 2 Hawk. P. C. chap. 43, sec. 10 and 32, pp. 582 and 589; 3 Co. Litt. 158, a. (p. 481.)*; 1 Chit. Crim. Law (*549) p. 548.

Challenges for favor take place where, though the juror is not so evidently partial as to amount to a principal challenge, yet there are reasonable grounds to suspect that he will act under some undue influence or prejudice.

The causes of such challenges are manifestly numerous, and dependent on a variety of circumstances; for the question to be tried is whether the juryman is altogether indifferent, as he stands unsworn. Whar. Crim. Law sec. 3022; Carnal v. the People, 1 Parker C. R. p. 272; Smith v. Floyd, Barb. Sup. C. R. p. 524; State v. Creasman, 10 Ire. p. 395; Malone v. the State, 8 Geo. p. 408; Bishop v. the State, 9 Geo. p. 121.

Where the cause of challenge stated amounts to a principal cause, *if the facts are undisputed*, the question whether the juror stands indifferent or not, is one of law, to be determined by the court. People v. Bodine, 1 Den. on pp. 364 and 365.

Whether the challenge be one for principal cause or for favor, if the facts are disputed, the question must be submited to triors. Ex parte Vermilyea, et als, 6 Cow. on p. 559; People v. Mather, 4 Wend. on pp. 239 and 240; Whar. Crim. Law sec. 30 and 41; Lewis Crim. Law page 611, at the bottom of the page; People v. Bodine, 1 Den. on pp. 304 and 305; 3 Co. Litt. (1 Am. ed.) (481)* p. 522; Bac. abr. juries, E. 12.

6. When the challenge is for favor the question whether the juror is indifferent or not must in all cases be submitted to triors. 3 Co. Litt, (1 Am. ed.) 158, b. p. 526; case of the Abbott of Strata Mercella, 5 Coke R. part 9 p. 32, cites as authority 9 E. 4, 5 b. 15 E. 4 24a. 4 E. 4, 18 E. 4, 18a, 16 E. 4, 7 b. 14 H. 7, 1 b. 19 H. 6, 48 b. 7 H. 4, 46a; 11 Petersdorf Abr. (740) p. 542; 2 Hale's P. C. (1 Am. ed.) 275; 1 Chitt. Crim. Law (549) p. 548; 3 Bac. abr. juries 12, p. 765; 2 Hawk. P. C. chap. 43; Whar. Crim. Law, sec. 3038; 3 Jac. law dic. Jury II, p. 576; 2 Tidd Prac. 779; Viner abr. trial of challenges A. e. p. 290; McCormick v. Brookfield, 1 South. p. 69; U. S. v. Johns, 4 Dall. p. 413; Howe's prac. jury p. 247; 1 Arch. Crim. Law by Wat. p. 163-4; Prindle v. Huse, 1 Cow. p. 432 and note on p 441; Mechanics' and Farmers' Bank v. Smith, 19 Johns. on p. 121; 4 Bl. Comm. p. 353, note 8; Lohman v. the People, 1 Coms. R. on p. 384; Lewis Crim. Law pp. 611 and 612; 1 Archb. prac. pp. 207 and 208; 2 Gabb. Crim. Law, p. 395; Anonymous, 1 Salk., R. 151; 3 Bl. comm. on p. 363.

7. The right of challenge for cause, is a right derived from the common law, and is not now nor was it ever conferred, or the manner of its exercise regulated by statute in this state, since the adoption of our constitution. Barrett v. Long, 16 Eng. law and eq. p. 1; Brook's abr. title challenge.

Our ancestors brought with them the common law, and their respect for it appears in all the statutes of the colonial governments, of which the act respecting trials passed in 1641, is a striking example.

It provides that "it shall be in the liberty of both plaintiff and defendant and likewise of every delinquent to be judged by a jury, to challenge any of the jurors, and if the challenge be found just and reasonable by the bench, or the rest of the jury, as the challenger shall choose, it shall be allowed him, and 'tales de circumstantibus' empanneled in their room." Anc. Charters of Mass. chap. 98, p. 199.

The act setting forth general privileges is equally explicit and instructive.

It provides among other things that, "In all capital cases there shall be a grand inquest who shall first present the offence, and then twelve men of the neighborhood to try the offender, who, after his plea to the indictment *shall be allowed his reasonable challenges.*" Anc. charters of Mass. chap. 2, p. 214.¼

Jurors at first were chosen by the freemen of the respective towns, and when so chosen it was made the duty of the constables "to warn them to attend the court whereto they are appointed." Colony laws, anc. charters, chap. 61 p. 144; Prov. laws, anc. charters, chap. 5, p. 221, and chap. 61, p. 332.

And by the act last mentioned, it is provided that if by reason of challenge or otherwise there do not appear a sufficient number of good and lawful men to make up the petit jury or juries to serve at the said court, then and in such case the said jury or juries shall be filled up de talibus circumstantibus.

The choice of jurors was further regulated by the act 33 George II, passed in 1760, requiring lists to be prepared and laid before the town at a meeting called for that purpose.

Under this act the jurors were drawn from the jury box, very nearly in the manner of the regulations of our revised statutes.

And the fourth section of the act provides almost in the words of chapter 115, section 65, of our revised statutes "that the justice of the respective courts aforesaid are hereby directed upon motion of either party *in any case* that shall be tried after the first day of June next, and during the continuance of this act, to put any juror to answer upon oath whether returned as aforesaid, or as talisman; whether he doth expect to gain or lose by the issue of the cause then depending. Whether he is in any way related to either party, or hath directly or indirectly given his opinion, or is sensible of any prejudice in the cause." Prov. laws, Anc. Charters, p. 626.

It must be obvious that the provisions above cited related solely to civil causes, and that there is no pretence that it repeals or is in any respect inconsistent with the act of 1641,

or the act declaring general privileges passed in 1692.    Idem.
pp. 191, 214.

Both those statutes recognizing challenges in criminal
cases as at common law were unrepealed and in full force in
1780, when the constitution of Massachusetts was adopted.
That constitution provides as follows:

" All the laws which have heretofore been adopted, used and
approved in the Province, Colony, or State of Massachusetts
Bay, and usually practiced on in the courts of law, shall
still remain and be in full force until altered or repealed by
the legislature; such parts only excepted as are repugnant
to the rights and liberties contained in this constitution."
Constitution of Mass., chap. 6, article 6; Comm. v. Webster,
5 Cush., on pp. 303, 304.

Chief Justice Shaw says in that case that the common law
"was adopted when our ancestors first settled here, by gen-
eral consent.

"It was adopted and confirmed by an early act of the pro-
vincial government, and was formerly confirmed by the pro-
vision of the constitution above cited.

" So far, therefore, as the rules and principles of the common
law are applicable to criminal law, and have not been altered
and modified by acts of the colonial or provincial govern-
ment, or by the state, they have the same force and effect as
laws formally enacted."

8. Those who allege the alteration must show it.    The
burden is upon the government in this case, and if they set
up a repeal of the common law right, they must show it
clearly; as the maxim is that statutes passed in derogation
of the common law are to be construed strictly, and are not
to operate beyond their words or the clear repugnance of
their provisions.    Stowell v. Zouch, Plow. R. 365; 1 Kent's
Comm., part 3, sec. 20, p. 464; Heydon's case, 2 Coke, R. part
3, p. 9; 6 Bac. abr. statute 4; 1 Bishop Crim. Law, sec. 91,
and case cited; 2 Weller 75.

A statute which is to take away a remedy given by the
common law aught never to have a liberal construction.

Hammond v. Webb, 10 Mod., 282; 6 Bac. abr. statute 6, page 388.

Where the new statute does not repeal the old law, both have a concurrent efficacy, and suitors may elect under which they will proceed. 1 Bishop Crim. Law, sec. 93, and cases cited.

Statutes are never repealed by nonuser. White v. Boot, 2 Term, p. 274; 1 Bishop Crim. Law, sec. 56, and cases cited.

The common law is an essential part of the jurisprudence of this state.

Our constitution provides that "all laws now in force in this state, and not repugnant to this constitution, shall remain and be in full force until altered or repealed by the legislature, or shall expire by their own limitation. Const., art. 10, sec. 7.

And it is provided by the act creating the Supreme Judicial Court, that "the said court may exercise jurisdiction, power and authority agreeably to the common law of this state, not inconsistent with the constitution or any statute. R. S., chap. 96, sec. 7.

9. Whence comes the right of challenge at all, whether peremptory, or for cause?

Challenge for cause is not mentioned in any statute now in force, nor in any one that ever was in force in this state.

Peremptory challenges are only referred to for the purpose of limiting the number.

Take for example the act of 1821. It is as follows: "And no person who shall be indicted for any such offence shall be allowed to challenge peremptorily above the number of twenty persons of the jury." Laws of 1821, chap. 59, sec. 42.

No person * * * * shall be allowed to challenge peremptorily more than twenty persons of the jury. R. S., chap. 172, sec. 17.

That number is reduced to ten by chap. 100, sec. 1, of the Laws of 1849.

At common law, the prisoner on a charge for treason, was entitled to thirty-five peremptory challenges, and such was

the law of the commonwealth, derived from the common law, until after the declaration of independence.

It was not until 1777 that any change was made in this respect. The number was then reduced to twenty, and the attorney general was forbidden to challenge peremptorily any juror about to be empanneled for any criminal accusation or charge. Appendix 2, Laws of Mass., chap. 61, secs. 13 and 14, p. 1050.

Section thirteen applies to trials for treason, and has no reference whatever to other capital offences.

The authority conferred upon the court by Revised Statutes, chap. 115, sec. 65, furnishes no answer to the inquiry.

10. Challenge for cause is the right of the accused. It is an absolute right, and not one dependent either upon the discretion or caprice of the court. No such right is conferred or even recognized in that section.

The court may or may not make the inquiries, and so far as that provision is concerned, neither the prisoner or his counsel have any rights whatever. Comm. v. Gee et. al, 6 Cush., pp. 177 and 178.

Parties may adopt that mode by consent, and if they do, it is clearly a waiver of the common law right of challenge for cause. People v. Mather, 4 Wend., on p. 240; Lewis Crim. Law, on p. 612; Whar. Crim. Law, sec. 3041.

It is a convenient mode, and one frequently followed, and unless triors are demanded, it may be regarded as satisfactory.

No greater error, however, can be committed, than to regard that provision as repealing by substitution the common law right.

One is an absolute right vested in the prisoner, which he may exercise himself or by counsel, the other is merely discretionary with the court, and cannot be exercised by the prisoner or his counsel, except as a matter of concession by the court or presiding justice.

Waiving these difficulties, which are insuperable, there is still another, quite as serious as the one described. Every interrogatory prescribed in that provison has reference en-

tirely to causes of principal challenge. Assuming (what I deny) that the provision was intended as a substitute for the common law right, then the right of challenge for favor does not exist.

All must agree that by the common law it did exist as a right, and for centuries was regarded in England as a valuable right. Our ancestors brought the common law with them, as appears by the terms of their charters from the crown, and they adopted and confirmed it by repeated statutes, some of which have been referred to.

And now, if it is lost, when was it lost? Where was it lost? By what means was it lost?

11. We go further, and contend that the provision when rightly construed, is in all respects save one, perfectly consistent with our views, and that is its discretionary aspect.

Suppose it may be applied in capital cases, which we deny, unless by consent, it does not militate with the argument in any respect except the one mentioned.

12. Every one of the interrogatories prescribed relate to principal cause, which is always determined by the court when the facts appear and are undisputed. The provision must receive a reasonable construction according to the rules of law, and when so construed it will be found to support our views.

" Statutes are to receive such a construction as may be agreeable to the rules of the common law in cases of that nature; for statutes are not presumed to make any alteration in the common law further or otherwise than the act expressly declares; therefore in all general matters the law presumes the act did not intend to make any alteration, for if the legislature had that design, they would have expressed it in the act." 1 Bishop Crim. Law, sec. 86, and cases cited; 6 Bac. Abr. Title Statute 4, p. 384; Arthur v. Bokeman, 11 Mod., 150.

Applying that rule to the interpretation of that provision, and there is not a word in it contradictory to the common law right of challenge for cause.

Take the phrase " if it appear from his answers   &ast;   &ast;   &ast; another juror shall be called and placed in his stead for the trial of the cause." It is just so at common law, if the challenge is for principal cause, and it appear from the answer of the juror, or in any manner, that he is not indifferent, the question becomes a mere question of law, and is determined by the court unless the facts are drawn into dispute, and then the question must be submitted to triors.

Suppose the fact is disputed, the provision of our statute is silent as to the manner in which the disputed fact is to be ascertained. It must be construed in accordance with the common law, and if so construed, it may well be inferred that the disputed fact shall be ascertained in the manner and by the means prescribed by the common law.

But the provision has reference entirely to trials in civil cases, and cannot be made applicable to the impanneling of jurors in capital cases.

13. Jurors in civil cases are impanneled generally for the term, and not for any particular cause. It was so in Massachusetts, and has always been so in this state. R. S., chap. 115, sec. 58–60; Laws of Mass., March 12, 1808, vol. 4, p. 41.

It is obvious that this provision was intended to prescribe interrogatories to be propounded to jurors after they are sworn, and the panel is made up, and they are called for the trial of a particular cause.

The words of the provision are expressly to that effect, *" another juror shall be called and placed in his stead for the trial of the cause."*

Another juror could not be placed " in his stead," unless the juror displaced or set aside had already been placed in the panel.

It must cost much ingenuity to make this provision apply to the impanneling of a jury in capital trials, where a new list is required to be made from the venires, and arranged in alphabetical order, and when the prisoner is required to make his challenges " before the juror is sworn."

Such conclusion would be contrary to every known rule of interpretation, contrary to the very words of the provision, and contrary to common sense. It cannot, therefore, be adopted.

14. The only remaining provision in the Revised Statutes is the following: The same challenges of jurors shall be allowed in criminal as in civil causes to the attorney general or other prosecutor, and to the defendant. R. S., chap. 172, sec. 31.

That section is an affirmation of the common law in all criminal trials *under the degree of felony. Parties in civil suits never had the right of peremptory challenge, and consequently it cannot be applied in capital cases.* Marsh v. Coppoch, 9 Carr. and P., p. 480.

Suppose it were otherwise, it can make no difference. It relates to the character of the challenges, and not to the manner in which they are to be made.

No statute is in existence specifying the manner in which challenges for cause shall be tried, nor was there ever one in this state or in Massachusetts, except the one cited before, passed in 1641. Anc. Char., chap. 98, p. 199; 2 Bon., S. D., Trial 606.

That provision of the Revised Statutes is a new one, unknown in the history of previous legislation in this state, consequently can have no influence in determining what are the constitutional rights of a person accused of a capital offence.

The meaning of the phrase " impartial jury," must be ascertained by the state of things which existed when the constitution was formed, and not by anything which has since occurred.

Waiving that, however, and assuming that the rules of interpretation before cited are correct, it follows that this provision cannot be held to make any change in the common law right of challenge for cause.

It does not purport to make any such change, nor can it be so construed without supplying words which the provision does not contain.

The rule of construction must be reversed to give it any effect inconsistent with our views.

15. Challenge is a technical word. It is an " exception to jurors who are returned to pass on a trial." 1 Chit. Crim. Law, p. 534; 1 Bouv. Law Dic., challenge, p. 216.

It must be made as they are called, and before they are sworn.

No such proceeding is contemplated by the provision in chap. 115, sec. 65, of our Revised Statutes.

That proceeding is not a challenge in any sense. Neither in form, nor the time of making, nor in the manner of its exercise.

The right of peremptory challenge continues until the juror is sworn. 3 Co. Litt. (483*); Regina v. Frost, 9 C. and P., 129, (38 E. C. L. 70); Whar. Crim. Law, sec. 3026; 1 Chitt. Crim. Law, p. 545; Lewis Crim. Law, on p. 612; People v. Bodine, 1 Den., p. 181; Comm. v. Knapp, 9 Pick., p. 419. Cannot be made after the juror is sworn. Comm. v. Knapp, 10 Pick., on p. 480. May be made after oath. Comm. v. Twombly, 10 Pick., in note on p. 480; U. S. v. Morris, 1 Curtis, on p. 37. Must precede the statute questions. Comm. v. Webster, 5 Cush., on p. 298.

This is not good law if statute questions constitute a challenge for cause. The right continues until the juror is sworn. Morris, case 4; Howell's Case Trials, p. 1255; Manley v. State, 7 Blackf., 593; Morris v. State, 7 Blackf., 607; the justices, &c., v. Plank Road Co., 15 Geo. 39.

16. It was first enacted in 1760, as a cumulative mode of securing an impartial jury in civil cases, and was never regarded, as far as can be ascertained from the course of legislation, as repealing the common law right of challenge. 7 Dane Abr., chap. 222, art. 17, p. 380; Robinson v. the State, 1 Kelley, (Geo.) 563; People v. Doe, 1 Manning R. (Mich.) 451; Copenhavin v. the State, 12 (Geo.) 444; Stuart v. the State, 8 Eng. (Ark.) 720.

Serious doubts were formerly entertained how far jurors could be examined on the voire dire as a ground of challenge,

State v. Knight.

and there are not wanting contradictory decisions upon that point. Anonymous, 1 Salk., 153.

The law is now well settled that a juror is bound to answer all questions which do not tend to render him infamous. People v. Bodine, 1 Den., p. 281; Whar. Crim. Law, sec. 3010; Mechanics' and Farmers' Bank v. Smith, 19 Johns., on p. 121; 3 Bac. Abr. Title Jury E.; People v. Jewett, 3 Wend., p. 314.

17. It seems certain, therefore, that Mr. Dane has furnished the true solution and design of this provision.

*It was not to abridge the rights of parties, or to deprive them of their common law right, but to furnish the court with additional means to secure an impartial jury.*

Subsequent legislation has stripped that provision of all its value as a right, and made it purely a matter of discretion.

We think it clear, therefore, that the challenges allowed in criminal cases and referred to in the Revised Statutes, chap. 172, sec 31, are the challenges known and allowed in that " great repository of rules, principles and forms, the common law," and not the discretionary proceeding referred to in chap. 115, sec. 65 of our statute before mentioned. Comm. v. Webster, 5 Cush., on p. 303.

18. A bill of exceptions lies for refusing triors, or upon any question arising upon a challenge to jurors in a case where triors may be demanded. People v. Freeman, 4 Den., on p. 33; 2 Tidd Prac., 786; Archb. Prac. 210; Bul. N. P. 316; Rex. v. Edmunds, 4, Barn. and Cress. p. 471.

Any law or decision which would place a right, so important as that of the right of challenge for cause, in capital trials, within the control of a single judge, will require a solid foundation on which to rest, or it cannot stand.

It is no answer to say that the prisoner may except; so he may in all matters of law.

It should be remembered, however, that challenge for cause, whether principal or for favor, involves questions of fact where there is no remedy by bill of exceptions, and challenges for favor are always " left to the conscience and dis-

cretion of the triors to find the jurors favorable or not favorable." People v. Bodine, 1 Den., on p. 305.

" They are final judges upon the matters submitted to them; and from their decision, when properly instructed, the law has provided no appeal." Freeman v. the People, 4 Den. on p. 34; 3 Bl. Comm., on p. 363.

19. A single judge has no right to hear and determine such matters, and the presiding justice erred in refusing the demand for triors and in ruling that " in all cases of challenge for cause, whether for favor or otherwise, the question of indifference or impartiality must be heard and determined by the court."

"Other challenges for cause were made by the prisoner before the pannel was completed; some of which were allowed and others were disallowed, on hearing before the presiding judge, under the ruling aforesaid."

20. The prisoner, therefore, is entitled to a new trial, if the right to demand triors in a capital case exists in this state.

11. 1. The questions, propounded by the counsel of the defendant, on cross-examination, to L. D. Rice, were proper, as effecting the credibility of the witness, and were improperly excluded. Desailly v. Morgan, 2 Esp. R., 691.

"A witness may be asked what he has said or written at a previous time at variance with his testimony." Ros. Crim. Evidence, p. 182; Tucker v. Welsh 17, Mass. 166.

Clearly, the second question was proper, and the ruling of the judge, in excluding it, was erroneous. The prisoner had a right to know where the witness so testified, if it was not before the grand jury. 1 Greenl. Ev. sec. 462, and sec. 449 on p. 576.

The witness voluntarily testified that, "this is not the first time I have testified that I saw Mr. Prout put his hand on deceased's face." Surely, after that the prisoner had the right to inquire where it was he so testified. 1 Stark. Ev., (199*), 198; Thomas v. Newton, Moo. and M., 48.

2. The question propounded by the government to Domin-

icus J. Prout, was clearly improper, as was also the answer of the witness. Both questions and answers should have been ruled out.

A party has no right to confirm a statement of his witness by proving that he gave the same account out of court.

Proof of declarations, made by a witness out of court in corroboration of testimony given by him on the trial, is clearly inadmissible. Ware v. Ware, 8 Greenl., on p. 55; Whar. Crim. Law, sec. 820; Dudley v. Bolles, 24 Wend. on p. 472.

"*A fortiori* he cannot be permitted to corroborate his own testimony, that he made the same statement to others." Deshon v. Merchants' Ins. Co., 11 Met., on p. 210; 1 Greenl. Ev., sec. 469; King v. Parker, 3 Doug., 242.

A question is always irregular, when it assumes a fact not proved, or admitted. 1 Grenl. Ev., (6th ed.) sec. 434, p. 554; Turner v. the State, 8 Sm. and Marsh., p. 104; People v. Mather, 4 Wend. on p. 249; 1 Stark. Ev., (7th Am. ed.,) (189*) 188 and note; Ros. Crim. Ev., 169.

3. Experts, in the strict sense of the word, are persons instructed by experience. 1 Bouv. Law Dict.

Every fact stated is matter of common observation, and no more within the province of an expert than is the conclusion to be drawn from any statement of circumstantial facts.

Other legal writers define the term as referring to persons professionally acquainted with the science or practice of which they are called to testify. Stark. on Ev., p. 408; Campbell v. Richards, (27 E. C. L., on p. 210,) 5 Barn. and Adol., p. 837; 2 Stephen N. P., p. 1778.

It seems to be admitted that the opinion of such witnesses is admissible whenever the subject matter of the interrogatory is one requiring peculiar skill and experience, in order to attain the requisite knowledge to answer the inquiry understandingly, or, in other words, when it so far partakes of the nature of science as to require a course of previous study or experience to qualify the witness to give the requisite information.

4. Opinions even then should be strictly limited to scien-

tific deductions. Jefferson Insurance Company v. Cotheal, 7 Wend. 72. It does not follow that the opinion of the witness is admissible because it appears that he is a man of science, nor even that the general subject matter of the inquiry is one of a scientific nature. 1 Stark. Ev., (175*) p. 174.

5. The opinion of witnesses, whether men of science or otherwise, cannot be received when the inquiry is into a subject matter, the nature of which is not such as to require any peculiar habits or study in order to qualify a man to understand it. Folkes v. Chadd., 3 Doug., 157 ; 1 Greenl. Ev., (6th ed.,) sec. 440 ; Rex. v. Searl, 2 M. and M. R., 75 ; 1 Smith's Leading Cases, (286) p. 544 ; Best Prin. of Ev., sec. 346.

6. Whenever an interrogatory is more comprehensive than the law allows, it should be rejected.

III. 1. The engraved plates and the skeleton of the bones of the human neck, introduced and exhibited to the jury, were in the nature of medical works, and therefore were inadmissible. Ware v. Ware, 8 Greenl. R., pp. 56, 57 ; Com. v. Wilson, 1 Gray, 337 ; Collier v. Simpson, 5 Car. and P., p. 74 ; Cocks v. Purday, 2 Car. and Kiw., 270.

2. The last question propounded to Dr. Alonzo Garcelon was improper and should have been excluded.

Secret things belong to God. He alone knows what is impossible.

Persons in a sudden phrenzy often perform strange and almost incredible acts, and frequently inflict injuries and wounds upon themselves which no sane person could perform. Besides, the right hand of one person for all practical purposes is the same as the left hand of another.

One person can perform physical acts with ease, when it would be impossible for another of equal strength to approach their performance.

The witness did not, and could not know whether it was impossible for the deceased to have inflicted that wound.

That might depend upon her situation at the moment, as whether standing, sitting or lying on the bed, or it might depend upon the physical peculiarities of the muscles of the

arm or shoulder, or upon a variety of circumstances known only " to that Being, who," (in the language of Judge Rice,) " has written the records of this world's progress in the solid rocks."

It may be true that the record of this world's progress is written in the solid rocks, but it is scarcely to be supposed that an expert may be asked to tell the day or the year when that record commenced.

Science cannot determine the matter with sufficient certainty to allow the question to be asked in a court composed of men whose knowledge at best is imperfect.

Experts are allowed to give opinions only where the conclusion is an inference of skill and judgment, and the examination ought to be carefully limited to interrogatories of that nature, as the right to use such testimony is founded on an exception to the general rule. 1 Stark. Ev., (174*) p. 173.

The general rule is that witnesses ought to be examined as to facts only, and not as to any opinion or conclusion which they may have drawn from facts, for those are to be found by a jury. 1 Greenl. Ev., sec. 440; Rex. v. Wright, Russ and Ryan, p. 456.

IV. The deed, George and Mary Knight to Moses S. Jordan, was improperly admitted and read to the jury.

1. It is apparent that an indictment for murder cannot be regarded as "*an action touching the realty*," and therefore it is not a case where office copies of deeds might be read as evidence. Rules of Court, No. 26, p. 14; Hutchinson v. Chadbourne, 35 Maine, 189; Kent. v. Weld, 2 Fairf., p. 459; Doe v. Scribner, 36 Maine, 168; Jackson v. Nason, 38 Maine, 85, per. Rice, J.; Dunlap v. Glidden, 31 Maine, 510.

These cases are decisive that office copies could not be used, and therefore it is equally clear that the original could not without proof of its execution. "It is a general principle of the law of evidence that the party offering to prove a fact by deed, must produce the original and prove its execution." Kent v. Weld, 2 Fairf., p. 459; 1 Grenl. Ev., (6th ed.) secs. 569 to 573 inclusive.

2. No case is known where it has been held that evidence that a party once had a deed in his possession, is sufficient to dispense with proof of its execution by the subscribing witness.

3. The cases cited affirm a different rule, and it is believed that none can be found to sustain a departure from the principle which they affirm. Vacher v. Cocks, (20 E. C. L., on p. 366,) 1 Barn. and Adol., p. 145, per. Bayley, J.; Cronk v. Frith, (38 E. C. L., on p. 77,) 9 Car. and P., p. 197; Betts v. Badger, 12 Johns., 225; Jackson v. Kingsley, 17 Johns., 158; 2 Stephen's N. P., 1704; Knight v. Martin, 8 East, 548, overruling; Rex. v. Middleton, 2 Term, 41.

Office copies can "be admitted only in actions touching the realty, and in all other actions the general principle of the law of evidence prevails, that a party offering to prove a fact by deed, must produce it and prove its execution. Hutchinson v. Chadbourne, 35 Maine, on p. 192; Kent v. Weld, 2 Fairf., 459; Wilkins v. Cleaveland, 9 Barn. and Cress., 864, (17 E. C. L., on p. 515;) 1 Chitt., C. L., p. 579, (580*;) Ackler's case, 1 Leach, C. C., 175.

It is insisted also for the same reason that the deed, Moses S. Jordan to George Knight, was improperly admitted.

5. The testimony of Dr. Augustus A. Hayes furnishes a striking example of the perversion of the rule, that the opinion of experts should be limited and confined to such matters as are of a scientific nature.

He was allowed, notwithstanding the objections of the counsel of the prisoner, to call the attention of the jury to what the witness characterized as a "peculiarity which the stain itself presents," and was allowed to describe it according to the impressions which it made upon his mind.

All this matter of description was as open to the observation of the jury as of the witness, and should have been excluded. People v. Bodine, 1 Den., on pp. 311, 312; 2 Russ. on Cr., p. 923.

A party calling and examining a witness, has no more right to stultify the witness, when the testimony is against him,

than he has to impeach his competency or credibility under like circumstances.

It is admitted, and all the authorities agree, that a party is estopped to impeach either the competency or credibility of a witness, however much he may be disappointed in his testimony.

The rule is, that "a party by calling and examing a witness, accredits him as competent and credible, and is estopped from avowing the contrary." Stockton v. Demath, 7 Watts., 39; People v. Safford, 5 Den. pp. 117, 118.

ERRORS ALLEGED IN THE INSTRUCTIONS GIVEN TO THE JURY.

I. The judge instructed the jury that "in all cases where the unlawful killing is proved, and there is nothing in the circumstances of the case as proved, to explain, qualify or palliate the act, the law presumes it to have been done maliciously; *and if the accused would reduce the crime below the degree of murder, the burden is upon him to rebut the inference of malice which the law raises from the act of killing by evidence in defence.*"

It is the last paragraph of the instruction to which objection is made.

Cases may be cited, undoubtedly, which furnish some countenance to the doctrine of the instruction.

The true rule, however, was laid down by Mr. Justice Wilde, though differing from the majority of the court in Comm. v. York, 9 Met., pp. 133 and 134.

1. That when the facts and circumstances, accompanying a homicide, are given in evidence, the question whether the crime is murder or manslaughter, is to be decided upon the evidence, and not upon any presumption from the mere act of killing.

2. That if there be any such presumption, it is a presumption of fact, and if the evidence leads to a reasonable doubt, whether the presumption be well founded, that doubt will avail in favor of the prisoner.

3. That the burden of proof, in every criminal case, is on

the state to prove all the material allegations in the indictment; and if on the whole evidence, the jury have a reasonable doubt whether the defendant is guilty of the crime charged, they are bound to acquit him.

That rule is now generally adopted and has been regarded as law ever since the opinion of that distinguished judge was published, wherever the question has been considered.

According to my understanding of the matter, it is now the law of Massachusetts; and if not, it is destined to be the law of every people where the English language is spoken. Comm. v. McKie, 1 Gray, 61; Comm. v. Hawkins, 3 Gray, on p. 466; Benn and Heard, Lead. Crim. Cas., pp. 347 to 360; State v. Fly, 26 Maine, 312; State v. Merrick, 19 Maine, 398; State v. Tibbets, 35 Maine, 81; Whar. Crim. Law, (4th Am. ed.,) sec. 717.

2. " When men are found to keep silence when they are surrounded with circumstances of suspicion, which require explanation, or give false explanation, or attempt to induce others to relieve them by falsehood and perjury, *inferences necessarily arise prejudicial to them;* and when such moral coincidences are connected with physical circumstances, it frequently gives a conclusive and inculpatory character to circumstances which otherwise might be inconclusive, or slightly inculpatory."

It is the province of the jury to judge of the force of circumstances, and not for the court. The proposition, as stated, left nothing for the jury to determine, except to ascertain whether the inculpatory circumstances were proved.

It should have been left to the jury to draw their own inferences. 1 Stark Ev., (7th Am. ed.) p. 577; 1 Greenl. Ev., sec. 49.

3. " That Being, who has written the record of this world's progress on the solid rocks and on the cliffs of the mountains, writes also the history of secret crime in characters which will be found so legible that they may be read with almost unerring certainty, if you will only give them your attention.

" Such, gentlemen, is the character of circumstantial evi-

dence, which is often inconsiderately spoken against; but, if properly understood and its principles correctly applied, will seldom lead to erroneous results.

"With these rules for ascertaining the truth, thus imperfectly illustrated before you, and with an earnest desire to arrive at just conclusions in the case, let us proceed to the examination of the facts proved, that you may determine what legitimate inferences should be drawn therefrom as to the guilt or innocence of the prisoner."

It seems to the counsel of the prisoner, that the rules for ascertaining truth from circumstantial evidence, are colored, and their efficacy as a guide to right results, is greatly overstated, and that, too, in a manner calculated to mislead the jury, and therefore erroneous. Miller v. Marston 35, Maine, 153; Pierce v. Whitney, 32 Maine, 113.

4. "You are asked, the government are asked, where are the foot-prints of the prisoner which connect him with his house in his passage to and from the heater-piece.

"It is said that there is a space of one mile and ninety-two rods which you are asked to overleap without testimony.

"Gentlemen, you are to try this case by the evidence *in* the case, and not that which is *out* of it."

Circumstantial facts, when grouped together, are justly characterized as a chain of circumstances, and it is their connection and consistency which gives them force and efficacy, as evidence in judicial trials.

The absence of proof, naturally to be expected, especially in cases depending upon circumstantial evidence, often furnishes an argument as strong against a given hypothesis, as would a positive repugnance in the circumstance proved. 1 Phill. Ev., (1st Am. ed.) Appendex, Rule 13, p. 61; 1 Stark. Ev., p. 573.

5. "If, however, the absence of such proof throws *an insurmountable barrier in your way*, then the hypothesis of the government fails.

"But if the situation of the parties at the time, and subsequent occurrences are such that you may suppose that it

State *v.* Knight.

would not have been possible for the government to have given you this species of evidence, then it is no imputation on the integrity or intelligence of the prosecuting officers that they have not done so, because they are not called upon to perform impossibilities."

This instruction is clearly erroneous. It does not allow the jury to acquit the prisoner unless the absence of such proof (the footprints) "throws an insurmountable barrier in the way" of the conclusion of guilt.

It is violative of every principle of law intended for the protection of the innocent in jury trials.

6. "If Lydia Knight was in that room with Mary Knight at the time of her decease, and did not see the blow struck by which her life was taken, you are not compelled to come to the incredible conclusion that Mary Knight is not dead.

"It does not necessarily follow that because Lydia Knight was present, but did not observe the manner or time of death, that it did not occur.

"There is a distinction between positive testimony and negative testimony."

There is an important distinction between positive and negative testimony, and in cases where the principle applies, it is not unfrequent that the judge, at the trial of an issue, depending upon the conflicting statement of witnesses, reminds the jury of it as a means of reconciling those statements consistently with the integrity of the witness.

It is contended that the principle in this case was wholly misapplied. 1 Stark. Ev., p. 578; 3 Bck. Com., p. 371.

7. "It is strongly insisted that the situation of that window is *absolutely* inconsistent and incompatible with the guilt of the prisoner; that he could not, by possibility, have committed the murder and escaped through that window, and that there is no suggestion of escape in any other direction.

"The consideration is worthy your attention, whether there were greater obstacles to the escape of the prisoner than there would have been to that of any other person.

"If you come to the conclusion that Mrs. Knight did not

7

commit suicide, but was killed by the hand of another, that other hand must in some way have come in contact with her.

"What person had the most favorable opportunity to perform this act?

"Who had a motive to do it? Who possessed the means and had the facilities with which to accomplish it? In what direction and to whom do the circumstances in the case, as proved, point, as being connected with the transaction?

"Do these circumstances *all* point in one direction? Are the circumstances of a conclusive and inculpatory character? Do they point to the prisoner as the guilty party? And are they of such a character as actually to exclude, to a moral certainty, and beyond all reasonable doubt, every other hypothesis except that of the guilt of the prisoner?"

It is apparent that the remarks of the judge were equivalent to an absolute denial of the rule of law "that all the facts should be consistent with the hypothesis." 3 Greenl. Ev., sec. 137, p. 127; 1 Stark. Ev., p. 572; 3 Greenl. Ev., sec. 134; Willes on Cir. Ev., p. 168.

V. Errors in refusing requests for instruction.

1. The counsel of the prisoner requested the judge to instruct the jury that "in order to convict the prisoner upon the evidence of circumstances, it is necessary not only that the circumstances all concur to show that he committed the crime, but that they all be inconsistent with any other rational conclusion." 3 Greenl. Ev., sec. 137, p. 127; Hodge's Case, 2 Lew. Crim. Cas., 227, per. Alderson, B.; 1 Stark. Ev., p. 560.

2. And the counsel of the prisoner requested the Court to instruct the jury that no conviction in a criminal case ought ever to take place, on circumstantial evidence, where the government has introduced direct evidence tending to show that the prisoner could not have committed the crime charged. 1 Stark. Ev., pp. 577 and 583.

3. And the counsel of the prisoner requested the court to instruct the jury, that direct evidence introduced by the government, tending to prove the innocence of the prisoner

State *v.* Knight.

"shall not be held refuted, from being opposed to circumstances incongruous with that evidence." 1 Phill. Ev. (1 Am. ed.) appendex, p. 56, Rule 5; 1 Stark. Ev., p. 586.

4. And the counsel of the prisoner requested the court to instruct the jury:

That the theory that the blood of animals, such as the ox or sheep, can be discriminated from that of man, when in a dried state, by chemical means, is too uncertain to be used as evidence or to be relied on as evidence in this case.

"The counsel of the government then asked the witness: Is there a distinction, chemical or physical or microscopic, between the qualities of human blood and that of any beast."

To which the counsel of the prisoner objected, the court overruled the objection, and the witness answered: "there is a distinction, a physical distinction, existing between the blood of man and that of some beasts. I do not know of any precise chemical distinction."

We deny that the blood of man when in a dried state can be discriminated by chemical means from the ox or the sheep, and insist that the theory that it can be so discriminated is not a science, and therefore that the instruction was improperly withheld. Taylor's Med. Jurisprudence, pp. 236 and 237 and 238.

5. And the counsel of the prisoner requested the court to instruct the jury that the theory, that the blood of the ox or of the sheep can be distinguished from that of a human being, when in a dried state, by microscopic observation, is too uncertain to be used as evidence, and the difference in size of the globules is too slight to be relied on as evidence in this case.

It is contended for the prisoner, that such evidence is too uncertain and unreliable to be received in a court of justice, and we deny that such discrimination can be made with sufficient certainty to authorize the court to allow the statements of the witness to be submitted to a jury in a criminal case. Whar. and Stille, Med. Jur., pp. 562 and 563; Taylor's Med. Jur., pp. 239, 240, and authors cited; Carp. Prin.

State *v.* Knight.

Phys., pp. 159 and 160; Todd and Boman Physiological Anatomy, p. 634, (1857;) Dunglison Med. Dict., p. 408.

6. And the counsel of the prisoner requested the court to instruct the jury that the distinction between positive and negative testimony is applicable to direct testimony, and cannot be applied to circumstantial evidence when placed in direct conflict with positive testimony. 1 Phil. Ev., (1st Am. ed.) appendix, p. 55, rule 5.

POINTS AND AUTHORITIES FOR THE STATE,

BY N. D. APPLETON, ATT'Y GENERAL, AND C. W. GODDARD,

COUNTY ATTORNEY.

I. Triors were properly refused, because,

1. The common law authorizing their appointment (3 Blackstone, 363; Bacon's Abr., E. 12,) was modified in Massachusetts by the colonial ordinance of 1641, which substituted for the ancient system another tribunal, to wit: *the bench, or the rest of the jury,* at the election of the party challenging.

"Also it shall be in the liberty of both plaintiff and defendant, and likewise of *every delinquent to be judged by a jury,* to challenge any of the jurors, and if the challenge be found just and reasonable *by the bench, or the rest of the jury, as the challenger shall choose,* it shall be allowed him, and *tales de circumstantibus* empanneled in their room." Anc. Charters and Laws, chap. 98, sec. 3, p. 199. We do not deny that by ancient and modern law practice, triors were allowed, as the counsel contends. But when trial of jury came to this country, it was not accompanied by all which there attended it. This was never adopted, but was modified by statute in 1641. No distinction between challenge for cause and favor. 3 Bl. Com., 361.

2. But this privilege, to wit, of submitting the challenge to the rest of the jury instead of the bench, seems never to have been exercised by the party challenging, and thus became obsolete.

" Notwithstanding the privilege allowed of referring the challenge to the bench or the rest of the jury, a practice might insensibly grow up under the influence of the circumstances already alluded to, (their simpler habits,) in which the first settlers were placed, which should withdraw the decision upon the competency of jurors challenged *from the rest of the jury*, and give it *to the court.*" American Jurist, vol. 12, p. 330. And accordingly no instance of its adoption in practice has been found.

3. Thus, by the repeal of the common law relative to triors, in 1641, and the entire disuse or rather neglect of the privilege substituted, the duty of hearing and determining all challenges to jurors, passed by statute and usage into the court.

And this was one of those ancient usages, originating from laws passed by the legislature of the colony of Massachusetts Bay, which were annulled by the repeal of the first charter, and from the former practice of the colonial courts, accommodated to the habits and manners of the people. Commonwealth v. Knowlton, 2 Mass., 534, bottom of the page.

And thus it became in part the common law of Massachusetts, and was adopted in her constitution. Constitution of Mass., chap. 6, sec. 6; Sackett v. Sackett, 8 Pick., 309; Gowen v. Emery, 16 Pick., 107; Cotterell v. Myrick, 12 Maine, 222; American Jurist, vol. 12, pp. 230–240, and cases there cited.

So the old common law right of polling the jury has never been adopted in this state nor Massachusetts. Com. v. Roby, 12 Pick., 514; State v. Fellows, 5 Maine, 333. Likewise the right of an alien to a jury *de medietate linguæ.* Dane's Abr., p. 331, chap. 221, art. 6, 93.

4. Hence, we find that triors have never been appointed nor claimed in this state, nor in Massachusetts, and that the common law touching this subject has never been practised upon here nor in that state. Borden v. Borden, 5 Mass., 67. (Language of Mr. Dexter on this point, acquiesced in by the deft's counsel, and sustained by the court.) Com. v. Knapp,

9 Pick., 498; same case, 10 Pick., 480; Com. v. Webster, 5 Cushing, 295; Com. v. Rogers, 7 Metcalf, 500. All of them being "cases which excited great interrerest at the time, and in which learned and active counsel were employed."

5. Nor in any other New England State. Rollins v. Ames, 2 N. H., 349; Boardman v. Wood, 3 Ver., 570; 2 Swift's System of Connecticut Laws, 233.

"Challenges" (to the favor) "are often tried in this way" (by triors) "in most of the states *south* of New England." Dane's Abr., vol. 7, chap. 221, art. 7, sec. 12. Therefore it is denied that any such right exists. For in the language of Lord Coke, "As usage is a good interpreter of laws, so non-usage, where there is no example, is a great intendment that the law will not bear it;" or of his great master, Littleton, "no action can be brought, insomuch as it was never seen or heard, &c.; and if any action might have been brought for this matter, it shall be intended that at some time it would have been put in use." Co. Litt., 81 b. and 383 b.

6. Moreover this trial of challenges is expressly vested in the court, by act of June 26, 1784, sec. 8, Laws of Massachusetts, which provides, that

"If it shall then (on challenge) *appear to the court,* that any juror does not stand indifferent in the cause, he shall be set aside from the trial of that cause, and another called in his stead."

And upon the separation of Maine from Massachusetts this provision is copied into chap. 84, sec. 9, of the laws, 1821.

7. The same provision, that the *court,* and *not triors,* shall try all challenges, both in civil and criminal cases, is now the express law of this State. R. S., chap. 115, sec. 65; R. S., chap. 172, sec. 31; 12 Pick. Com., v. Robie; 2 Howe's Practice is the only authority from which any suggestion should be made that triors may be appointed.

8. But even if the common law right to triors did exist in this state, the prisoner's exception cannot avail, because it does not appear from the exceptions what the *ground* of challenge was, whether for principal cause or for favor. This

should appear on the record, for how else can the court know whether it was for principal cause or for favor?

"When a juror is challenged for principal cause or for favor, the *ground of challenge should be distinctly stated*, for without this the challenge is incomplete, and may be wholly disregarded by the court. It is not enough to say, '*I challenge*,' and stop there; the *cause* of challenge must be *specified*." Freeman v. The People, 4 Denio, 31.

This appears nowhere in the prisoner's exceptions, and according to the law in states where triors can be claimed, this defect is fatal.

9. But granting, for the sake of the argument, all that the prisoner claims; conceding that the right to triors exists here, and that the ruling of the court denying them was erroneous; still the prisoner's exception cannot be sustained. Because it does not appear from the exceptions that a single juror was challenged for cause, either for favor or otherwise, who was not either rejected by the court, according to the prisoner's request, or else peremptorily challenged and excluded by the prisoner.

Not a single juror on the panel which convicted him was challenged or objected to, and if he had been allowed triors according to his demand, so far as his panel was concerned, they would have had nothing to try.

Hence, the prisoner has literally enjoyed the privilege of selecting his own jury, and cannot now be allowed to complain of the result of his own election. (The People of New York v. Knickerbocker, 1 Parker's Criminal Reports, 302; Freeman v. the People, 4 Denio, 31; People v. Bodine, 1 Denio, 300.)

II. The prisoner's question to L. D. Rice, "Is not this the first time (excluding what you may or may not have stated before the grand jury,) that you have *testified* that you thought you saw blood on the prisoner's wrist?" was properly excluded, because,

1. An *affirmative* answer must have disclosed a portion of the witness' *testimony before the grand jury*.

The admission of that question, in view of the previous testimony elicited by the prisoner, would have been an infringement of the rights of the witness and of the privilege of the grand jury and the government, and contrary to the settled and uniform policy of the law.

2. A witness cannot be asked what was his *testimony* on former occasions. (Regina v. Holden, 8 Carrington and Paine, 606; [34 Common Law Reports, 507;] Regina v. Shillard, 9 Carrington and Paine, 280; [38 Common Law Reports, 121.])

3. The prisoner's next question to L. D. Rice, "Where was it that you so *testified*, provided it was not before the grand jury?" was open to the same objections as the preceding, (Exc. No. 2,) and was properly excluded, because,

Although, at first sight it appears unobjectionable, seeming, like the former, to exclude all reference to the grand jury, it will yet be perceived that a *negative* answer would have involved the fact that the witness had testified before the grand jury, and before the grand jury only, that he " saw Mr. Prout put his hand on the deceased's face," because Mr. Rice had already testified on cross-examination, that " that was not the first time that he had sworn that he had seen that act."

The court is not obliged to permit the introduction of a collateral fact, which might occasion a new issue. State v. Whittier, 21 Maine, 341.

IV. The question propounded by the government to Mr. Prout, "Did you on that day, or the day after, inform any person of having seen the prisoner coming from the place, and in the direction above described?" was properly allowed, because,

1. The answer would be explanatory of the testimony of Morrill, Thurston and als., showing the knowledge and information on which their conduct was based. It was an independent *fact* proper to be known, and within the witnesses' own knowledge, a part of the history of the transaction intimately connected with the finding of the knife; a fact which

led to it, and without which it probably would not have happened. Its obvious effect, when answered affirmatively, was to show that the search instituted at that particular point and time, was an intelligent and not an accidental one.

2. This was no hearsay testimony, but derives its effect solely from the credit attached to the witness himself, and does not rest on the veracity of others from whom the witness might have received information. It admits of the usual tests of truth which the law requires; the sanction of an oath, and the test of a cross-examination. 1 Phillips' Evidence, 184; 1 Greenl. Ev., 111.

3. The information given by Prout to Thurston was admissible as being a part of the *res gestæ* connected with and explaining the facts and circumstances attending the finding of the knife.

It was itself a fact, a circumstance accompanying this principal event, and as one of the surrounding circumstances, it was rightly shown to the jury along with the principal fact, viz.: the search for and finding of the knife, and its admissibility depended upon its degree of relation to the main fact. This degree of relation was properly determined by the judge, being a subject for the exercise of his sound discretion. 1 Greenl. Ev., p. 120, sec. 108; Lund v. Tyngsboro', 9 Cushing, 42.

As to what circumstances are a part of the *res gestæ*. Poole v. Bridges, 4 Pick., 378; Allen v. Duncan, 11 Pick., 308; Stansbury v. Arkwright, 3 Car. and Paine, 575; [24 Com. Law Rep., 462;] Taylor v. Williams, 2 Barn. and Adolph., 845; [22 Com. Law Rep., 195;] Rydley v. Guide, 9 Bridgham, 349; [23 Com. Law Rep., 304.]

4. If this was not a part of the *res gestæ*, it was by reason of the vagueness of the answer, which, if it failed to show the connection between the information and the search before the knife was found, became immaterial and without injury to the prisoner. Bemis' Webster case, 115.

V. The question to Dr. Carr, first objected to by the prisoner, " What was the general character of the instrument

occasioning the wound, as indicated, in your opinion, by the wound?" was properly admitted, because,

1. Dr. Carr was called, and testified as a medical and scientific *expert*, and for the express purpose of giving his *opinion* on medical and scientific subjects, and his *opinion* was for that reason admissible when other men would be confined to the statements of *facts*. Roscoe's Crim. Ev., 167; 1 Chit. Criminal Law, 620; 1 Greenleaf's Ev., pp. 489 and 611; 1 Starkie's Ev., 154; State v. Smith, 37 Maine, 370; Davis v. Mason, 4 Pick., 156; Com. v. Webster, 5 Cushing, 295; [Report of Webster case, pp. 72, 79, 97 and 98; Opinions of Drs. Wyman, Jackson and Holmes, and p. 184, testimony of Tyler;] Norman v. Wells, 17 Wend., 162; Forbes v. Chad., 3 Doeg., 157; Cotterell v. Myrick, 12 Maine, 222; Boyce v. McAllister, 12 Maine, 308; Sweetser v. Lowell, 33 Maine, 447; 1 Archbold's Crim. Law, 168, 3; Hathorn v. King, 3 Mass., 371; Definition of the word *expert* in Bouvier's Law Dict., and in Webster's Dict.; Van Dine v. Burpee, 13 Met., 291; Hobbie v. Dana, 17 Barb., 11; 2 Archb., 261, (note.)

2. It did not *directly* involve a main fact—either that the prisoner was guilty of murder, or that a murder had been committed—nor does it fall within any other exception to, or qualification of, the general rule. It was peculiarly within the knowledge of a physician and surgeon, and not equally, if at all, within the knowledge of the jury. And it was necessary for their clear comprehension of other portions of his testimony, to wit: the appearance of the wound, the condition of its edges, &c.

3. The *answer* was strictly responsive to the question, was within the medical and scientific knowledge of the witness, was not within the sphere of the judgment and observation of ordinary men, and was unobjectionable in every respect.

VI. The question to Dr. Carr next objected to by the prisoner, " Could a person, in your opinion, after the infliction of such a wound as that disclosed, perform acts of voluntary motion?" as well as the next question to the same witness,

" In your opinion, did or did not the wound indicate whether more than one impulse was communicated to the instrument producing it?" was properly admitted for the same reasons heretofore given.

These questions all related to an important and legitimate inquiry, to wit: whether the death of the deceased was a suicide or a homicide.

This the government did not attempt to prove *directly* by the opinion of Dr. Carr, but by showing the inability of the sufferer to communicate to the instrument producing the fatal wound, *the second impulse*, which, in the doctor's opinion, was given by the hand that inflicted it, as well as the impossibility of her retaining the voluntary power to suppress the flow of blood, jam down the pillow, and perform the other acts testified to as having occurred after the infliction of the wound.

VII. Dr. Garcelon was properly allowed to illustrate his testimony descriptive of the wounds by diagrams, plates and skeleton.

These were not admitted as *evidence* nor *authority*, but simply as *chalk* for *illustration*, and as such have always been admitted in the courts of Massachusetts and this state, both in civil and criminal trials. (Report of the Webster case, pp. 62 and 69.)

It is of no consequence whether the first three questions put by the government to Dr. Garcelon, and objected to by the prisoner, were properly admitted or not, because, whether in themselves objectionable or not, the answers to them were, at the prisoner's request, all stricken out. An improper question becomes injurious only when answered.

Consequently the prisoner has sustained no injury from the questions, and they therefore can furnish no ground for exception, and should not have been included in the exceptions.

VIII. .The question to Dr. Garcelon last objected to by the prisoner, " State, whether, in your opinion, as a physician and surgeon, the wound described on the neck of the deceased, could have been inflicted by the right hand of the

deceased?" was probably put, for the reasons given in answer to exceptions No.'s 5, 7, and 8.

IX. The deed from the prisoner and his wife to Jordan, and the deed from Jordan back to the prisoner *alone*, were properly admitted without proof of their execution, because,

1. They were relevant to the issue as tending to show one of the prisoner's *motives* to the murder. Will. on Cir. Ev., chap. 2, sec. 4, p. 51, chap. 3, sec. 1, p. 54; Hendrickson v. the People, 1 Parker's Crim. Law, 486; Com. v. Watkins, 11 Conn., 47.

Hence they were neither collateral nor irrelevant, and instead of *prejudicing* the jury, their admission tended very strongly to throw *light* upon his conduct, and to *explain* it to the jury.

2. It was not necessary for the government to prove the deeds by the subscribing witness.

Surely this could not reasonably be asked of the government in a prosecution for forgery, of the very deeds in question, because it would involve the absurdity of requiring the government, *in limine*, to prove an instrument to be valid, and a signature genuine, when the very *gravamen* of the charge sought to be established is, that the former is worthless and the latter counterfeit. 1 Starkie, p. 349 and notes.

Equally absurd would it be to require it of the government in this case, where nothing is claimed of the prisoner by conveyance, where the title to no real estate is in controversy, and where, instead of seeking to establish the validity of his deeds, the government point to his certain fraud and probable forgery as a strong additional inculpatory circumstance. His guilty motive is made apparent by his connection with forged papers.

The possession of documents under such circumstances, affords ground for affecting parties with an implied admission of the statements contained in them. 1 Greenl. Ev., 231; Shaley v. State Georgia, 11 Georgia, 123.

Hence the propriety and importance of the question to Jordan, " Did you ever see the deed (from George and Mary

Knight to you) before?" Also the other question to the same witness, " Did you ever know of its existence before?"

The negative answers to both show, that though the deed purported to be duly executed to Jordan, and though it was treated by the prisoner as a valid deed, and even recorded as such, yet in fact it never had any validity, and was made for a fraudulent and sinister purpose.

X. Dr. Hayes, a distinguished chemist and assayer of the Commonwealth of Massachusetts, was properly allowed to illustrate his testimony on the subject of the blood-stains and the qualities of blood by a diagram.

Dr. Hayes was properly permitted to point out to the jury the peculiarity which the blood-stain on the prisoner's undershirt presented, as exhibiting on one side of the fabric a larger portion of the coloring matter of the blood than on the other side,

Because a reference to a visible fact was necessary to a proper explanation of the chemical experiments and microscopic observations to which he, as an expert, had subjected the stain, which experiments and observations sustained the inference drawn from its outward appearance.

The government, therefore, contend that an expert has a right to illustrate his testimony touching the experiments he has made, and their results by reference to a peculiarity in the appearance of the article experimented on, even if that peculiarity is of such a character as to be " open to the observation of the jury."

So also the question put by the government to Dr. Hayes, " Whether blood flowing directly from the skin upon the shirt, could or not have produced such a spot?" as well as the next, " In your opinion, could or not blood flowing directly upon the outer surface of the shirt, have occasioned such a spot?" and the subsequent explanations of and reasons for his opinion, were properly admitted,

Because all his testimony related to a subject peculiarly within the knowledge and sphere of experience of a chemist and microscopist, and of no one else, viz.: the fact that the

chemical and physical constitution of blood is such as to show in a given case that the stain on a flannel undershirt worn next to the prisoner's skin on the night of the murder of his wife, could neither have issued from his own veins upon it, nor flowed on it from without, except through the interstices of some other fabric which had strained it of some of its original coloring matter.

The government ask with confidence, who but an expert, a man of rare scientific experience, is qualified to form such an opinion, upon the facts presented on the trial of this case?

To exclude such testimony would be alike dangerous to the government, and to the innocent accused.

The question put to Dr. Hayes by the government, and objected to by the prisoner, "Is there a distinction, chemical, physical or microscopic, between the qualities of human blood and that of any beast?" was properly put, as appears from the clear and unhesitating testimony of Dr. Hayes in reply.

Dr. Hayes had been sworn as an expert, without objection, and had testified at great length and with great ability, touching the qualities of *blood*, a subject with which both his reading and experiments had rendered him perfectly familiar.

This question, like all the preceding, related to the same general subject, *the qualities of blood;* it simply narrowed down the inquiry to *human* blood.

How can the court decide in advance, that no such distinction as Dr. Hayes testifies to, in fact exists, without arrogating to themselves the wisdom of experts?

It is impossible, in the very nature of things, to make a question of law here, where there is nothing but fact.

Surely the distinction cannot be made that Dr. Hayes, having acquired familiarity on the entire subject of blood, by his own personal studies and researches, has been permitted to testify thereon, as an expert, in a court of justice, up to a certain point, giving all the characteristics of blood generally, and then shall be peremptorily forbidden to utter a word tending to show that the vital fluid of man differs from that

of any brute, excluding his learning just at the point where it is most useful?

Such a decision would voluntarily blind justice to the advancing light of science, jeopardizing at one time the safety of society, and at another the life of the innocent accused.

The courts of this state, as well as of other enlightened commonwealths, on both sides of the Atlantic, have admitted testimony of this character.

The testimony was properly admitted, to receive from the jury, in the language of the presiding judge, "the consideration to which they thought it justly entitled."

The same reasons fully authorized and required the admission of the testimony in answer to the next question, put by the government to Dr. Hayes, "Have you subjected any of the articles before you to any observations or tests touching this distinction?"—to the succeeding, "Will you please state what these observations and tests were, and their result?" and to the last, "In your opinion, could the blood upon the knife first shown, have flowed from a sheep?"

The reply did not prove that the blood was human, but that it was not ovine.

XI. The objection to that part of the closing argument of the counsel of the government which referred to Lydia Knight, "That the government had no right to argue against the intelligence and capacity of its own witness," Lydia Knight, to the extent pursued by the government on that occasion, is without foundation, either in principle or authority.

1. The counsel of the government *expressly* conceded the competency and credibility of Lydia Knight, and all its other witnesses, disclaiming all purpose of impeaching either, and claiming only the right to correct mistakes. This the government had a right to do. 1 Greenl. Ev., p. 599, cases cited in the note; 2 Phillips' Ev., p. 448, note 392; 1 Starkie's Ev., 424; Gilbert's Law of Ev., 151. A party may always correct his own evidence, though by directly contradicting him. Lawrence v. Baker, 5 Wend., 305; Johnson v. Leck, 12 Wend., 105; Cowdin v. Reynolds, 12 Serg. and Rawle, 281;

Steinback v. Columbia Ins. Co., 2 Caines, 131; Crowell v. Kirk, 3 Devereaux, 357; Friedlander v. London Ass. Co., 4 Barn. and Adolph, 193; Bradley v. Ricardo, 8 Bingham, 57; Regina v. Ball., 8 Car. and Paine, 745; [34 Eng. Com. Law Rep., 616.]

2. It was not only the *privilege*, but the *duty* of the government to call Lydia Knight, because she was present at, or very near the time of the beginning of the assault, which terminated in the murder with which the prisoner was charged. Under circumstances somewhat similar, Patteson, Justice, said that the witness ought to be called, and animadverted upon the course of the prosecuting officer, in intimating an opposite purpose. Regina v. Holden, 8 Car. and Paine, 606.

But in being generous and liberal to the prisoner, they do not understand that they are bound by every answer of their witness, however erroneous, and estopped from pointing out to the jury, in argument, even honest mistakes.

How unreasonable is such a doctrine, and how impracticable in its application! It would seem difficult to contrive one more unjust or dangerous. 1 Hale's P. C., 455, note 1, 1st Am. ed.; note, Com. v. Knapp, cited 4 Black., to show that the prisoner must reduce the crime below murder, chap. 23, p. 425 to 429; 1 East. P. C., pp. 224, 340 and 436, chap. 26; State v. Varney, 8 Bos. Law Rep.; 2 Metcalf, 1; 19 Pick., 25.

XI. The prisoner's sweeping exception to the entire "charge and instructions" of the presiding judge, "and to each of them, and to each and every part thereof," without further allegation or specification, was not only unreasonable, unusual and improper, unjust to the court and to the government, but unauthorized either by the letter or spirit of our law. R. S., chap. 96, sec. 17; Jackman v. Bowker, 4 Metcalf, 236; Decker v. Mathews, 2 Kernan, 313; 1 Starkie, pp. 472 and 473.

Although, in the opinion of the counsel for the government, the charge, even as reported, will sustain itself without

any defence from them, they are unwilling to concede the legality of the form in which this exception is presented, or the reasonableness of requiring them to answer it. Com. v. York, 9 Metcalf, 133; 1 Chitty's Crim. Law, 483; Roscoe, 651 and 652; Com. v. Webster, 6 Cushing, 305; 1 Starkie's Ev., 474; Ware v. Ware, 8 Greenl., 42.

XII. The thirtieth instruction requested by the prisoner, "That in order to convict the prisoner upon the evidence of circumstances, it is necessary not only that the circumstances all concur to show that he committed the crime, but that they *all* be inconsistent with any other rational conclusion," had been already substantially and repeatedly given by the judge to the jury, in his charge, as well as in Nos. 18, 19, 20, 21 and 22 of the prisoner's requested instructions.

The language of Mr. Greenleaf (Greenl. Ev. 3, sec. 137,) is borrowed and condensed from Starkie, (1 Starkie's Ev., pp. 507 and 512,) and in his charge the court instructed the jury in the words of the original author, of which it is not known that Mr. Greenleaf's language is any improvement.

This court will determine whether, on every point of law discussed in the charge, a sufficient number of repetitions of the same idea were not allowed the prisoner in the twenty-nine requested instructions given. Com. v. Dana, 2 Metcalf, 329; Wolcott v. Keith, 2 Foster, 196.

3. If so, then the *form* of the instruction is immaterial, provided the idea has been already substantially given. Wolcott v. Keith, 2 Foster, 196.

XIII. The thirty-first instruction requested by the prisoner, "That no conviction in a criminal case ought ever to take place on circumstantial evidence, where the government has introduced direct evidence tending to show that the prisoner could not have committed the crime charged," was properly refused, because,

1. The requested instruction was based on a state of facts which did not exist in the case. There was no such direct evidence.

8

2. It attempts to draw a distinction detween direct and circumstantial evidence, unknown to the law. Any intrinsic and necessary superiority of one over the other is denied. 1 Starkie, 494.

3. Such a doctrine might withdraw from the consideration of the jury material testimony, proper for their consideration, and of the weight of which they should be the exclusive judges, by embarrassing the government in every case of circumstantial evidence, with the apprehension that some direct evidence of the character named might be elicited from some of their witnesses.

4. The cases cited in answer to exception No. 34, show that it was the duty of the government to introduce, and of the jury to consider and weigh the whole testimony in the case, applicable to the question at issue. The requested instruction would have rendered this impossible.

5. The doctrine of the requested instruction is, that however overwhelming and conclusive the number and weight of the circumstances against a prisoner, in any criminal case, still he shall never be convicted thereof upon such testimony, provided that any direct evidence, however little, tending in any degree, however slight, to negative the hypothesis of his guilt, may, during a trial of whatever length, have been elicited from any one of the government witnesses. It is obvious that such a rule would render a conviction for any offence, upon circumstantial evidence, on a seriously contested trial, a practical impossibility, and consequently it cannot be law.

6. The judge in his comments on the testimony of Lydia Knight, as well as in other parts of his charge touching the nature and effect of circumstantial evidence, had already given all the instructions on this subject which were necessary and proper.

The same reasons and authorities apply to the refusal of the judge to give the thirty-second instruction requested by the prisoner, "That direct evidence introduced by the government, tending to prove the innocence of the prisoner, shall

not be held refuted, from being opposed to circumstances incongruous with that evidence."

This requested instruction is merely the counterpart of the preceding, and was properly refused.

XIV.  The thirty-third instruction requested by the prisoner, "That the theory that the blood of animals, such as the ox or the sheep, can be discriminated from that of man, when in a dried state, by chemical means, is too uncertain to be used as evidence, or to be relied on as evidence in this case." was properly refused.

1.  It was not pertinent nor applicable to the case, for no evidence had been introduced tending to show that the blood of the ox, in a dried state, could be distinguished from human blood.

2.  The judge had already, in the charge, given full, ample and correct instruction on this point.

The same reasoning and authorities apply to the thirty-fourth instruction requested by the prisoner, "That the theory that the blood of the ox, or of the sheep, can be distinguished from that of a human being, when in a dried state, by microscopic observation, is too uncertain to be used as evidence, and the difference in the size of the globules is too slight to be relied on as evidence in this case."

This was properly refused for reasons given in the preceding.

XV.  The last instruction requested by the prisoner, "That distinction between positive and negative testimony is applicable to direct testimony, and cannot be applied to circumstantial evidence, when placed in direct conflict with positive testimony," was properly refused,

Because it attempts to introduce into the law a distinction between direct and circumstantial evidence, which the law has never recognized.

Each has its appropriate sphere, and either may be more or less satisfactory than the other, according to the peculiar circumstances of the case.  These can never be defined in advance by any such general and unbending rule as the one now

sought to be introduced into the law, and consequently the law recognizes no fixed and permanent superiority of one over the other. Wills on Cir. Ev., p. 31; 1 Greenl. Ev., sec. 13, A.; 1 Starkie 494–5.

TENNEY, C. J.—The prisoner was put to the bar for his trial, upon the plea of not guilty of the charge of murder, as alleged in the indictment, and the clerk proceeded to empannel the jury. Upon the call of one of the jurors, the counsel of the prisoner challenged him *for favor*, and demanded the appointment of triors " *according to the course of the common law, to hear and determine the question of his indifference and impartiality.*" The presiding judge denied the demand for triors, and ruled that in all cases of challenge for cause, the question of indifference and impartiality must be heard and determined by the court.

The counsel of the prisoner having cited English authorities in support of the right to triors, we are to understand that the " common law " referred to in the demand, was the common law of England. Such is also the intention as disclosed by the whole argument. It becomes necessary, therefore, to ascertain what the common law of England on this subject was, at the time that it is claimed as having been adopted in Massachusetts, as a part of the code of that colony, province, state or commonwealth, or in this state since its separation. We are not, however, aware, that so far as the question now before us is involved, it has undergone in England any essential change.

Under the English law, challenges to the jury are of two sorts; challenges to the array, and challenges to the polls. The former are at once an exception to the whole panel in which the jury are arrayed and set in order by the sheriff in his return; and they may be made on account of partiality or some default of the sheriff or his under officer, who arrayed the panel. 3 Bl. Com., 359.

Challenges to the polls *in capita* are exceptions to the particular jurors; these are reduced to four heads by Sir Ed-

ward Coke; *propter honoris respectum; propter defectum; propter affectum; and propter delictum.* Ibid, 361. The particular definition of the three heads first named do not become material to our present inquiry.

Jurors may be challenged *propter affectum* for suspicion of bias or partiality. This may be either a principal challenge, or *to the favor.*

A principal challenge is such, when the cause assigned carries with it, *prima facie,* evident marks of suspicion, either of malice or favor; either that juror is kin to either party within the ninth degree; that he has been arbitrator on either side; that he has an interest in the cause; that there is an action pending between him and the party; that he has taken money for his verdict; that he has formerly been a juror in the same cause; that he is the party's master, servant, counsellor, steward or attorney; or of the same society or corporation with him; all these are principal causes of challenge, which, if true, cannot be overlooked, for jurors must be *omni exceptione majoris.* Ibid, 363.

Challenges *to the favor* are when the party hath no principal challenge, but objects only to some probable circumstances of suspicion, as acquaintance and the like, the validity of which must be left to the determination of *triors,* whose office it is to decide whether the juror be favorable or unfavorable. The *triors,* in case the first man called be challenged, are two indifferent persons named by the court, and if they try one man and find him indifferent, he shall be sworn, and then he and the two triors shall try the next; and when another is found indifferent and sworn, the two triors shall be superseded, and the two first sworn on the jury shall try the rest. Ibid, 363.

The right in respect to the challenge of jurors to the favor, and the mode of hearing and determining the question of indifference by triors belonging to parties in civil suits did not essentially differ from the right of the crown, and one accused of crime. In capital cases, a privilege was granted to the accused, *in favorem vitæ* to make peremptory chal-

lenges, which would not involve the necessity of triors, or any hearing whatever. In 4 Bl., Com., p. 352, it is said " challenges may here be made either on the part of the king or on that of the prisoner, and either to the whole array or to the separate polls, for the very same reasons, that they may be made in civil causes, for it is here at least as neces- sary as there; that the particular jurors should be *omni ex- ceptione majoris*, not liable to objection, either *propter hono- ris respectum, propter defectum, propter affectum or propter delictum.*" And reference is made to book 3, which treats of private wrongs, and to page 363 from which the foregoing quotation is made touching triors in civil suits. And again on page 363, the same commentator remarks, " challenges upon any of the foregoing accounts are styled challenges for cause, which may be without stint in criminal and civil trials."

The subject of challenges of jurors is discussed at some length in Gabbett's treatise on Criminal Law, cited and relied upon by the prisoner's counsel. In volume 2 of that treatise it is said, as to challenge to the polls, if it be a *principal* one, it is sufficient if the ground of it be made out to the satis- faction of the *court;* but a challenge to the favor must, as already observed, be left to the discretion of triors. If this challenge be made to the first juror who is called, two triors are appointed by the court, and if he be found indifferent and sworn, he will be joined with these triors in determining the next challenge; and when a second juror who has been challenged, has been also found indifferent and sworn, then every subsequent challenge shall be referred to the decision of these jurymen, and the other triors shall be discharged. Lord Hale puts a case where the triors are appointed by the parties, and not by the court; for he lays it down, that if the plaintiff challenges ten and the prisoner one, then he that remains shall have added to him one chosen by each party, and they three shall try the challenge. But if several be sworn and the rest be challenged, the court may assign any two of those sworn to try the challenge. And when six

State *v.* Knight.

jurors are sworn and the rest challenged, the court may appoint any two of the six sworn to try the challenges. Co. Lit., 189; 7 Dane Abr., 334. The foregoing are all the modes found in treatises upon the subject, touching the trial of challenges made to the favor.

"A challenge to the array must be in writing; but in the case of challenge to the polls, the intention of challenging is verbally intimated by such words as these: "I challenge him," or "challenged;" and when the challenge is peremptory these words will suffice, but when the challenge is for cause the defendant must immediately show the ground of objection." Ibid 393.

In King v. Edmonds, 4 Barn. and Ald., 471, Abbott C. J. says: "When a challenge is made, the adverse party may then demur, (which brings into consideration the legal validity of the matter of challenge,) or counter plead, (by setting up some new matter consistent with the matter of challenge to vacate or annul it, as a ground of challenge,) or he may deny what is alleged for matter of challenge, and it is then, and then only, that triors are to be appointed."

" The challenges in this case ought to have been put upon record, and the defendants are not in a condition, in strictness, to ask of the court an opinion upon their sufficiency."

From the authorities cited, it is obvious that in all challenges for cause, the ground must be distinctly stated, and entered upon the record. The necessity of this is very manifest, when the purpose is that the question of indifference should be submitted to triors instead of the court; for the distinction between a principal challenge and one to the favor is not always clear; and it is only in the latter that the question of indifference of the juror challenged can be submitted to triors.

By the exceptions in this case it does not affirmatively appear that these preliminary steps were taken on the part of the prisoner, when the challenge was made, though it was announced to be for favor. If the grounds of challenge had been made as required by strict rules, it might have been

a case where the challenge was principal, and not *to the favor;* and if so, the prisoner was not aggrieved.  But the grounds of challenge may have been *for favor*, and as the judge expressed his intention to deny his right to triors in challenges for any cause, and to raise the question whether such denial could be erroneous, it is proper, in order to avoid the possibility of doing injustice, to regard this point in the case as open.

Did the right claimed by the prisoner, at the time of the call of the jurors to constitute the panel for his trial, under a challenge *for favor*, legally exist?

It is proper that we should look into the history of legislation in Massachusetts, and this state since its separation, and the constitutions of both, so far as they can have any bearing upon this question.

In chapter 98 of " Charters and general laws of the Colony and Province of Massachusetts Bay," 199, entitled "Acts respecting trials," section 1 refers to all causes between. *party and party;* and section 3 provides that it shall be the liberty of both *plaintiff* and *defendant*, and likewise of every delinquent, to be judged by a jury, to challenge any of the jurors, and if the challenge be found just and reasonable by the *bench*, or the *rest of the jurors*, as the challengers shall choose, it shall be allowed him.   This chapter was manifestly designed to apply to trials in civil and criminal matters.

Chapter 2 of the same, page 214, entitled "An act setting forth general privileges," secures to persons certain rights and liberties touching the enjoyment of property, freedom from arrest and imprisonment, and trial for alleged offences, and forbids the deprivation of these generally, unless by the law of the province, and by the judgement of his peers, in a jury consisting of twelve of the neighborhood of the accused, in which the offender shall be allowed his *reasonable challenges.*   The rights designed to be secured by this chapter are those referred to in *magna charta*, and appertain to matters both of a civil and criminal nature.

By chapter 61 of the same, page 230, which is entitled

"An act for establishing a superior court of judicature, court of assize and general gaol delivery within the province," (see sec. 1,) such a court is established, having *cognizance of all pleas, personal or mixt, as well as pleas of the crown*, and all matters relating to the conservation of the peace, and punishment of offenders, &c.; and, in section 5, provision is made for the attendance of jurors upon said court, making no distinction between those who shall sit in civil and criminal trials, but providing for other jurors than those originally returned, when the latter are deficient in number by reason of challenges.

By chapter 275 of the same, entitled "an act for the better regulating the choice of jurors," provision is made for a different mode of selecting jurors for the purpose of serving as such at the superior court of judicature, court of assize and general gaol delivery, to be put into one box in each town, and those to serve at other courts in another box; and as a method of preventing partial juries, the fourth section provides, that the justices of the respective courts aforesaid are hereby directed, upon motion from either party, in any cause that shall be tried after the first day of June then next, and during the continuance of this act, to put any juror returned as aforesaid, or as talesman, to answer upon oath "whether he doth expect to gain or lose, by the issue of the cause then pending? whether he is any way related to either party, or hath directly or indirectly given his opinion, or is sensible of any prejudice in the cause? And if it shall then appear to said *court*, that such juror does not stand indifferent in said cause, he shall be set aside from the trial of that cause and another appointed in his stead."

No other law upon the subject of challenges or exceptions to jurors appears to have been enacted by the Colony or Province of Massachusetts Bay before the declaration of independence; or by the State of Massachusetts afterwards, till the adoption of the constitution of the Commonwealth in 1780.

It does not appear from any record, or work of authority,

that challenges to jurors for favor were ever submitted to the determination of triors before the declaration of independence, by virtue of the common law principle, which seems to have been well defined and understood in the country of its origin.   But as early as 1641, in the colonial act, chapter 98, there was an important modification of that principle, in allowing the party making challenge to submit the question of indifference of the juror to the bench, or the *rest of the jury*.   In this provision there is no restriction in respect to the challenge to a juror for any cause.   The choice was with the challenger, whether exception taken was a principal challenge or to the favor; and we have seen that, at common law, when a challenge to the favor was made, the trial was not *by the rest of the jury*.

The act of 1760, chapter 275, referred to, so far as it was applicable, was mandatory, and not to be enforced as the court, or either of the parties should elect in the case of objection to a juror, by either party.   In all challenges coming within the provision of the act, this was the only mode, by the terms used, and operated so far, a repeal of the former act, as being inconsistent therewith.

But it is insisted for the prisoner, that this provision refers only to trials in civil matters, and is inapplicable to trials for criminal offences.   This deserves consideration.   The impartiality of juries under the English common law being secured by the intervention of triors, in civil and criminal cases precisely in the same manner, and that mode having existed from time immemorial, it may not be unreasonable to suppose that if a distinction in that respect was intended by the authors of the provincial law of 1760, such intention would be expressed or in some way manifested.   But nothing in the act itself discloses such a design.

Again, this act provided not only a new, but what was then thought a better mode for regulating the choice of petit jurors, by providing boxes, in which the names of persons deemed qualified to serve as jurors should be placed for the different courts, and the names drawn therefrom from

time to time as their services were required. The names of those in one box, supposed to have higher qualifications than the others, were drawn to serve in the superior court of judicature, court of grand assize, and of general gaol delivery, a court having cognizance of pleas of the crown, including capital cases, as well as of civil matters.

No provision is found in any other law of the colony or province, in force at the date of this law, requiring or authorizing the jurors for criminal trials to be obtained in any other mode than by being drawn from the box in each town to which *venire facias* writs were sent. But the provisions made for the attendance of jurors for the superior court, and the services thereat, are general, and apply equally to the exercise of its jurisdiction over civil and criminal suits.

The mode of determining the impartiality of jurors challenged or objected to, and the tribunal which is intrusted with the power of hearing the challenge or objection, are also applicable, by the language used, to all jurors, without distinction between those called for the trial of civil actions and cases in which the party is accused of a crime. The inquiry prescribed will embrace everything necessary to secure impartiality, and if the authors of the law were willing that the investigation should be confined to the answers of the juror challenged, when a civil suit is to be tried, no good reason is seen for its being regarded insufficient in a criminal trial; especially as by the new mode of preparing the lists, they were deliberately selected by the selectmen of the several towns in which they resided, and were afterwards submitted to the town in the corporate meeting of its voters.

In the trial of Judge Chase, on impeachment, one article of which was, that the respondent overruled the objection to a juror called to sit in the trial of one James Thompson Callender, indicted for a libel, and who wished to be excused from sitting in that trial, because he had made up his mind as to the publication from which the words charged to be libelous in the indictment were extracted, and the juror was sworn and sat in the trial. It was argued by the respondent and

his counsel that it was not a good cause of challenge, that a juror called had *formed* an opinion, if he had not delivered it. Mr. Dane regards this reasoning as something light and trifling, and refers to the legislation in some states (Massachusetts, &c.,) which is the same as that embraced in the provincial act of 1760, chapter 275, requiring the court to ask the juror himself the question, whether he had *formed an opinion,* and the author remarks, " thus a wise provision obliges a juror, if he has formed an opinion to declare it, and he is then set aside." 7 Dane's Abr., 380.

This ruling of Judge Chase having occurred in a criminal trial, the remarks of Mr. Dane were entirely inapplicable, on the hypothesis that the statute provision referred to by him was designed for trials of civil actions only.

By the constitution of the commonwealth of Massachusetts, chapter 6, article 6, " all laws which have heretofore been adopted and approved in the Province, or Colony of Massachusetts Bay, and usually practiced upon in courts of law, shall still remain and be in force, until altered or repealed by the legislature; such part only excepted as are repugnant to the rights and liberties contained in this constitution."

This provision is intended, probably, to embrace, not only existing enactments of the legislatures of the Colony, Province or State of Massachusetts, but those unwritten rules and maxims of the common law of England, which had been treated practically as applicable to the altered condition of the emigrants therefrom to this land of their adoption, affected perhaps by the simpler forms in applying the great principles of their general laws.

By this provision of the constitution, it was indispensable that a doctrine of the common law of England should have been adopted, and approved, and usually practiced upon in courts in the Colony, Province, or State, in order to be treated as obligatory. The conditions on which they were to become a part of the code of the Commonwealth were in their character affirmative, and no principle of those laws was embraced in this article, unless it be affirmatively proved. The language

will not admit of the construction, that by adopting the constitution, the whole common law of England was *ipso facto* introduced, and only such parts excluded as were shown not to have been previously adopted, approved, and practiced upon in the courts of law. The history of Massachusetts, from the time of the first establishment of a colonial government therein, to the time of the constitution, shows that their laws, being generally of their own enactment or adoption, were satisfactory. The provision to which we refer was not designed to enlarge or change their system or principles of jurisprudence, but to make those in practical operation effectual. The provision in the constitution declaring what laws shall remain in force, excludes all others by a well settled legal maxim, *expressio unius exclusio alterius est.*

It is well settled that many of the doctrines of the English common law were never adopted here, either by practice or legislation. And if they have not been transplanted in either of those modes, they have been treated by courts and jurists as having no binding authority.

In the introduction of Dane's Abridgement to the American Law, the author having engaged in professional and political employments in the spring of 1782, (page 3) says, on page 5, that "the object is to make our American charters and constitutions, statutes and adjudged cases the *ground-work* on each subject; and therewith to incorporate that portion of the English law *recognized* in the United States, beginning with the *magna charta* and the first charters and statutes in our colonies. The *ground-work* has been thus viewed, because it is obvious that when constitutions and laws made in our country are not consistent with English law adopted here in practice, the former must prevail and the latter yield.

In the case of Commonwealth v. Roby, 12 Pick., 496, which was an indictment against the defendant for murder, when the jury answered at the call of the clerk, that they had agreed upon a verdict, a motion was made in behalf of the prisoner, that the jury should be polled, which motion was overruled. After argument, the court affirmed its decision,

saying, if the question depended upon a revision and application of legal authorities, the point would certainly demand a more ample investigation.

" But it is conceded that this practice has never been used in this commonwealth, and the application is to introduce a practice not before adopted. Such an application is at the judicial discretion of the court, and must be supported by some good and substantial reasons of justice and propriety;" and referring to chapter 6, article 6, of the constitution, the court adds, " the plain object and purpose of this constitutional provision was to confirm and perpetuate the laws, including the common law, as they had been usually practiced in courts of justice, thereby confirming and sanctioning all such alterations and modifications in the practice as had been sanctioned by actual usage and approbation in the courts of justice."

It ·is insisted that the statutory provision requiring the court to examine the juror, on motion of either party, varient from the common law practice, was not intended to apply to *challenges*, in the technical meaning of the term, nor to abrogate this practice, but was designed to secure impartial juries by additional requirements.

If the statutes referred to were enacted as a substitute for the common law principle, or for the provision of the colonial act of 1641, chapter 98, the particular terms used to signify an exception taken to a juror is of little importance. It is not believed that an objection to a juror clearly made known, without the use of the word "challenge," will fail on that account to secure rights, to which the party making it would otherwise be entitled. The term is used in law, for an exception to jurors, who are returned to pass on a trial." 1 Chit. C. R., 533. But any other word expressive of the same exception, if the grounds of the exception are properly stated, is not found to have been held insufficient. The form now in general use in this state and others, when the jury is about to be empanneled for the trial of a criminal cause, is, that if the defendant will *object* to any of the jurors he will

do so as they are called, and before they are sworn; and in capital trials the form is the same, touching objections for cause.

If every inquiry, prescribed by the statute to be made by the court, should be answered in the negative, and no more, it is not perceived that anything would be omitted, which could be properly proposed to the juror by triors. If, upon such examination, the court should find that the juror was not indifferent in the cause, he was to be set aside, and a new one called in his stead, making the judgment conclusive in that event in favor of the challenger. But under the common law, in a challenge to the favor, it was the right of *both* parties, that the hearing and determination should be by triors. The statute has, therefore, abridged so far, the right enjoyed under the former mode, by the party adverse to the challenger.

By the common law, witnesses could be examined by triors. 2 Gabbett on Crim. Law., 395. This was not provided for in any of the statutes of the Colony, Province, State or Commonwealth of Massachusetts, before the separation of this state therefrom. If the common law practice was not wholly abrogated, but was in force, only so far as the statutes were absolutely repugnant to it, when a juror, to whom exception was taken for favor was found indifferent by the court, upon his own answers, triors could have been appointed to hear witnesses upon the question of his competency; thus upon the same challenge providing for two distinct tribunals.

To hold that the prisoner's challenges to the favor are to be determined by triors, under the common law, modified by these statutes, would be incorporating into the practice upon this subject such alterations as would make it an anomaly, highly derogatory to the intelligence of the authors of the statute, inconsistent with their obvious intention, having no precedent, and not insisted upon by the prisoner's counsel.

Has the common law principle of submitting challenges *to the favor* to the hearing and determination of triors been usually practiced upon in courts of Massachusetts before the adoption of its constitution? It is said in an article in the

American Jurist, volume 12, page 330, published in 1834, "It has been lately decided by a respectable judge, that the competency of a juror upon a challenge to the favor, may be determined under the laws of Massachusetts, by triors appointed by the court for that purpose." And it is laid down in Howe's Practice, page 247, that all challenges *for favor* are tried by triors, in the mode pointed out in the English authorities before cited. We are not informed in what court it was that this mode of determining the competency of jurors was allowed; nor whether it was by the consent of the prosecuting officers, and the party accused. Consequently we cannot know whether it can be regarded as authority, in that commonwealth, on a controverted point. If it were so it is not binding upon courts in another jurisdiction, but must have respect according to the intrinsic merits of the argument in its support, which is not before us.

The authorities referred to by Judge Howe, in support of the text cited, are confined to treatises of English jurists.

So far as any discussion touching the introduction in practice of the principle contended for by the prisoner's counsel, in Massachusetts, has taken place, the authority is against his position. As early as the year 1809, it was treated in the Supreme Judicial Court, by a jurist of the highest standing, and among those who had been engaged for the longest period and in the most extensive practice, as not having been adopted there. Borden v. Borden, 5 Mass., 71.

In Rollins v. Ames, 2 N. H. 350, the court say a challenge to favor, in England, is determined by triors, but here the court uniformly decide on its validity. In Connecticut all challenges of jurors are decided by the court. 2 Swift's System of Laws of Conn., 233; Boardman v. Wood, 3 Vermont, R., 570. The subject is ably discussed in the article in the American Jurist referred to, and the authorities bearing upon the question of the adoption of the practice in Massachusetts, of determining the competency of jurors by triors, are cited and commented upon; and the writer concludes that this principle of the common law has not been usually practiced

upon in its courts, and is not a part of its law. "Challenges are often determined by triors south of New England." 7 Dane's Abr. 334. This statement of a fact, coming from one of the learning and experience of the author, in the text of a work, having for its object what it is declared in the introduction to be, is certainly evidence entitled to great weight, though of a negative character.

After the adoption of the constitution of Massachusetts, the legislature re-enacted the provision in the provincial law of 1760, chapter 275, section 4, in the statute of June 26, 1784, entitled "an act for regulating the choice and services of petit jurors," section 8, and in the statute of 1808, chapter 139, section 9. The same provision was incorporated into the statutes of this state in the revision of the statutes of Massachusetts, after our separation. This legislation since 1780 was all during the connection of the learned author of the abridgement of American law with the bar, and when, according to his own account, in the introduction, page 3, he early turned his attention to the subject of this great work, and in good earnest engaged in collecting materials upon it. If the competency of jurors challenged to the favor was determined by triors, during this period, to such an extent as to make the practice a part of the law of the commonwealth under the provision of the constitution referred to, he must have known it. The language quoted from his 7th volume, page 34, is little short of conclusive, that in New England no such practice prevailed. Hence, we may well infer, in the absence of proof to the contrary, that under similar statutory provisions of the provincial legislature, the common law of England, on this subject, had not been recognized.

The mode provided by the provincial statute which has subsisted to the present time in Massachusetts and in this state, for the trial of all exceptions taken to jurors for every cause, by the court, is direct and uniform, and is in harmony with the general character of legal proceedings in this coun-

try, distinguished from those in England by their greater simplicity.

No one can doubt that the court are as competent to decide any questions which are determined by triors in other places, as those appointed by the court. The range of inquiry of the juror is as broad in one case as the other.

The positive evidence of the adoption of the English common law right of triors in cases where the principle was applicable, being entirely wanting at the time of the formation of the constitution of 1780, according to uniform authority, and the rule of that constitution, prescribing that laws previously existing shall continue till changed by the legislature, of itself amounts to a failure of a foundation upon which the principle contended for can be sustained.

The constitution in this state is invoked by the prisoner's counsel, as securing the right contended for, free from any power of the legislature to interfere therewith.

By act 1, section 6, "no person shall be deprived of life, liberty, property, or privileges, but by the judgment of his peers, or the law of the land." By this section, in another part, "The legislature shall provide by law a suitable and impartial mode of selecting juries, and their number and unanimity in indictments and convictions shall be held indispensable."

The meaning of the words, "the law of the land," as used in the constitution, has long had a construction, which is regarded as fully settled. This term, as Lord Coke says, "is (to speak once for all,) the due course and process of law." Coke, 2 Inst., 46. The law, in this sense, as held by Blackstone, 1 Com., 44, is a rule, not a transient, sudden order from a superior, to or concerning a particular person, but something permanent, uniform, and universal. The words "law of the land," as used in magna charta, from which they are borrowed in reference to criminal matters, are understood to mean, due process of law; that is, by indictment, or presentment of good and lawful men. 2 Kent's Com., sec. 24. Judge

Story in 3 Com. on Const., sec. 1783, says, "the clause, 'by the law of the land,' in effect, affirms the right of trial according to the process and proceedings of the common law."

When the constitution of Massachusetts was formed, "each individual of the society had a right to be protected by it, in the enjoyment of his life, liberty and property, according to standing laws, part 1, art. 10, and no subject could be arrested, imprisoned, despoiled, or deprived of his property immunities or privileges, put out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land. And the legislature were forbidden to make any law that should subject any person to a capital or infamous punishment, excepting for the government of the army or navy, without trial by jury. Part 1, art. 12, and chap. 6, sec. 6, so often herein referred to, gave validity to existing laws, which had been adopted and approved in the Colony, Province, or State of Massachusetts Bay, and usually practiced upon in the courts of law.

"The law of the land," in this constitution, did not refer to any country or government which was foreign to the commonwealth, but to that land and to that people therein, which adopted this as their frame of government. But the law referred to was the common law of Massachusetts, and so far as it was the means of security of life, liberty, property, and privileges of the people, it was the great principles of magna charta, embracing the trial by jury as therein secured, and all the maxims of law which were brought to this country by our ancestors, on its settlement, and continued in practice; or recognized as parts of the common law of England afterwards, and customs of their own, which were permanent, uniform and universal. We have seen that whatever laws might have been an established part of the common law of England, which were never adopted and approved in Massachusetts Bay, and usually practiced upon in courts of law, did not, under the constitution, become a part of the system of jurisprudence.

The trial by jury, according to its meaning in magna charta, and as it was understood in England generally till the emigration of our ancestors, in practice was introduced into our colonial system of jurisprudence at an early period. And the inquiry is not improper, whether it is not to be considered as adopted here, with all its incidents, under the constitution of Massachusetts, in which this great security of private rights was manifestly designed to be carefully preserved and guarded.

The number constituting a jury of trials, and perfect unanimity in a verdict, were essential elements in the jury trials.

It was also indispensable that the individuals composing the jury in a given case, should be impartial, indifferent, and under no bias or prejudice, *omni exceptione majores*. It is likewise important that the jury, as an array, should be free from objection on account of any irregularity in the manner practiced under the writs by authority of which they are summoned. But if all the essential elements were secured in their integrity, the particular mode in which this was done in England has not been practically treated as absolutely required. There the jury were summoned in a manner very different from that which has here prevailed for a century. A verdict, as we have seen, was not required necessarily to be secured by polling the jury upon motion of either party; and we are not satisfied it would be a material infringement of this important right, secured by the constitution of Massachusetts that the court should be vested by the legislature with the power to determine conclusively the indifference of jurors, in the place of triors, in certain cases, of the appointment of the court.

Before the adoption of this constitution, the statutes of the Colony and Province of Massachusetts, touching the manner of testing the competency of jurors, had been held obligatory. The statute of 1760, chap. 275, was in force at the time when this constitution became the supreme law of the commonwealth. The several parts of this constitution took effect simultaneously. By chap. 6, sec. 6, thereof, those

statutes became binding while they continued unrepealed. They underwent no essential change afterwards, so long as this state was a constituent part of Massachusetts; and at the time of the separation and the organization of the new government, they became a part of the law of Maine. Con. of Maine, art. 10, sec. 3.

The common law principle, in relation to triors, not having been shown to have been adopted in Massachusetts, but another mode believed to be quite as effectual to secure impartial juries, provided by legislative authority, was that which had been usually practiced upon in courts, and became the law of that commonwealth, under the constitution.

When the constitution of Maine was adopted, if there had been no other provisions touching jury trials in criminal cases than that contained in art. 1, sec. 6, already quoted, this section could not be construed to refer to the common law of England, as such, but to that common law which was then permanent, uniform and universal in Massachusetts, in the modified form in which it stood at the time that the new government assumed the functions of an independent state. In criminal prosecutions, the accused could be deprived of life, &c., only by the judgment of his peers, or the law of the land, as the law had been, and was then under the constitution of Massachusetts, and that legislation designed to give efficacy to that constitution.

But the part of the constitution of Maine quoted from, (art. 1, sec. 7,) not only allows, but requires the legislature to enact statutes to secure the selection of juries, which shall be impartial.

The construction of this provision which would restrict legislative enactments for the selection of names of impartial persons, from whom jurors might be summoned upon writs of *venire facias*, regardless of the impartiality of those called to sit in a given case, cannot be admitted. It is obvious, that it was designed also to embrace laws in reference to the empanneling of juries for each trial.

Until twelve men are actually empanneled and sworn, it

cannot be said that a *jury* exists, in the strict sense of the term. The requirement in the same sentence of the established number, and of unanimity, must refer to a jury prepared and qualified in all respects to sit in a trial.

In obedience to this constitutional requirement, the legislature, in 1821, re-enacted former statutes in substance, for the purpose of having in attendance upon courts, under a summons thereof, persons suitable for jurors, and of hearing and determining the indifference and impartiality of each, who should be called upon to sit in a trial, either civil or criminal, in case of objection.

In the Revised Statutes which went into operation in 1841, it was the design to range under separate chapters provisions which had often before been under one chapter. The title of chap. 115, is " Of proceedings of civil actions in court." And it is provided in sec. 65 thereof, that the court, on motion of either party in a suit, may examine on oath any person called as a juror therein, whether he is related to either party, or has given or formed an opinion, or is sensible of any bias, prejudice or particular interest in the cause, or if it shall appear from any competent evidence introduced by the party objecting to the juror, that he does not stand indifferent in the cause, another juror shall be called and placed in his stead, for the trial of the cause. The inquiries to be made by the court are substantially the same as those required in other and previous statutes, with the addition that other evidence may be introduced, which was allowed before triors under the English common law.

It is insisted that this examination is not imperative upon the court, under the Revised Statutes, but is purely a matter of discretion. Such a construction, when the objection to a juror is for cause, which would amount to a principal challenge, as would authorize the court to permit the juror to sit in the trial when objected to, without any examination or hearing of testimony, is unreasonable, and is certainly at variance with the practical interpretation of the provision. The language of the statute may have been varied under a

view taken by this court in the case of Ware v. Ware, 8 Greenl., 42, that a juror objected to might be legally set aside, though it was not made to appear that the objection had a sufficient basis. The court say in that case, "but as strong objections were still urged against him by the appellee, he was set aside by the judge, who expressed a desire to have the cause decided by an unobjectionable jury, and thereupon another was called," and this was held not erroneous. The evidence introduced by the party objecting, from witnesses, may show the incompetency of the juror, without inquiry of him, and the latter evidence may with propriety be omitted.

We cannot suppose that the change of the auxiliary verb from *shall* to *may* was designed by the legislature to recognize the existence of the English common law practice, which was superseded by a satisfactory provision of the statute, which has existed under the different forms of government in Massachusetts.

Challenges of jurors are allowed in criminal as in civil causes. R. S., chap. 172, sec. 31. They must have been for similar reasons, and the court is the only tribunal which the statute has provided for their trial, whether they be principal challenges, or challenges to the favor. Something more than silence of the statute is necessary to induce the belief that a practice in English courts which had never existed under the colonial, provincial or state government of Massachusetts, was intended to be introduced under the constitution of this state, and the general provisions for determining the competency of jurors just referred to.

It is suggested that the provisions of sec. 31 of chap. 172, was not designed to apply to capital trials, because the right of the prisoner in such, to challenge peremptorily a certain number of jurors has always been recognized, and never denied, but the right exists in no other cases. The privilege of peremptory challenge in capital cases, has been admitted from time immemorial, is believed to have been allowed under our colonial and provincial systems, and in the commonwealth of

Massachsetts; and is clearly implied by the statutes of this state of 1821, chap. 59, sec. 42; by R. S., chap. 172, sec. 17, and by statutes of 1849, chap. 100, sec. 1, limiting the number of such challenges. The challenges referred to in sec. 31, chap. 172, have regard to those for cause, as no other are allowable in civil trials. By giving the accused the same right of exception to jurors in criminal as in civil causes does not restrict him so as to take away the right of peremptory challenge.

2. L. D. Rice, a witness for the state, on his direct examination, testified that on the afternoon of the day next succeeding the death of the deceased, he saw something on the sleeve of the shirt of the prisoner, which he thought was blood; and that on cross-examination, that he was a witness before the magistrate and before the coroner's inquest. In answer to the prisoner's inquiry whether he had testified before, that he saw blood on the prisoner's wrist, answered in the affirmative; and then the question was proposed in behalf of the prisoner, if this was the first time he had so testified, excepting before the grand jury. This question being objected to, was excluded. It is not controverted by the prisoner's counsel that a witness is not permitted to disclose evidence before the grand jury. It follows that a question which *may* be answered in a manner to make such disclosure cannot be proper. If the witness had testified to the same fact only before the grand jury, an affirmative answer would be tantamount to the statement that he had testified the same before that body.

It has been regarded as an established rule, that a witness cannot be called upon to state his testimony given on a former occasion in a trial where the same evidence is relevant, and the authorities cited for the state sustain the rule. The question was properly excluded.

The same reasons will apply to the exclusion of the question put by the prisoner's counsel in cross-examination, " where it was that he testified he saw Prout on the night of October 6th, 1856, put his hand on deceased's face."

3. William F. Morrill, for the state, testified that he was present with George F. Thurston and James Dunn, when a knife was found by the side of a fence, between the prisoner's field and the woods, near a pair of bars. The case finds that the day subsequent to the death of the deceased, Dominicus J. Prout testified that he saw the prisoner coming out of the woods, from a pair of bars leading therefrom to the prisoner's field. The prisoner was walking fast; when he saw the witness and another man who was with him, he did not walk quite so fast. The prosecuting officer inquired of the witness if he, on the same or the next day informed any person of having seen the prisoner coming from the place, and in the direction above described. The answer was that he informed Thurston, and went with him to the place after the information was given. The question and answer were objected to.

The ground of this objection is, that the state cannot thus corroborate its own witness. It is not perceived how the inquiry and the answer could have this affect, the one informed not having been called to confirm the statement of the witness, but the inquiry was undoubtedly made to connect the discovery of the knife after the death of the deceased, with the prisoner, upon the spot where the knife was found, when he exhibited conduct which might be thought suspicious; and also to show that the discovery of the knife was upon search therefor, by the person informed of the prisoner's previous presence at that place, and not accidental.

If the one who saw the prisoner near the bars, had the day subsequent, himself found the knife, it is very clear that the fact of his having seen the prisoner at that place, and the finding of the knife upon his own search, would all have been unobjectionable in evidence. The first named fact being within the knowledge of one, and communicated to another who found the knife, or who was present when it was found, is not the ground of a legal distinction.

4. A surgical expert examined the wounds upon the deceased, and against the objection of the prisoner's counsel,

was allowed to state that in his opinion, the instrument by which they were caused, was a pointed, cutting and sharp instrument. To determine the general character of the instrument from a wound produced, must necessarily depend upon the experience and skill of one accustomed to examine wounds, and it has been properly regarded by courts as an important step in the proceedings in criminal trials where no direct evidence is found.

The form and appearance of the wounds upon the deceased having been ascertained by an expert, it was a proper inquiry to the same, when a witness, whether the razor before him, independent of the place where it was found, and the dust upon it, in his opinion could have produced the wound, and proper to be answered. The most obvious object was to ascertain if the wound examined corresponded in form with that which could be caused by that particular instrument. If his intention was to base his opinion upon other circumstances than the form and properties of the razor, such intention could have been ascertained on further examination, and if the opinion was founded upon facts of which the jury could judge as well as an expert, it could have been excluded.

5. Dr. A. Garcelon, called by the government, and shown to be an expert as a physician and surgeon, was at the examination of the body of the deceased, and was permitted, subject to objection, to exhibit to the jury certain engraved plates of the humnn neck, and of the bones of the neck, and also a skeleton of the human neck, in order to illustrate his testimony in describing the wounds, and especially that upon the vertebræ of the spinal column. The object of the exhibition of these plates and bones was to render the testimony of the witness intelligible, and not to make them evidence of themselves. Maps and diagrams not claimed to be strictly accurate are permitted to be used as chalk for purposes of illustration, and to make more clear a verbal description. The authorities cited for the prisoner are not in point.

6. The admission of the answer to the question put to Dr. Garcelon by the counsel of the government, that in his opin-

ion as a physician and a surgeon, the wound described in the neck of the deceased could not have been inflicted by her own right hand, was not legally erroneous. The question could be properly answered only by one who had the knowledge of an expert in anatomy and surgery. The answer given is a fact, which, like other facts, may be controverted by proof. It is to be received as testimony in reference to the party injured, and is a denial by the witness that the wound could have been inflicted by the deceased under any state of the mind of a human being, known to him, and having the power to use her right hand in the ordinary manner. If the presiding judge had excluded the answer, it must have been upon the ground that he could better determine what facts claimed to be within the range of surgical science were incredible than one experienced therein.

7. The papers purporting to be deeds from George Knight and Mary Knight to Moses S. Jordan, and from the grantee therein to George Knight alone, and the testimony of Dennis L. Bragdon, John H. Otis, and Moses S. Jordan, in reference to these papers and others which were left for record, were admissible. The rule of this court, No. 14, does not apply to this question. These deeds are not treated by the counsel of the government as certainly genuine, but as documents in the hands of the prisoner which, by his acts, he must have regarded as of value to him, he being a party to them. If the deeds were genuine, his conduct in reference thereto may be supposed to have had some relation, as a circumstance, to the issue before the jury, as indicating a motive for the crime charged. If not genuine, and he treated them as valid, the forgery might be exposed in some mode, if the deceased was in life. If the subscribing witness had been called, and had denied their genuineness, it is not perceived that they and other evidence could have been excluded.

8. Dr. A. A. Hayes was called, and examined as an expert touching the properties of human blood, ascertained by chemical tests, and by microscopic observations, and he exhibited

a diagram, and desired to use it in order to illustrate his statements, and was allowed to do so for that purpose, subject to the prisoner's objection. It appeared from the testimony, that one diagram exhibited recent blood as seen through a microscope; another, the coagulating of blood; a third, recent blood, to which water had been added; a fourth, blood to which a saline solution had been added.

It would be very difficult for an expert of the most accurate and extensive observation, to exhibit in language with precision, so as to be understood, those delicate appearances which are appreciable only by the sense of vision. Nothing short of an exact representation to the sight can give with certainty, a perfectly correct idea to the mind. The witness was permitted to present the diagrams, merely to explain his meaning, and not as an infallible test of truth. A diagram approximating in any degree to perfect representation, when exhibited by one qualified from knowledge and experience to give explanations, may do much to make clear his testimony, without danger of misleading.

9. The witness exhibited a shirt, which he remarked was of cotton flannel, and which he testified he had examined. He stated that he first alluded to the peculiarity which the stain presented. And the counsel of the prisoner here objected to the witness' describing what he called the peculiarities of the stain; as, if any such existed, they were open to the observation of the jury. The court allowed the witness to call the attention of the jury to a spot (pointed out,) as exhibiting on one side of the fabric a much larger proportion of coloring matter of the blood, than was presented upon the other part, or the surface which was worn next to the skin. The witness then stated that he cut a piece from the blood spot on which the experiments were subsequently made.

The opinion of the witness was not introduced, as supposed in argument. The attention of the jury was directed to the shirt in question, that they might notice by inspection, the actual appearance of the blood stain, exhibited to them

as the basis of experiments which were made, and which were described in another part of the testimony of the witness.

The question whether such a spot as that exhibited upon the shirt could, or could not have been occasioned by blood flowing directly upon the outer surface thereof was allowed to be answered by the witness as an expert, when, as it is contended, it was a question which called for an answer not within the province of the witness, and one not within the province of an expert. The witness testified " that the coloring matter of the blood, which is suspended in the blood, remained on the outer surface of the fabric; the effect being the reverse of that which would have taken place, had the blood flowed from the arm of the person wearing it." Whether the witness' theory touching the coloring matter of the blood, and the appearance present d when it has flowed upon cotton flannel is correct or otherwise, it is not for the court to determine, it being a matter for the jury upon evidence. It appears that this proposition of the witness was made upon chemical experiment, and observations aided by the microscope. It is not perceived that the answer to the question was not peculiarly the result of scientific knowledge and experience.

Dr. Hayes testified touching the properties of blood of animals, and was allowed to state that such a distinction exists in the appearance of human blood and that of the sheep, that one may not be mistaken from the other, after such experiments as have been made by men of science and skill. Objections were made by the prisoner's counsel to the questions which elicited these answers. The history of the developement of scientific principles by actual experiments, within a few of the last years, show us that many things which were once regarded generally as incredible, are now admitted universally to be established facts. And so long as the existence of facts, which are the result of experiments, made by those versed in the department of science to which they pertain, are received as evidence, it would be

legally erroneous for the court to determine that the absurd-
ity of such facts was so great as to require their exclusion.
If the facts so offered in proof are untrue, their fallacy is to
be shown by the evidence of other experts, who have made
application of their scientific knowledge and experience.  The
court is required to be learned in the law, and to apply it by
instructions to the jury, but to be learned in all matters of
science is not required, and such learning, if possessed by the
court, cannot with propriety be given by it to the jury; nor
can it withdraw from them the consideration of scientific
facts, testified to by experts.

10.  The counsel of the government introduced Lydia
Knight, the prisoner's mother, who occupied the same bed
with the deceased, the night of her death.  The testimony,
when taken alone, may not be inconsistent with the prisoner's
innocence of the crime charged.  And although the death
was occasioned by violent means, as we infer from the testi-
mony of others, either by her own hand, or that of an assas-
sin, yet it was unknown to Lydia Knight, according to her
account.

The counsel for the state, in his closing remarks to the
jury, endeavored to show that the death of the deceased
took place after Lydia Knight had left the bed, contrary to
her own express statement, and although he disclaimed the
intention of impeaching the competency or the credibility of
this witness, he insisted upon other facts adduced in evidence
that she was mistaken; and to show that this mistake was
not unnatural, nor inconsistent with the most honest inten-
tions, he referred to her extreme age, her appearance before
the jury, bowed down, deaf and decrepit, generally in a fee-
ble condition, both physical and mental, and having forgotten
her own son who addressed her as his mother.  This course
of argument was objected to by the prisoner's counsel, but
permitted by the court.

That a party calling a witness cannot impeach his compe-
tency or credibility, if his testimony turns out unfavorable
to him, is well established.  But it certainly would not tend

to develope truth, to preclude a party from showing that his witness was honestly mistaken, and no such rule is recognized in law. The rule of law is, that if a witness proves a case against the party calling him, the latter may show the truth by other witnesses. In Buller's N. P., 297, the rule as to the right of a party to contradict his own witness is thus laid down: "A party shall never be permitted to produce *general evidence* to discredit his own witness," for the reason, it " would enable him to destroy the witness, if he spoke against him, and to make him a good witness, if he spoke for him, with the means in his hands of destroying his credit, if he spoke against him. But if a witness proved facts in a cause which make against the party who called him, yet the party may call other witnesses to prove that those facts were otherwise ; for such facts *are evidence in a cause,* and the other witnesses are not called directly to discredit the first witness, but the impeachment of his credit is incidental and consequential only."

In Ewer v. Ambrose, 3 Barn. and Cres., 229, it is said by Littledale, Justice, " when a witness is called by a party to prove his case, and he disproves that case, I think the party is still at liberty to prove his case by other witnesses. It would be a great hardship if the rule were otherwise, for if a party had four witnesses upon whom he relied to prove his case, it would be very hard that by calling first the one who happened to disprove it, he should be deprived of the testimony of the other three. If he had called the three before the other who had disproved the case, it would have been a question for the jury upon the evidence, whether they would give credit to the three or to the one. The order in which the witnesses happened to be called ought not, therefore, to make any difference."

The rule laid down by Bosanquet, J., in Bradley v. Ricardo, 8 Bing., 220, is that a party who calls a witness into the box is not permitted to prove generally that he is unworthy of credit, but may contradict him as to particular facts, and the rule in Buller's N. P., cited, is held to be correct. It is laid

down in the same case, that by so contradicting the witness, his testimony is not to be altogether repudiated, and Aldenson, J., says, "the rule laid down by Mr. Justice Buller is intelligable and clear; namely, that a party shall not be permitted to throw general discredit upon a witness whom he has put into the box; but it would be monstrous if the whole of his testimony were to be struck out, because a subsequent witness sets him right as to a single fact which he may have stated incorrectly."

The rule invoked by the prisoner's counsel from Russel on Crimes is that in Buller's N. P., before cited, with the exception of the last sentence, which is as follows: " Still a party is not at liberty to set up so much of his witness' testimony as makes for him, rejecting and disproving so much as makes against him." The language just quoted is that of Lord Ellenborough, in Alexander v. Gibson, 2 Camp., 556, to which he adds " that a witness giving evidence against the party calling him, may be contradicted by witnesses on the same side, and that in this manner his evidence may be entirely repudiated." In the case of Bradley v. Ricardo, before cited, Gaselee, J., says in reference to the remarks of Lord Ellenborough, "With defference to Lord Ellenborough, it seems to me it is for the jury to say, whether his evidence is to be entirely repudiated or not. It is going too far to determine that the party shall suffer because a witness is not consistent in his testimony." These remarks of Gaselee, J., are founded in reason. There is no inflexible rule of law that the jury are bound to disregard important testimony of a witness, which testimony they fully believe, because it is inconsistent with the evidence of another, called by the same party. Such is the frailty of human memory that a witness may state a fact which is untrue, but with the fullest belief that he actually knows it; the jury may be satisfied of the error, and of the uprightness of the witness, and are they legally compelled to reject other parts of the evidence of the same witness, which they fully believe?

Lydia Knight having an opportunity of knowing facts, not

within the knowledge of any other person, excepting the deceased, and the one who may have caused her death, she was called in behalf of the prosecution, with great propriety. In Regina v. Holden, 8 Car. and Payne, 606, which was a case of murder, Patterson, J., inquired why the daughter of the deceased, a child nine years old, was not called. It appeared that she was present when the fatal injury was produced, and that she was present in court. The counsel for the prosecution stated that her name was not on the back of the indictment, and that she was brought by the other side, and that he did not intend to call her. The judge then said "she ought to be called. She was present at the transaction. Every witness who was present at a transaction of this sort ought to be called, even if they give different accounts, it is fit that the jury should hear their evidence, so as to draw their own conclusion as to the real truth of the matter." The daughter of the deceased was examined.

The mother of the prisoner had made the statement of her knowledge of the transaction, which the counsel for the state insisted was founded in mistake, in some particulars, as shown by other facts and circumstances in the case. The evidence tending to show the mistake of the witness being properly before the jury is the subject of legitimate argument.

11. The jury were instructed that "where the killing is unlawful, and neither express or implied malice exists, the crime is reduced from murder to manslaughter. But in all cases where the unlawful killing is proved, and there is nothing in the circumstances of the case as proved, to explain, qualify or palliate the act, the law presumes it to have been done maliciously; and if the accused would reduce the crime below the degree of murder, the burden is upon him to rebut the inference of malice, which the law raises from the act of killing, by evidence in defence."

The doctrine enunciated in these instructions has been much examined by courts of the highest standing, and jurists of great respectability, within a few of the last years. Uncom-

mon learning, research, and power of ratiocination have been exhibited in support of the principle; and those who have denied its soundness have maintained the denial in arguments of distinguished ability and force. An attempt to discuss the question again cannot be expected to throw much additional light upon it. The instruction is a doctrine of the English common law, of Massachusetts, as recognized in the case of Com. v. Knapp, 9 Pick., 496; Com. v. Knapp, 10 Pick., 484; Com. v. York, 9 Met., 93; Com. v. Webster, 5 Cush., 82. It is not known to have been denied by courts of this state, but it has been expressly admitted, and the jury instructed accordingly by this court, sitting as a full court in State v. Sager, in the county of Kennebec, in the year 1834; in State v. Varney, in the county of Penobscot, in 1845, and in State v. Cripps, in the county of Sagadahoc, in 1855, none of which are reported in the Maine Reports, but distinctly recollected. The instruction given, having the weight of authority in its support, and not having been satisfactorily shown to be erroneous, is sustained.

12. Exceptions are taken to the remark of the presiding judge, that "where men are found to keep silence when they are surrounded by circumstances of suspicion, which require explanation, or give false explanation, or attempt to induce others to relieve them by falsehood and perjury, inferences necessarily arise prejudicial to them." Whatever conduct of a person creates suspicion against him in the minds of those knowing his conduct, or informed thereof, must be to his prejudice. The two propositions are substantially identical. If explanation will overcome the unfavorable suspicions, it will at the same time subdue the prejudice.

The remark was rather a maxim in morals than any rule in law, which could operate injuriously to the prisoner. It was general, and in it no legal error is perceived.

13. No particular ground for the exception to the general remark of the presiding judge, touching circumstantial evidence is pointed out in the argument by the prisoner's counsel, though it is said that "it seems to the counsel, that the

rules for ascertaining truth from circumstantial evidence are colored, and their efficacy as a guide to right results, is greatly overstated, and that, too, in a manner calculated to mislead the jury." The opinions of the judge thus expressed, and thought objectionable in law, are not subject to exception.

14. The case finds, that the counsel for the prisoner relied upon the want of proof of his foot-prints over the ground, between the heater piece and his house, a space of one mile and ninety-two rods. The jury were instructed that they must try the cause by the evidence *in* the case, and not by that which is *out* of it. And they were further instructed, that they must determine whether the evidence before them gave them reasonable satisfaction. If sufficient, they were not to say " we will not find a verdict because other evidence had not been produced." No error is perceived in this. When evidence is introduced which produces full conviction in the mind, of the truth of the proposition attempted to be established, it is difficult to perceive that the omission to introduce further proof of facts, which may or may not exist, and which, if adduced, might be corroborative of that already before the jury, can cause doubt.

The subsequent remark connected with the same subject, that " if the absence of such proof throws an insurmountable barrier in your way, then the hypothesis of the government fails," is not deemed erroneous, when viewed with the evidence, and all that was said in the instructions upon this point. The prisoner's counsel gives to the language of the judge an erroneous interpretation, when he holds it to mean, that it does not allow the jury to acquit the prisoner unless the absence of proof of the foot-prints throws an insurmountable barrier in the way " of the conclusion of his guilt." The government attempted to sustain the charge in the indictment by a connected train of circumstances. If the train was absolutely broken, so that the separate parts were insufficient to produce satisfaction in the minds of the jury, the hypothesis was not sustained. The prisoner relied upon the want of

evidence of his passage over the ground indicated by his foot-prints between his house and the heater piece. The hypothesis of the government was, that the prisoner did pass over this ground, and relied upon other evidence than his foot-prints for proof of that fact. The judge suggested for the consideration of the jury circumstances which might or might not account for the want of this proof, after the prisoner was suspected of an agency in the death of his wife, consistently with the fact, that he did pass over this ground, and adds in the language quoted. It is quite manifest that he designed to say, that if the effect of the evidence of the government on this point was so weakened, from the want of proof of the foot-prints, that they were not satisfied that he passed over the ground between the heater piece and his house, or in other words, caused a reasonable doubt of this fact, this position of the government was left without support by the evidence.

15. The instruction that "it does not necessarily follow, that because Lydia Knight was present, but did not observe the manner or time of death, that it did not occur; there is a distinction between positive testimony and negative testimony," is held not to be erroneous. It was not disputed that Mary Knight was dead, or that she came to her death at the time assumed by the government. Lydia Knight's testimony shows that she must have been present when the death occurred. But she did not know that the deceased died at a time when she was so present, and she could not have known by what agency death took place. This is purely negative, and does not necessarily overthrow positive evidence, which tends to show that the death took place at a certain time, during which Lydia Knight was present. We perceive no legal ground for the exception to this instruction.

16. The judge remarked to the jury, "if you come to the conclusion that Mrs. Knight did not commit suicide, but was killed by the hand of another, that other hand must in some way have come in contact with her. What person had the most favorable opportunity to perform this act," &c. This is

regarded by the prisoner's counsel as an absolute denial o the rule of law, that all the facts should be consistent with the hypothesis set up by the government. The judge herein stated no rule of law, nor denied any legal proposition whatever. The attention of the jury was called to certain matters of fact for their consideration, without any reference to the law, which had been stated or which was stated afterwards. The government had attempted to satisfy the jury by circumstances, that if the death was caused by an assassin, that the prisoner had the most favorable opportunity to inflict the fatal wounds; that he had a motive to do it; that he had the means and facilities with which to accomplish it, &c., and the judge asks in view of the circumstances adverted to, whether they all point in one direction, and whether they are of such a character as to exclude to a moral certainty, and beyond all reasonable doubt, every other hypothesis, except that of the guilt of the prisoner? These remarks were not legally objectionable.

17. The judge was requested to instruct the jury, " that to convict the prisoner upon evidence of circumstances, it is necessary, not only that the circumstances all concur to show that he committed the crime, but that they all be inconsistent with any other rational conclusion. The instruction was not given upon the request. A judge, when called upon, is bound to give instructions in law which are applicable to the evidence in the case; but he is not bound to give them in the language used by the counsel making the request, nor to repeat them when requested, if once given.

In his general instructions to the jury, the judge had said to them, that the prisoner was " entitled to the presumption of innocence until it is overcome by legal testimony. That testimony, in all its material facts, must be consistent with his guilt. If there is any substantial circumstance proved, which cannot exist consistently with his guilt, it acquits him. If, on the other hand, the circumstances are all consistent with his guilt, if they conclusively tend to prove his guilt, and are of a character to exclude all reasonable doubt that the

crime could have been committed by any other person, and if you are satisfied beyond all reasonable doubt, that the fatal wound was not inflicted by the deceased herself, but was inflicted by the prisoner; if the government have proved all this, they have done all that they were required to do, and are entitled to a verdict at your hands. If they fail to do this, the prisoner is entitled to a verdict of acquittal." These instructions, and others of similar import to that requested, were as full as that requested upon the point we are considering, and were as favorable to the prisoner as he could legally claim.

18. The court declined to instruct the jury as requested, that no conviction in a criminal case ought ever to take place on circumstantial evidence, when the government has introduced direct evidence, tending to show that the prisoner could not have committed the crime charged. No authority is cited, and none has been found in support of this doctrine. If the whole circumstantial evidence should satisfy the jury beyond all doubt, of the guilt of the accused in a case wherein a witness called for the prosecution had made a direct statement of a fact, tending in a slight degree to show his innocence, and the jury were satisfied that the witness was mistaken in that statement, to give it the effect contended for would overthrow the established rule that a party is not concluded by testimony against him of his own witness, and would allow this statement while believed by the jury to be founded in mistake to have absolute control, so that the most convincing proof of guilt would be arbitrarily nullified thereby. This cannot be admitted.

The instructions which appear by the bill of exceptions to have been next requested, are similar in principle to those just considered, and the same reason for their refusal will apply.

19. The instruction requested in relation to the distinction which the government attempted to show between human blood, and that of other animals named, involved no question of law, and was properly refused.

State *v.* Knight.

20. Another request for instructions, made in behalf of the prisoner, and refused, was, that the distinction between positive and negative testimony, is applicable to direct testimony, and cannot be applied to circumstantial evidence when placed in direct conflict with positive testimony. Circumstantial evidence is composed of facts equally with that which is denominated direct. It consists of proof, which applies immediately to collateral facts supposed to have a connection near or remote with the fact in controversy, while the latter consists of proof applicable immediately to the fact in issue, to be shown without any intervening process. Satisfactory proof is required for the establishment of the facts relied upon in both species of evidence. The distinction invoked has no legal foundation.

Upon the fullest consideration we have been able to give to the numerous questions involved, and which have been relied upon in argument, some of which are of great importance in themselves, and all are of momentous interest to the prisoner, we have come to the conclusion that the exceptions must be overruled; judgment on the verdict.

RICE, APPLETON, CUTTING, MAY, and DAVIS, JJ., concurred.

NOTE.—For the convenience of counsel for the defendant, and by consent of the attorneys for the government, this case was heard in the middle district, and determined by the judges who there presided.